David Greene (DG 4163)
Joseph N. Froehlich (JF 5221)
LOCKE LORD BISSELL & LIDDELL LLP
885 Third Avenue, 26th Floor
New York, New York 10022
(212) 947-4700 (Telephone)
(212) 947-1202 (Fax)

Brandon J. Witkow (*Pro Hac Vice Application to be filed*)
Cory Baskin (*Pro Hac Vice Application to be filed*)
LOCKE LORD BISSELL & LIDDELL LLP
300 South Grand Avenue, 8th Floor
Los Angeles, California 90071
(213) 687-6781 (Telephone)
(213) 341-6781 (Fax)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PA PAH PRODUCTIONS, INC. and ELGIN BAYLOR LUMPKIN p/k/a GINUWINE, | ) ECF Case )<br>)<br>) |
| Plaintiffs, | ) Civil Action No. 08 CV 0391 (AKH) ) |
| v. | ) **COMPLAINT & JURY DEMAND** ) |
| KING MUSIC GROUP, INC., KING MUSIC GROUP, LLC, M&A HOLDINGS, LLC, MICHAEL BOURNE and DOES 1-10, inclusive, | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

Plaintiffs Pa Pah Productions, Inc. and Elgin Baylor Lumpkin p/k/a

Ginuwine (together "Plaintiffs") file this Complaint against King Music Group,

Inc., King Music Group, LLC, M&A Holdings, LLC and Michael Bourne (collectively "Defendants") for breach of contract, fraud, negligent misrepresentation and declaratory relief.

## INTRODUCTION

1.    This is an action for breach of contract, fraud and other related claims arising out of Defendants' unjustified breach of the parties' October 9, 2007 Settlement Agreement, which amended the parties' May 8, 2007 Recording Agreement.

2.    Defendants' unjustified refusal to comply with their obligations under the explicit terms of the parties' exclusive Recording Agreement and Settlement Agreement has resulted in significant damage and lost professional opportunities to Plaintiff Lumpkin, a nationally known recording artist. In addition, Defendant Bourne, knowing full well that he did not possess funding sufficient to comply with the advance payment and recording line of credit requirements called for by the agreements, has continually misrepresented his intent and ability to perform his obligations under these agreements in order to ensure that Plaintiffs' exclusive services remain with Defendant King Music Group. Accordingly, Plaintiffs seek compensatory and punitive damages, as well as their attorneys' fees and costs,

2

from Defendants to compensate Plaintiffs for lost professional opportunities and

the damage they have caused.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this controversy on the

basis of complete diversity of the parties under 28 U.S.C. § 1332.

4.    The amount in controversy exceeds seventy-five thousand dollars

($75,000.00).

5.    This action is properly venued in this Court pursuant to 28 U.S.C.

§ 1391(a)(2) because, pursuant to section 16.08 of the "Standard Form Recording

Agreement," annexed to and made a part of the May 8, 2007 Recording

Agreement, this is where the Recording Agreement was delivered, and in which a

substantial part of the acts or omissions complained of occurred.  Section 16.08 of

the "Standard Form Recording Agreement" further provides, in relevant part:

THIS AGREEMENT HAS BEEN ENTERED INTO IN THE STATE OF
NEW YORK.  THE VALIDITY, INTERPRETATION AND LEGAL
EFFECT OF THIS AGREEMENT IS GOVERNED BY THE LAWS OF
THE STATE OF NEW YORK APPLICABLE TO SUCH CONTRACTS
ENTERED INTO AND PERFORMED ENTIRELY WITHIN SUCH
STATE.  THE NEW YORK COURTS (STATE AND FEDERAL), ONLY,
WILL HAVE JURISDICTION OVER ANY CONTROVERSIES
REGARDING THIS AGREEMENT, AND THE PARTIES HERETO
CONSENT TO THE EXCLUSIVE JURISDICTION OF SAID COURTS.

As further described herein, the parties' Settlement Agreement, which forms

the basis of the claims alleged herein, did not amend the forum selection clause

provided for in section 16.08.

## THE PARTIES

6.    Plaintiff Pa Pah Productions, Inc. ("Pa Pah") is a Delaware

corporation with its principal place of business at 12408 Plantation Drive,

Brandywine, Maryland 20613. Pa Pah is a corporation wholly owned by Plaintiff

Lumpkin. Pa Pah is the sole owner of the entire worldwide right, title and interest

in and to the results and proceeds of Plaintiff Lumpkin's services as a recording

artist.

7.    Plaintiff Elgin Baylor Lumpkin ("Lumpkin") is an individual residing

in Prince Georges County, Maryland. Lumpkin, under his professional name

"Ginuwine," is a nationally known R & B recording artist. Since the early 1990s,

Lumpkin has released seven albums (under several prominent labels such as Epic

Records) that have sold in excess of ten million albums, and worked with the

recording industry's top producers. Lumpkin is a three-time nominee for the

American Music Award's favorite male R & B artist and the recipient of the Soul

Train Music Award for Best R & B Soul Male Album.

8.     Defendant King Music Group, Inc. ("King Music Group"), despite holding itself out as a corporation, is, upon information and belief, in actuality an unregistered and non-existent corporation doing business in Memphis, Tennessee. King Music Group, Inc. is purportedly the record label formed by Defendant Bourne, and the signatory to the parties' Recording Agreement and Settlement Agreement.

9.     Defendant M&A Holdings, LLC ("M&A Holdings") is a Tennessee limited liability company with its principal place of business at 6625 Lenox Parkway, Suite 110, Memphis, Tennessee 38115. M&A Holdings may be served *via* its registered agent Teresa M. Bernhardt at 6363 Polar Avenue, Suite 405, Memphis, Tennessee 38119.

10.     Defendant King Music Group, LLC ("King Music Group, LLC") is a Tennessee limited liability company with its principal place of business at 6625 Lenox Parkway, Suite 110, Memphis, Tennessee 38115. King Music Group, LLC may be served *via* its registered agent Teresa M. Bernhardt at 6363 Polar Avenue, Suite 405, Memphis, Tennessee 38119. Upon information and belief, King Music Group, LLC is the actual record label formed by Defendant Bourne and was, upon information and belief, the intended beneficiary of the parties' Recording Agreement.

11.    Defendant Michael Bourne ("Bourne") is an individual residing in Memphis, Tennessee. Bourne is the owner and/or principal shareholder in several companies, including, as relevant here, King Music Group, Inc., King Music Group, LLC, M&A Holdings and Bourne Holdings, LLC. Pursuant to the terms of the Settlement Agreement further discussed herein, Bourne is personally responsible for all obligations/payments contained in the Settlement Agreement.

12.    The true names and capacities of additional Defendants named herein as Does 1 through 10, inclusive, are unknown to Plaintiffs at this time. Therefore, Plaintiffs sue Defendants by such fictitious names. Plaintiffs will amend this complaint to allege these Defendants' true names and capacities when they have been ascertained. (Hereinafter, references to "Defendants" include Doe Defendants.)

13.    Each of the Defendants sued herein, including each Doe Defendant, is and was liable, in some manner, in whole or in part, for the wrongful, illegal, and tortious acts which have occurred and are ongoing, as alleged herein. On information and belief, at all times relevant hereto, each Defendant was the agent, servant, and/or employee of every other Defendant, and the acts of each Defendant were done within the course and scope of its, his, or her agency, service, and/or

employment with each of the other Defendants.  As such, each of the Defendants is

jointly and severally liable for the tortious misdeeds of the other Defendants.

## FACTUAL BACKGROUND

### The Recording Agreement

14.    In or about March 2007, Bourne personally contacted Lumpkin in

order to express his interest in having Plaintiff join his recently formed record

label, King Music Group, Inc., as its first and featured artist.  Unbeknownst to

Lumpkin, King Music Group, Inc. was not formed and has never been legally

formed by Bourne.  Lumpkin was receptive to the idea and requested that Bourne

provide him additional details regarding the proposed venture.

15.    Upon information and belief, at the time Bourne contacted Lumpkin,

Bourne had no experience in the recording music industry and was seeking to use

Lumpkin and his longstanding reputation as the springboard for his and his label's

entrance into this industry.

16.    Throughout late March and April 2007, Lumpkin and Bourne met to

further discuss the details of the proposed venture.  In these discussions, Bourne

proposed that, in exchange for Lumpkin providing his exclusive services to King

Music Group, Lumpkin would be provided, among other things, (1) a one-half

interest in King Music Group, Inc., the record label which would produce and

distribute Lumpkin's music; (2) advance payments; (3) a production budget and studios; and (4) payments based on the sale of Lumpkin's recordings, merchandise and public performances.

17.    On or about May 8, 2007, Plaintiffs and King Music Group, Inc. entered into a written Recording Agreement containing an Exclusive Services Agreement (hereafter, together, "Recording Agreement") for Lumpkin's exclusive services as a recording artist.  Attached hereto as Exhibit "A" is a true and correct copy of the parties' executed Recording Agreement.

18.    Section I, paragraph 3 of the Recording Agreement provides that King Music Group would pay Plaintiffs $750,000.00 ($500,000.00 upon execution of the Recording Agreement, and $250,000.00 upon delivery of the first album) in connection with the recording of the first album, as well as make a $1 million dollar line of credit available for recording purposes.  In addition, section I, paragraph 4 of the Recording Agreement provides Plaintiffs a specified percentage of the net profits from sales of the album, merchandise, endorsements and touring revenues.  The Recording Agreement was to cover the production of one (1) album, plus two (2) option periods (which would automatically vest if the first album sold 500,000 units within nine (9) months of release).  (*See* section I, paragraph 2).  Finally, paragraph 4 of the Recording Agreement's Exclusive

Services Agreement contains a non-competition clause, restricting Plaintiffs'

ability to "enter into any agreement or make any commitment which would

interfere with [the] performance of [their] obligations under the Agreement" or

"perform or render services in connection with the recording of master recordings

for any person, firm, or corporation" other than King Music Group.  In addition,

Plaintiffs are restricted from "perform[ing] for any person, firm or corporation"

other than King Music Group for a period of five (5) years after the last recording

delivered to King Music Group or two (2) years after expiration of the Recording

Agreement.

19.    The Recording Agreement further provides that "[y]ou [both parties]

understand and acknowledge that this Agreement constitute[s] a valid and binding

legal document which affects your legal rights and interests…You acknowledge

that you have had ample opportunity to read this Agreement and that you

understand the terms and conditions set forth in the Agreement."

20.    Following the parties' execution of the Recording Agreement, King

Music Group and Bourne immediately began promoting the launch of the King

Music Group record label and its exclusive relationship with Plaintiffs.  For

example, King Music Group created a webpage on www.myspace.com that stated:

> King Music Group is a new record label soon to be
> launched by Memphis businessman Michael Bourne and

R&B artist Ginuwine. Michael Bourné is a true American entrepreneur and the embodiment of the term "self-made man." Michael worked his way through the University of Tennessee, and has gone on to create successful businesses in multiple industries. He has now decided to enter into the music industry along with one of R&B's most pre-eminent artists, Ginuwine. During the late 90's Ginuwine's sultry, seductive crooning earned him a substantial female following and made him a regular presence on the R&B charts, even after the futuristic production he favored was eclipsed by the more organic, retro-leaning neo-soul movement. Now Ginuwine's back and alongside Michael Bourne have formed King Music Group...

21.    Despite having agreed to provide Lumpkin a one-half interest in King Music Group and publicly proclaiming that he has "formed King Music Group" with Lumpkin, Bourne never provided Lumpkin any legal interest in King Music Group.

22.    Further, despite the fact that King Music Group, Inc. was the signatory to the Recording Agreement, by its signature affirmed that "this Agreement constitutes a valid and binding legal document," and that Bourne has held King Music Group, Inc. out as a validly formed corporation created to serve as the "new record label" for Bourne (and Lumpkin), Bourne has never validly formed King Music Group and no documentation exists governing its management, ownership interest, financing, assets, voting power etc.  Rather, Bourne made false representations as to the existence of King Music Group and

10

caused a non-existent entity to execute the Recording Agreement in order to induce

Plaintiffs to enter into the Recording Agreement.

### The Settlement Agreement

23.     Following the execution of the Recording Agreement, King Music

Group and Bourne failed to make the initial $500,000.00 payment to Plaintiffs

required under section I, paragraph 3 of the Recording Agreement.  On several

occasions in mid-June 2007, Lumpkin e-mailed Bourne to inquire as to the status

of the payment and to express his concern about Bourne's professed interest in

moving forward with the production of an album.  Specifically, on June 21, 2007,

Lumpkin emailed Bourne to demand that he "tell him something" and send over

the payment because his lawyers were pressuring him to send a letter declaring a

breach of contract. On June 22, 2007, Bourne responded by stating "I am on it. I

don't keep that kind of cheese in my checking account.  I moved it and it should be

cleared my account first of the week." Despite this promise, Bourne never had any

intention of making the advance payment to Lumpkin and in fact never made the

advance payment to Lumpkin called for by the Recording Agreement.

24.     During this same timeframe, in an apparent effort to assuage

Lumpkin's concerns about his failure to make the advance payment, Bourne

11

delivered to Lumpkin a 2005 Rolls Royce Phantom. Bourne later explained that the automobile was a "gift" with title staying in "the company['s] name."

25.    While waiting for Bourne to honor the payment terms of the Recording Agreement, Lumpkin was offered several recording and performance opportunities. Because of the existence of the non-competition provisions of the Recording Agreement and Bourne's continued promises to comply with the Recording Agreement and advance the monies owed to Lumpkin under the Recording Agreement, Plaintiff refused these opportunities. For example, on June 22, 2007, Lumpkin emailed Bourne to explain that he gave up "two deals for this," and "to please get this done." On June 26, 2007, Lumpkin again reiterated his request that Bourne put the payment "in an account" set up by Lumpkin's business manager, Louis Bush ("Bush"). Having received no response to these emails, Lumpkin's counsel thereafter sent letter to King Music Group demanding that it comply with the advance payment terms of the Recording Agreement.

26.    From June 26, 2007 until late August 2007, Lumpkin, individually, and Bush, on behalf of Plaintiffs, repeatedly emailed and sent text messages to Bourne to demand the payment called for under the Recording Agreement. In these communications, Lumpkin repeatedly emphasized that he expected Bourne to honor his commitments as he turned down numerous professional opportunities

in order to proceed with an exclusive recording arrangement with King Music

Group. Despite having no available funding to commit to Lumpkin, Bourne

responded to several of these emails by continually reassuring Plaintiffs that the

payments would be forthcoming. Indeed, in one particular response, on June 30,

2007, Bourne wrote:

> "I have 500k coming to u asap. I am a man of my word and wish i would
> have been fronting deal from day one. But ill make you look like a king.
> Ask anyone in my business i will deliver. Ill call u and peove [sic] to u its
> on."

27. Despite his repeated promises, neither Defendants King Music Group

nor Bourne ever made the required $500,000.00 payment to Plaintiffs.

28. On October 3, 2007, Plaintiffs filed a lawsuit against Defendants

entitled *Pa Pah Production, Inc. and Elgin Baylor Lumpkin p/k/a "Ginuwine" v.*

*King Music Group, Inc. Michael Bourne and Does 1-10*, in the State Supreme

Court of the State of New York, County of New York, and assigned case no.

07603262 (hereafter "RA Lawsuit"). Attached hereto as Exhibit "B" is a true and

correct copy of the RA Lawsuit. The RA Lawsuit asserted claims for breach of

contract, fraud and negligent misrepresentation and sought damages in the amount

of $1,750,000.00.

29. Shortly after the RA Lawsuit was served on Defendants King Music

Group and Bourne, Bourne contacted both Lumpkin and his counsel, Joseph E.

13

Porter III ("Porter") to express his desire to resolve the lawsuit quickly and amicably. Over the next several days, Bourne personally negotiated and agreed to terms of a settlement with Lumpkin.

30.    On October 9, 2007, the parties executed a Settlement Agreement resolving the RA Lawsuit. Attached hereto as Exhibit "C" is a true and correct copy of the parties' executed Settlement Agreement. The Settlement Agreement, in the form of a letter agreement, was expressly intended to "amend" the Recording Agreement where applicable. Specifically, the parties' Settlement Agreement provided the following terms, as relevant here:

(a)    Bourne will deliver a payment of $250,000.00 to Lumpkin concurrent with the execution of the Settlement Agreement;

(b)    Bourne will, concurrent with the execution of the Settlement Agreement, deliver the registration for the 2005 Rolls Royce previously gifted to Lumpkin, together with title in the automobile transferred into Lumpkin's name. Furthermore, Bourne agreed to "quit claim" any interest he possessed in the automobile, but will remain "totally responsible for all payments" on the automobile;

(c)    On or before November 17, 2007, Bourne will deliver a payment of $100,000.00 to Lumpkin;

14

(d)    Bourne will establish a line of credit in the amount of $1,000,000.00 to be available to Lumpkin and/or Bush for all costs incurred in connection with the recording of Lumpkin's first album. Bourne agreed that Lumpkin and/or Bush would "have the right to draw against this account to fulfill the delivery obligations" of the Recording Agreement. Furthermore, Bourne agreed to provide Lumpkin and Bush with individual user American Express Black cards on his account in order to permit Lumpkin to draw on the recording line for recording costs;

(e)    Bourne will deliver a payment of $250,000 to Lumpkin within five (5) days of Lumpkin's delivery of the first album to King Music Group;

(f)    Lumpkin will be entitled to a fifty-percent (50%) interest in the net profits derived by Bourne or King Music Group, and that Lumpkin and Bourne are "equal partners in King Music Group";

(g)    Lumpkin will only be required to deliver one (1) album to King Music Group;

(h)    Bourne agreed that all sums paid to Lumpkin through the Settlement Agreement, including all payments identified above, other than the $1 million recording line of credit, shall not be recoupable under the terms of the Recording Agreement; and

15

(i)    Bourne agreed to be personally responsible for the performance of each of the obligations contained in the Settlement Agreement.

31.    Pursuant to the terms of the Settlement Agreement, Plaintiffs voluntarily dismissed the RA Lawsuit on November 4, 2007.

32.    Defendants King Music Group and/or Michael Bourne have complied with requirements (a) and (c) above, by issuing two payments to Lumpkin in the total sum of $350,000.00. Defendants have wholly failed, however, to comply with their remaining obligations under the Settlement Agreement. Specifically, Defendants have unjustifiably refused to (1) transfer full title, free of all liens and encumbrances, to the 2005 Rolls Royce to Lumpkin; (2) establish and provide access to a $1 million dollar line of credit for recording costs; (3) establish American Express Black card accounts for Lumpkin and Bush for recording costs; and (4) convey Lumpkin a fifty-percent (50%) interest in King Music Group.

33.    Beginning on October 11, 2007 and continuing until the filing of this Complaint, Lumpkin and/or his representatives have repeatedly requested from Bourne that he make available the $1 million dollar line of credit, as well as the American Express Black Cards, and that he transfer full title to the 2005 Rolls Royce. In response to each of these requests, Bourne responded with a pattern of

misrepresentations, shifting positions and refusals to recognize the contractual

obligations he agreed to in the Settlement Agreement. For example:

(a)    On October 12, 2007, Bourne represented that "me and markie

d from my side will setup the funds with us and everything next week when we

meet." On October 18, 2007, however, Bourne refuted his agreement and wrote

that "[o]ur label will put up cash advances as we move forward but not direct

access to our line.";

(b)    On October 18, 2007, November 5, 2007 and December 6,

2007, Bush e-mailed Bourne to demand that the recording line of credit be

"accessible so that G can begin production of his new album." On December 10,

2007, Bourne responded "I can not give up the money to you to spend. Its not the

way its done.";

(c)    On October 11, 2007, Bush e-mailed Bourne to determine the

status of the American Express Black cards to be issued to Lumpkin and Bush

under the terms of the Settlement Agreement. That same day, Bourne responded

that "everything is cool," and that he just needed "a birthdate and social [security

number]" from Lumpkin and Bush to receive the cards. However, on October 18,

2007, Bourne wrote Bush that "I see no urgency getting you a credit card or check

book until we lay out the plan to move forward." Later, on December 10, 2007,

Bourne wrote "[t]he only thing I didn't give you guys was a black card and i wont do this either.";

(d)     On December 17, 2007, Bush e-mailed Bourne to again demand access instructions to the recording line of credit and to inform him that he has set up an account at Bank of America for these purposes. On December 17, 2007, Bourne responded "Sounds good...I will put the money in the b of a account that u requested." On December 18, 2007, after receiving an e-mail from Bush about why the money was not wired into the designated account, Bourne wrote Bush and stated "I am moving the funds into yalls account this week." On December 20, 2007, with the deposit still having not been made, Bourne wrote Bush and stated "You didn't say a date to put in there mr bush. I was not going to put 500k into an account and lose interest on it until u guys are ready to go make music. if u say we are going next week then it will be there.";

(e)     On December 27, 2007, Bush again demanded from Bourne a reason why the deposit was not made into the recording fund. Bourne responded by text message that "My bond guy has been moving the money and as it is a holiday my personal bankers get back Wednesday. The depsoit [sic] will go in then....I have initiated the wire and funds. So we will be good for 2008";

(f)    On January 2, 2008, Bush e-mailed Bourne to again demand the status of the deposit.  That same day, Bourne responded that "i told you i had my people start the process of moving the funds…It will be clear in the next few days to wire."

(g)    On January 4, 2008, Plaintiffs' counsel, Brandon J. Witkow, in a final attempt to avoid litigation on this matter, sent a letter to Defendants demanding that they comply with the recording line and other obligations identified above.  Attached hereto as Exhibit "D" is a true and correct copy of Witkow's January 4, 2008 letter.  In response, on January 7, 2008, Bourne e-mailed Witkow and stated "We will be putting up the money in the deal for you as requested."  Later that same day, Bourne again e-mailed Witkow and stated "Your money will be in the account this week bases[sic] on the letter I was sent."  As has been Bourne's pattern, no account for the recording line of credit was ever set up, nor were any access instructions ever provided.

34.    To date, despite their repeated promises to do so, Defendants have failed to establish the $1 million recording of line credit or otherwise provide such funds to an account designated for recording purposes.  Bourne has also refused to provide American Express Black cards for use by Lumpkin and Bush and transfer the registration and title documentation for the 2005 Rolls Royce to Lumpkin.

Specifically, with respect to the Rolls Royce automobile, on November 1, 2007,

despite his previous agreement to convey the automobile free and clear of all liens

and encumbrances, Bourne wrote Bush that "[a]fter going back and forth with the

bank they will not add G's name to the title without him being on the note."

Finally, as previously discussed, Bourne has never validly formed King Music

Group, Inc. or conveyed Lumpkin his one-half interest in this entity, as required by

the Settlement Agreement.

      35.    As a result of Defendants' numerous and repeated breaches of the

Settlement Agreement, Plaintiffs have been unable to begin recording of the album

to be delivered to King Music Group under the terms of the Recording Agreement,

as amended.   Additionally, Lumpkin has lost numerous recording and

performance opportunities in reliance upon Defendants' repeated (false) promises

to comply with the terms of the Recording Agreement.

### COUNT I - BREAK OF CONTRACT
**(Against All Defendants)**

      36.    Plaintiffs repeat and reallege Paragraphs 1 through 35 of the

Complaint as if fully set forth herein.

      37.    On or about May 8, 2007, Plaintiffs and King Music Group

voluntarily entered into a valid, binding Settlement Agreement.  Upon information

and belief, King Music Group has never been validly formed and thus could not, as a matter of law, enter into any contract or agreement.

38.    Upon information and belief, King Music Group, King Music Group, LLC, and M&A Holdings are affiliated entities owned and/or controlled by Bourne and are alter egos of one another.

39.    The consideration provided by Plaintiffs for the contract was sufficient as a matter of law.

40.    At all times relevant hereto, Plaintiffs performed all their conditions, covenants, obligations, and promises under the Settlement Agreement.

41.    Defendants have inexcusably and intentionally failed to perform and have openly and notoriously breached their clear and admitted obligations by refusing to (1) transfer full title, free of all liens and encumbrances, to the 2005 Rolls Royce to Lumpkin; (2) establish and provide access to a $1 million dollar line of credit for recording costs; (3) establish American Express Black card accounts for Lumpkin and Bush for recording costs; and (4) convey Lumpkin a fifty-percent (50%) interest in King Music Group.  In addition, King Music Group has breached its representation and warranty contained in the Settlement Agreement by executing the agreement as a validly formed and registered entity.

21

42.     Defendants breach of contract is the actual and legal cause of damages to Plaintiffs in an amount greater than $1 million dollars, which will be proved at trial.

43.     Paragraph 10 of the Settlement Agreement also provides that Plaintiffs are entitled to recover all attorney fees and costs of suit incurred enforcing their rights in this regard.

## COUNT II - FRAUD
### (Against All Defendants)

44.     Plaintiffs repeat and reallege Paragraphs 1 through 43 of the Complaint as if fully set forth herein.

45.     Bourne, for himself and for the benefit of King Music Group, King Music Group, LLC and M&A Holdings, made false representations of material facts to, and concealed material facts from, Plaintiffs concerning the benefits to Plaintiffs in executing the exclusive Recording Agreement and the ability of Defendants to fund their obligations under the Recording Agreement, and later, the Settlement Agreement, the payment of compensation to Plaintiffs, the formation of King Music Group as a viable entity, the availability and provision of a recording line of credit to pay for the recording costs incurred by Plaintiffs in producing an album, and the conveyance of a fifty-percent (50%) interest in King Music Group to Lumpkin, among other things, as described above.

46.    Bourne made such false representations and omissions with knowledge of their falsity and with the intent of inducing Plaintiffs to act upon those false representations or omissions.

47.    At all times material hereto, upon information and belief, Bourne was an authorized officer and director of King Music Group, King Music Group, LLC and M&A Holdings, and Plaintiffs were therefore entitled to rely on information and statements made by Bourne.

48.    Plaintiffs reasonably relied on the false representations and concealment of material facts of Defendants.

49.    The wrongful acts and omissions of King Music Group and Bourne caused Plaintiffs to be damaged in a substantial amount not presently known with certainty, but above the jurisdictional minimum of this Court.

50.    The acts and omissions of King Music Group and Bourne were deliberate, willful, oppressive, malicious, and fraudulent, and thereby justify an award of exemplary or punitive damages to Plaintiffs.

51.    In addition, it is inequitable for Bourne to enjoy the benefits of Lumpkin's stock ownership in King Music Group, including distributions and other income, because such benefits rightfully belong to Lumpkin.  Defendant gained this property through fraud and hold same as constructive trustees for the

23

benefit of Lumpkin.  Lumpkin is entitled to the equitable remedy of a constructive

trust, and an accounting, to recover these assets.

## COUNT III - NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

52.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through

51 as if set forth fully herein.

53.    Bourne, for himself and for the benefit of King Music Group, King

Music Group, LLC and M&A Holdings, made false representations of material

facts to, and concealed material facts from, Plaintiffs concerning the benefits to

Plaintiffs in executing the exclusive Recording Agreement and the ability of

Defendants to fund their obligations under the Recording Agreement, and later, the

Settlement Agreement, the payment of compensation to Plaintiffs, the formation of

King Music Group as a viable entity, the availability and provision of a recording

line of credit to pay for the recording costs incurred by Plaintiffs in producing an

album, and the conveyance of a fifty-percent (50%) interest in King Music Group

to Lumpkin, among other things, as described above.

54.    Bourne made such false representations and omissions with negligent,

careless, or reckless disregard of the truth or falsity of the representations and

omissions, but with the intent of inducing Plaintiffs to act upon those false

representations and omissions.

24

55.   At all times material hereto, upon information and belief, Bourne was an authorized officer and director of King Music Group, King Music Group, LLC and M&A Holdings, and Plaintiffs were therefore entitled to rely on information and statements made by Bourne.

56.   Defendants owed Plaintiffs a duty not to make misrepresentations in connection with King Music Group's potential or actual business dealings with Plaintiffs.

57.   Plaintiffs reasonably relied on the false representations and concealment of material facts of Defendants.

58.   The wrongful acts and omissions of King Music Group and Bourne caused Plaintiffs to be damaged in a substantial amount not presently known with certainty, but above the jurisdictional minimum of this Court.

59.   The acts and omissions of King Music Group and Bourne were deliberate, willful, oppressive, malicious, and fraudulent, and thereby justify an award of exemplary or punitive damages to Plaintiffs.

60.   In addition, it is inequitable for Bourne to enjoy the benefits of Lumpkin's stock ownership in King Music Group, including distributions and other income, because such benefits rightfully belong to Lumpkin.  Defendant gained this property through fraud and hold same as constructive trustees for the

benefit of Lumpkin. Lumpkin is entitled to the equitable remedy of a constructive

trust, and an accounting, to recover these assets.

## COUNT IV - DECLARATORY JUDGMENT
### (Against All Defendants)

61.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through

60 as if set forth fully herein.

62.    On or about May 8, 2007, the parties executed a Recording

Agreement.  Attached hereto as Exhibit "A" is a true and correct copy of the

Recording Agreement.

63.    Paragraph 4 of the Recording Agreement's Exclusive Services

Agreement contains a non-competition clause, restricting Plaintiffs' ability to

"enter into any agreement or make any commitment which would interfere with

[the] performance of [their] obligations under the Agreement" or "perform or

render services in connection with the recording of master recordings for any

person, firm, or corporation" other than King Music Group.  In addition, Plaintiffs

are restricted from "perform[ing] for any person, firm or corporation" other than

King Music Group for a period of five (5) years after the last recording delivered to

King Music Group or two (2) years after expiration of the Recording Agreement.

64.    On October 3, 2007, Plaintiffs filed a lawsuit against Defendants

entitled *Pa Pah Production, Inc. and Elgin Baylor Lumpkin p/k/a "Ginuwine" v.*

26

*King Music Group, Inc. Michael Bourne and Does 1-10*, in the State Supreme

Court of the State of New York, County of New York, and assigned case no.

07603262. Attached hereto as Exhibit "B" is a true and correct copy of the RA

Lawsuit. The RA Lawsuit asserted claims for breach of contract, fraud and

negligent misrepresentation arising out of Defendants' failure to comply with the

payment and other terms of the Recording Agreement, and sought damages in the

amount of $1,750,000.00.

65.    On or about October 3, 2007, the parties executed a Settlement

Agreement with respect to the RA Lawsuit. Attached hereto as Exhibit "C" is a

true and correct copy of the Settlement Agreement.

66.    The Settlement Agreement, in the form of a letter agreement, was

expressly intended to "amend" the Recording Agreement where applicable. Thus,

both agreements were to be read in tandem in order to govern the parties'

relationship.

67.    Plaintiffs have repeatedly demanded that Defendants comply with the

explicit terms of the Settlement Agreement. However, to date, Defendants have

breached the Settlement Agreement by failing to (1) transfer full title, free of all

liens and encumbrances, to the 2005 Rolls Royce to Lumpkin; (2) establish and

provide access to a $1 million dollar line of credit for recording costs; (3) establish

American Express Black card accounts for Defendant Lumpkin and Bush for recording costs; and (4) convey Lumpkin a fifty-percent (50%) interest in King Music Group.

68.  Plaintiffs contend that as a result of Defendants' failure to perform the terms of the Settlement Agreement, which serves to amend the Recording Agreement, Plaintiffs are excused from their obligations under both the Settlement Agreement and the Recording Agreement, including the non-competition clause of the Recording Agreement.

69.  Defendants have contended that they have performed or are continually in the process of performing their obligations called for under the Settlement Agreement, and thus both agreements remain in full force and effect.

70.  A true and actual controversy exists based on the disputes set forth above.

71.  A declaration by the Court is necessary and appropriate so that all the parties, including the corporate defendants, can ascertain their rights with regard to the Recording Agreement and the Settlement Agreement.

72.  Plaintiffs lack an adequate remedy at law.

73.  Accordingly, Plaintiffs seek a declaration that Defendants have breached the terms of the Settlement Agreement, dated October 3, 2007, and as a

result of such breach Plaintiffs are excused from any further performance under the terms of the Settlement Agreement and the Recording Agreement, including the non-competition clause of the Recording Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

1.     For a declaratory judgment that the Defendants have breached the terms of the Settlement Agreement, dated October 3, 2007, and as a result of such breach Plaintiffs are excused from any further performance under the terms of the Settlement Agreement and the Recording Agreement, including the non-competition clause of the Recording Agreement;

2.     For general, statutory and special damages, plus interest, according to proof at trial;

3.     For exemplary and punitive damages according to proof at trial;

4.     For the imposition of a constructive trust, and an accounting, over Lumpkin's fifty-percent (50%) interest in King Music Group, Inc.;

7.     For costs and attorneys' fees incurred by Plaintiffs in this action; and

8.     For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:     New York, New York
           January 15, 2008

                              LOCKE LORD BISSELL & LIDDELL, LLP

                   By:    _____
                          David Greene (DG 4163)
                          dgreene@lockelord.com
                          Joseph N. Froehlich (JF 5221)
                          jfroehlich@lockelord.com
                          Locke Lord Bissell & Liddell LLP
                          885 Third Avenue, 26th Floor
                          New York, New York 10022
                          (212) 947-4700 (Telephone)
                          (212) 947-1202 (Fax)

                          -and-

                          Brandon J. Witkow
                          bwitkow@lockelord.com
                          (*Pro Hac Vice Application to be filed*)
                          Cory Baskin
                          cbaskin@lockelord.com
                          (*Pro Hac Vice Application to be filed*)
                          Locke Lord Bissell & Liddell LLP
                          300 South Grand Avenue, 8th Floor
                          Los Angeles, California 90071
                          (213) 687-6781 (Telephone)
                          (213) 341-6781 (Fax)

                          *Attorneys for Plaintiffs Pa Pah Productions,
                          Inc. & Elgin Baylor Lumpkin p/k/a
                          Ginuwine*

                          30

**EXHIBIT "A"**

King Music Group Inc.
c/o Grubman Indursky & Shire, PC
152 West 57th Street, 31st floor
New York, NY 10019
Attention: Kenneth Meiselas, Esq.

Dated as of May 8, 2007

Pa Pah Productions, Inc.
f/s/o Elgin Baylor Lumpkin p/k/a "Ginuwine"
c/o Davis Shapiro Lewit & Hayes, LLP
689 Fifth Ave., Fifth Floor
New York, New York 10022
Attention: Steven G. Shapiro, Esq.

Dear Ginuwine:

This letter confirms the material terms of the agreement ("Basic Terms") between Pa Pah Productions, Inc. f/s/o Elgin Baylor Lumpkin p/k/a "Ginuwine" ("Artist" and/or "you") and King Music Group Inc.("Company") in connection with, among other things, Company's engagement of Artist's exclusive recording services.

The Basic Terms, together with Company's standard form recording agreement which is annexed hereto as Exhibit "A" and made a part hereof (the "Recording Agreement Long Form") shall constitute the entire agreement (the "Agreement") between you and Company. Following complete execution hereof, the parties shall negotiate the Recording Agreement Long Form in good faith, other than the Basic Terms, with the express understanding and agreement that unless and until a superceding Recording Agreement Long Form is fully executed, if at all, the Basic Terms with the annexed Exhibit "A" shall constitute the full and complete understanding and fully binding Agreement between the parties. In the event of any inconsistency between the Basic Terms and the provisions of the Recording Agreement Long Form, the Basic Terms shall control to the extent necessary to rectify the inconsistency. All terms used herein, unless separately defined, shall have the same meaning as in the Recording Agreement Long Form. The parties mutually agree as follows:

## I. RECORDING AGREEMENT

1.  Territory:     The universe

2.  Term/Product Commitment

    Term:          Initial Period plus two (2) Option Periods

    Product:       Initial Period:      One (1) Album
                   Each Option Period:  One (1) Album

    If Album 1 achieves sales in excess of 500,000 units in the U.S. (as reported by Soundscan) within 9 months of its initial commercial release in the U.S., the recording commitment for 1st Option Period (i.e.. Album 2) shall automatically be deemed exercised as of the last date of the Initial Contract Period. Further. if Album 2 achieves sales in excess of 500,000 units in the U.S. (as reported by Soundscan) within 9 months of its initial commercial release in the U.S., the recording commitment for 2nd Option Period (i.e., Album 3) shall automatically be deemed exercised as of the last date of the 1st Option Period.

3.    Artist Advance/Recording Funds:

(a)    Recording Funds:

Albums 1-3:    $1,000,000 per Album. Company shall pay you, as a non-returnable Advance (subject to paragraph 9 below), $750,000 (to be deducted equally from each of the Recording Funds for Albums 1-3, i.e., $250,000 from the each such Recording Fund), paid as follows: $500,000 upon full execution of this Agreement ("Execution Advance"); and $250,000 upon Delivery of Album 1. Company shall also pay you the amount by which the applicable Recording Fund exceeds Recording Costs for each such Album. The Advance referred to in the preceding sentence shall be paid to you promptly following Delivery of the applicable Album, and such sum shall be deemed an additional Advance. Notwithstanding the foregoing, you hereby irrevocably direct and authorize us to remit Thirty-Seven Thousand Five Hundred Dollars ($37,500) of such Execution Advance to the order of Davis Shapiro Lewit & Hayes, LLP ("DSLH") at 689 Fifth Ave., Fifth floor, New York, New York 10022, Attn: Stephen G. Shapiro, Esq. Company's compliance with such authorization shall constitute an accommodation to you, and nothing contained herein shall constitute DSLH a beneficiary or party to this Agreement.

(b)    Recoupability of Artist Advances: All in-pocket advances payable to you (including without limitation, the Advances) shall be recoupable from your share of Net Profits.

4.    Net Profits Participation:

(a)    Records:    Company will credit to your account forty percent (40%) of Company's Net Profits with respect to Company's sale and exploitation of Artist's master recordings.

(b)    Merchandise:    Company will credit to your account eighty percent (80%) of Company's Net Profits with respect to Company's sale and exploitation of your "Merchandise Rights". Notwithstanding the preceding sentence, Company will credit to your account ninety percent (90%) of Company's Net Profits with respect to Company's sale and exploitation of your Merchandise Rights for those exploitations secured by Artist. "Merchandising Rights" means Company's exclusive right throughout the Territory to use and/or exploit, reproduce, publish and/or display the approved Artist ID Materials, any approved Artwork, either alone or in conjunction with other elements, pertaining to the manufacture, sale and distribution for commercial and/or promotional merchandising purposes including without limitation, the exclusive right to sell, distribute, market and/or promote physical merchandise items (e.g., hats, t-shirts, sweatshirts, posters, stickers, games, comics and novelties, etc.) as well as virtual items (e.g., avatars, screen savers, etc.) including tie-ins, fan clubs, and "bounceback" merchandising. Merchandise Rights shall also include the right to sell Merchandise in connection with Artist's live concert engagements.

(c)    Endorsement/Sponsorships:    Company will credit to your account eighty percent (80%) of Company's Net Profits with respect to Company's sale and exploitation of your "Endorsement Rights." Notwithstanding the preceding sentence, Company will credit to your account ninety percent (90%) of Company's Net Profits with respect to Company's sale and exploitation of your Endorsement Rights for those exploitations secured by Artist. "Endorsement Rights" means Company's exclusive right throughout the Territory to use and/or exploit, reproduce, publish and/or display the Artist ID Materials, including necessary personality rights, for commercial endorsement, strategic partnerships, and sponsorship purposes, including your personal services in connection therewith ("Endorsements") such as, but not limited to, a commercial advertising campaign for a third party product or service endorsed by you or commercial sponsorship of an event at which you are to appear (collectively, Endorsement Rights"). All exploitations of

such Endorsement Rights shall be subject to Artist's prior approval.

(d)    Touring:    Company will credit to your account seventy-five percent (75%) of Company's Net Profits with respect to Company's sale and exploitation of Artist's "Touring Services". Notwithstanding the preceding sentence, Company shall not be entitled to any of Company's Net Profits: (i) with respect to the first twenty (20) performances in connection with Artist's Touring Services; and (ii) to the extent Artist's account is fully recouped. Touring Services" means Company's exclusive right throughout the Territory to the performance of your services as a musician, vocalist and/or performer in connection with one or more live performances or concerts ("Concert(s)"), including without limitation, Concerts by means of public stage performances of all kinds, webcasts, sponsorships, television broadcast or cablecasts (including pay-per-view telecasts), motion pictures, one-nighters, concert tours and the like.  All Touring Services provided by Artist shall be subject to Artist's prior approval.

(e)    "Net Profits" means gross receipts less Company's direct costs (including without limitation, recordings costs, manufacturing costs, marketing costs, distribution/services fee of 23%, mechanical royalties, and all monies becoming payable to third parties which become or may become payable by reason of the acquisition, creation, recording, manufacturing, distribution, exploitation or other use of the masters). Notwithstanding the preceding sentence, no distribution/services fee shall be deducted from gross receipts received by Company relating to Touring Services, Merchandise Rights and Endorsement Rights. In computing Net Profits, losses from prior accounting periods will be carried forward.

(f)    To the extent that your account is fully recouped, Company shall not cross-collateralize Net Profits derived from one stream of income with any other stream of income earned hereunder.

5.    Mechanical Royalties:

USA and Canada:    100% of the minimum statutory rate as of the date of release ("Controlled Rate").

Configurational Ceilings:    Albums:    12 times Controlled Rate
                             EP's:      5 times Controlled Rate
                             Singles:   2 times Controlled Rate

Mechanicals would be payable on records sold and not returned.  So-called "excess" mechanicals paid by Company would be deemed an Advance against your share of Net Profits.

6.    Creative Matters:    (a)    Artist and Company shall have mutual approval of (i) the musical compositions to be included on each Album, producers, video directors and storyboards; and (ii) Artist's likenesses and biographical material.  Company's and Artist's approval shall not be unreasonably withheld; and in the event of an impasse, you and Company shall use their respective best efforts, reasonably and in good faith, to reach a resolution, provided that Company's reasonable good faith decision will control.

(b)    During the Term, Company will endeavor to consult with Artist regarding the initial marketing campaign in connection with each Album Delivered in fulfillment of your Recording Commitment hereunder.

7.    Delivery standard:    Commercially and technically satisfactory.

8.    Rights: Company shall own all masters (excluding the underlying musical compositions) throughout the universe, in perpetuity, as "works made for hire," including, without limitation, those existing

master recordings embodying the performances of Artist recorded prior to the date hereof which are not subject to a third party exclusive recording agreement ("Existing Masters"), a list of which is set forth on "Schedule A" attached hereto, and you shall make the standard representations and warranties in connection therewith. In addition, Company shall have the exclusive rights to your and Artist's rights with respect to Artist's ID Materials (subject to pre-existing grants of rights made to third parties prior to the Term hereof), Merchandise Rights, Endorsement Rights and Touring Services. Notwithstanding the foregoing, the parties acknowledge that prior to the Term hereof, Artist was party to an exclusive recording agreement with Sony_____("Sony") dated as of _____ (the "Sony Agreement"), whereby Sony may require Artist to deliver no more than two (2) additional master recordings in connection with a so-called "Greatest Hits" album (the "GH Masters"). Artist shall notify Company in the event Artist receives notice from Sony requiring Artist to deliver the GH Masters, and you and Artist will use your best efforts to ensure that the release of the GH Masters will not conflict with any Album or other Record to be released by Company hereunder.

9.    Co-Publishing Agreement: In order to induce Company to execute this Agreement (it being to Artist's benefit as a recording artist that Company execute same) and to pay good and valuable consideration inuring to Artist's benefit under this Agreement, Artist hereby agrees that Company shall not be obligated or required to allow Artist to commence recording the Album to be delivered in connection with the Recording Commitment for the initial Contract Period of the Agreement, unless the parties hereto negotiate and execute a co-publishing agreement (the "Co-Publishing Agreement"). In the event the parties fail, after good faith negotiations, to execute a Co-Publishing Agreement within the time prescribed in the preceding sentence, Company shall have the right to terminate this Agreement.

MISCELLANEOUS:

This document may be signed in counterparts, and may be executed and delivered by facsimile, which when taken together will have the same effect as if signed in its original form by both parties. You understand and acknowledge that this Agreement constitute a valid and binding legal document which affects your legal and financial interests. You acknowledge that you have had ample opportunity to read this Agreement and that you understand the terms and conditions set forth in the Agreement. You hereby acknowledge that Company has advised you to obtain independent legal counsel in connection with the execution of this Agreement and you further acknowledge that you have either obtained such independent legal counsel or have voluntarily waived your right to do so.

This Agreement shall not be construed against either party as the drafter, it being agreed that this Agreement has been drafted jointly by the parties.

If the foregoing reflects your understanding of the Agreement, please so indicate by signing in the space provided below.

KING MUSIC GROUP INC.

By: _____

Title:    President

ACCEPTED AND AGREED:

Pa Puh Productions, Inc.

An Authorized Signatory

304512.4
052407

Elgin Baylor Lumpkin p/k/a "Ginuwine"
c/o Davis Shapiro Lewit & Hayes, LLP
689 Fifth Ave.
Fifth Floor
New York, New York 10022
Attention: Steven G. Shapiro, Esq.

Date: May 8, 2007

King Music Group Inc.
c/o Grubman Indursky & Shire, PC
152 West 57th Street, 31st floor
New York, NY 10019
Attention: Kenneth Meiselas, Esq.

Gentlemen:

Pursuant to an exclusive recording contract (the "Recording Contract") between Pa Pah Productions, Inc. ("Company") and me, Company is entitled to my exclusive services as a recording artist and is the sole owner of the entire worldwide right, title and interest in and to the results and proceeds of my services as a recording artist under the Recording Contract, including, without limitation, master recordings embodying my performances and the phonograph records derived therefrom. I have been advised that Company is entering into a written agreement with you (the "Agreement"), pursuant to which Company is agreeing to furnish my services as a recording artist exclusively to you and pursuant to which you shall be the sole owner of the entire worldwide right, title and interest in and to the results and proceeds of my services as a recording artist.

In consideration of your entering into the Agreement, and as a further inducement for you to do so, it being to my benefit as a recording artist that you enter into the Agreement, I hereby represent and agree as follows:

1.    (a)    I have read the Agreement in its entirety and fully understand the Agreement and all of the terms thereof were explained to me before signing this document.

(b)    Company has the right to enter into the Agreement and to assume all of the obligations, warranties and undertakings on you on the part of Company contained therein, and Company shall continue to have those rights during the term of the Agreement and thereafter until all of those obligations, warranties and undertakings shall have been fully performed and discharged.

(c)    All of the obligations, warranties and undertakings covenants and agreements on the part of Company contained in the Agreement which concern Company or me are true and correct.

(d)    I shall fully and to the best of my abilities perform and discharge all of the obligations, warranties and undertakings contained in the Agreement insofar as the same are required of me and to the extent Company has undertaken to cause the performance and discharge by me of those obligations and undertakings.

2.    If during the term of the Agreement or any extensions or renewals thereof, Company shall, for any reason, cease to be entitled to my services as a recording artist or the results and proceeds thereof in accordance with the terms thereof or Company shall, for any reason, fail or refuse to furnish my services as a recording artist or the results and proceeds thereof exclusively to you as and when required under the Agreement or Company shall commit any action or omission proscribed in paragraph 15.04 of the Agreement, I shall, at your written request, for the remaining balance of the term of the Agreement upon the

terms contained therein, be deemed substituted for Company as a party to the Agreement as of the date of your notice to me. Without limitation of the foregoing, in the event I am substituted in place of Company as a party to the Agreement, I shall render all services and perform all acts as shall give to you the same rights, privileges and benefits to which you are entitled under the Agreement as if Company had continued to be entitled to my services as a recording artist and had continued to furnish my services as a recording artist and the results and proceeds thereof exclusively to you as and when required under the Agreement, and such rights, privileges and benefits shall be enforceable in your behalf against me.

3. You and any person, firm or corporation designated by you shall have the perpetual, worldwide right to use and to permit others to use my name (both legal and professional, and whether presently or hereafter used by me), likeness, other identification and biographical material concerning me, for purposes of trade and advertising. You shall have the further right to refer to me during the term of the Agreement as your exclusive recording artist, and I shall in all my activities in the entertainment field use reasonable efforts to be billed and advertised during the term of the Agreement as your exclusive recording artist. The rights granted to you pursuant to this paragraph with respect to my name, likeness, other identification and biographical material concerning me shall be exclusive during the term of the Agreement and nonexclusive thereafter. Accordingly, but without limiting the generality of the foregoing, I shall not authorize or permit any person, firm or corporation other than you to use during the term of the Agreement my legal or professional name or my likeness in connection with the advertising or sale of phonograph records (including, without limitation, audiovisual records).

4. During the term of the Agreement, I shall not enter into any agreement or make any commitment which would interfere with my performance of my obligations under the Agreement, and I shall not perform or render services in connection with the recording of master recordings for any person, firm or corporation other than you. After the expiration or termination of the term of the Agreement, I shall not prior to the later of the following dates perform for any person, firm or corporation other than you, for the purpose of making recordings of phonograph records, any selection which had been recorded under the Agreement or under any other agreement between Company or me and you or your affiliates: (a) the date five (5) years subsequent to the date on which that selection shall have been last delivered to you in a master recording recorded under the Agreement; or (b) the date two (2) years subsequent to the expiration or termination of the term of the Agreement.

5. Intentionally Deleted.

6. You may, in your name, institute any action or proceeding against me individually or collectively, at your election, to enforce your rights under the Agreement, under this guarantee or under the Recording Contract.

7. Company expressly acknowledges that Company's and my services hereunder and under the Agreement are of a special, unique, intellectual and extraordinary character which gives them peculiar value, and that if Company or I breach any term hereof or of the Agreement, you will be caused irreparable injury which cannot adequately be compensated by money damages. Accordingly, you shall be entitled to injunctive relief, in addition to any other rights or remedies which you may have, to enforce the terms hereof or of the Agreement.

8. I shall look solely to Company for any and all royalties, recording fees or other monies payable to me in respect of the recording of all recordings under the Recording Contract and under the Agreement and in respect of your manufacture, distribution, sale or other use or recordings recorded under the Agreement and all phonograph records and other reproductions derived therefrom, all throughout the world.

9. I warrant and represent that I am not a resident of the State of California.

10. I, on behalf of myself and on behalf of any publisher or other person or entity which has or may

have any interest in or to any Controlled Composition (as defined in the Agreement) hereby license to you mechanical reproduction rights with respect to each Controlled Composition upon the terms and at the mechanical royalty rates applicable to Controlled Compositions licensed to you by Company.

11.  If there is more than one (1) individual signatory to this Agreement, our obligations hereunder and under the Agreement are joint and several, and your rights hereunder and under the Agreement apply with respect to each of us individually and collectively.

12.  This Agreement has been entered into the State of New York, and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York. All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the state of New York or the Federal District Courts located in New York City; provided, however, if you are sued or joined in any other court or forum (including an arbitration proceeding) in respect of any matter which may give rise to a claim by you hereunder, I consent to the jurisdiction of such court or forum over any such claim which may be asserted by you. Any process in any action or proceeding commenced in the courts of the State of New York arising out of any such claim, dispute or disagreement, may among other methods, be served upon me by delivering or mailing the same, via certified mail.

Very truly yours,

Elgin Baylor Lumpkin p/k/a "Ginuwine"
S.S.#: _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_

Agreed to and Accepted:

KING MUSIC GROUP, INC.

By: _____
    An Authorized Representative

29.1512.4
052407

8

SCHEDULE A

EXHIBIT "A"

<u>EXHIBIT "A"</u>

AN AGREEMENT made this ____ day of _____, 2007, between King Music Group Inc., c/o Grubman Indursky and Shire, PC, 152 West 57th Street, 31st floor, New York, NY 10019 ("Company") and Elgin Baylor Lumpkin ("you"), _____.

1.    <u>REPRESENTATIONS, WARRANTIES AND COVENANTS</u>

1.01.    (a)    You hereby represent, warrant and agree that during the term of this agreement, you will render your exclusive recording services to Company in the Territory as provided herein. You are sometimes called the "Artist" below; all references in this agreement to "you and Artist" and the like, will be understood to refer to you alone.

(b)    "Artist" refers to you as well as any individual who at any time during the term hereof records with you (other than background vocalists and instrumentalists). The substitution of, addition to, or subtraction from any of the present members of Artist may be done only upon the prior written approval of you and Company, provided that any substituted or added individual will be deemed a party to this agreement and must agree in writing to be bound by all of the terms and conditions of this agreement. You will promptly deliver to Company documents executed by you and that substituted or added member necessary or advisable in Company's judgment to confirm that the new member has agreed to be so bound.

1.02.    You are authorized, empowered and able to enter into and fully perform your obligations under this agreement. Neither this agreement nor the fulfillment hereof by any party infringes upon the rights of any Person. You have no knowledge of any claim or purported claim that may interfere with Company's rights hereunder or create any liability on the part of Company.

1.03.    You warrant and represent that you are not a resident of California.

1.04.    As of the commencement of the term hereof, there are no unreleased recorded performances by Artist, other than those Recordings listed on Schedule "1" attached hereto and incorporated herein by this reference. No Person other than Company will be authorized to release any such prior unreleased recorded performances during the term hereof. You warrant and represent that Schedule "1" attached hereto is a complete and accurate list of Artist's unreleased recorded performances as of the commencement of the term hereof.

1.05.    You warrant and represent that to the extent applicable, the Masters hereunder and performances embodied thereon will be produced in accordance with the rules and regulations of the American Federation of Musicians, the American Federation of Television and Radio Artists and all other unions having jurisdiction. You warrant and represent that Artist is or will become, and will remain to the extent necessary to enable the performance of this agreement, a member in good standing of all labor unions or guilds in which membership may be required for the performance of Artist's services hereunder.

1.06.    You warrant and represent that Artist will not perform for any Person other than Company (and neither you nor Artist will license or consent to or permit the use by any Person other than Company of Artist's name or likeness) for or in connection with the recording or exploitation of any Record embodying a Composition recorded by Artist under this agreement prior to the later of (i) the date five (5) years after the date of Delivery hereunder to Company of the last Master embodying that Composition, or (ii) the date two (2) years after the expiration or termination of the term of this agreement or any subsequent agreement between Company and you

14.2
07

1

or Artist or any other Person furnishing Artist's recording services. Neither you nor Artist, during or after the term, will perform or authorize the recording for use in advertisements of a Composition embodied on a Master Delivered hereunder. Your agreement with the individual producer of each Master will restrict said producer from producing a Composition produced by such individual hereunder on another Master for any Person other than Company for at least three (3) years from the date of Delivery to Company of such Master.

1.07.    You warrant and represent that none of the Masters hereunder, nor the performances embodied thereon, nor any other Materials, nor any authorized use thereof by Company or its grantees, licensees or assigns will violate or infringe upon the rights of any Person.

1.08.    Without limiting the foregoing, Company will not be required to make any payments of any nature for or in connection with the acquisition, exercise or exploitation of rights pursuant to this agreement, except as specifically provided herein. Subject to paragraphs 4.02, 4.03 and 4.04 below, you are solely responsible for and will pay all sums due Artist, the individual producers of each Master hereunder, and all other Persons entitled to receive royalties or other payments in connection with the exploitation of Masters hereunder, including the sale of Records derived therefrom (other than Mechanical Royalties and union "per-record" royalties). You warrant and represent that each Person who renders any services in connection with the recording of Masters will grant to you and Company the rights referred to in this agreement and will have the right to so render such services and grant such rights. You warrant and represent that no Person whose performance is embodied in a Master hereunder or whose services are used in the recording of a Master hereunder will be bound by any agreement that may prevent or restrict such performances or services.

1.09.    (a)    Neither you nor Artist will authorize or knowingly permit the Artist's performances to be recorded for any purpose without an express written agreement prohibiting the use of such recording on Records in violation of the restrictions herein. You and Artist will take reasonable measures to prevent the manufacture, distribution and sale at any time by any Person other than Company of such Records. Neither you, Artist, nor any Person deriving any rights from you or Artist, will use or authorize or permit any Person other than Company to use Artist's name (including any professional name or sobriquet) (individually and collectively referred to herein as "Artist Name"), likeness (including picture, portrait or caricature) or biography in connection with the exploitation of Masters recorded during the term hereof or in connection with the sale or other exploitation of Records during the term hereof. Except as otherwise set forth herein, neither you, Artist, nor any Person deriving any rights from you or Artist, will use, authorize or permit any Person other than Company to create, host or maintain any Websites which incorporate Artist's name, likeness, or any Masters, Videos or Artwork.

(b)    You and/or Artist are the sole owner of the professional name "Ginuwine", and no other Person has or will have the right to use such name in connection with Records during the term. Artist will not use a different name in connection with Records unless you and Company mutually agree in writing. You agree that Company shall cause a search to be instituted to determine whether there have been any third party uses of your name as well as the professional name of Artist. Company may cause an application for federal registration of the name to be made in favor of you and Artist for Record and/or entertainment purposes. You agree that, with respect to each such name, any amounts expended by Company pursuant to this paragraph will be deemed a Deduction hereunder. If the search indicates that such name should not be so used, Company and you will mutually agree upon a substitute name for Artist. Nothing contained herein releases you from your indemnification of Company in respect of Company's use of such name.

614.2
307

2

1.10.    Neither you, nor Artist, nor any Person deriving any rights from you or Artist, will at any time do or authorize any Person to do anything inconsistent with, or that might diminish, impair or interfere with, any of Company's rights hereunder or the full and prompt performance of your obligations hereunder. During the term hereof, neither Artist nor you will endorse any product or service related to home audio duplication, including, without limitation, blank recording tape, tape recording equipment, compact disc burning, or recording equipment, or digital file storage services, but excluding blank recording tape intended solely for professional use or tape recording equipment intended solely for professional use.

1.11.    Neither you nor Artist is under any disability, restriction or prohibition respecting Compositions recorded hereunder.

1.12.    You hereby represent and warrant that each member of Artist is above the legal age of majority pursuant to the laws governing this agreement and the performance hereunder.

2.    **TERM**

2.01.    The term of this agreement and the initial Contract Period hereunder will begin on the date hereof. Each Contract Period hereunder will end, unless extended as provided herein, on the date nine (9) months after Company's United States retail street date for the last Album Delivered by you in fulfillment of your Recording Commitment for the Contract Period concerned. Notwithstanding the foregoing, but subject to the other provisions of this agreement, no Contract Period will end prior to the date twelve (12) months after the date of the commencement of such Period.

2.02.    (a)    You hereby grant Company four (4) separate options, each to extend the term of this agreement for one additional Contract Period per option ("Option Period") on the same terms and conditions applicable to the initial Contract Period except as otherwise provided herein. Company may exercise such an option by giving you notice at any time before the expiration of the Contract Period then in effect. If Company exercises such an option, the Option Period concerned will begin immediately after the end of the then current Contract Period (or, if Company so advises you in its exercise notice, such Period will begin on the date of such exercise notice).

(b)    Notwithstanding anything to the contrary contained in this paragraph 2.02, if Company has not exercised its option to extend the term of this agreement for an additional Contract Period as of the date the then-current Contract Period would otherwise expire, the following will apply:

(1)    You will notify Company (the "Option Warning") that the applicable option has not yet been exercised.

(2)    Company will have the right to exercise such option at any time until the date fifteen (15) business days after its receipt of the Option Warning (the "Extension Period").

(3)    The then-current Contract Period will continue in effect until either the end of the Extension Period, or Company's notice to you ("Termination Notice") that Company does not wish to exercise such option, whichever is sooner.

(4)    For the avoidance of doubt, nothing herein will limit Company's right to send a Termination Notice to you at any time, nor limit Company's right to exercise an

option at any time if you fail to send Company an Option Warning in accordance with clause 2.02(b)(1) above.

3.    **DELIVERY OBLIGATIONS**

3.01.    During each Contract Period, you will Deliver to Company commercially satisfactory Masters. Such Masters will embody the featured vocal performances of Artist of contemporary selections, not recorded "live" or "in concert", and that have not been previously recorded by Artist, whether hereunder or otherwise. (Any Masters that were partially or completely recorded prior to the term of this agreement will be deemed to have been recorded during the initial Contract Period.) Neither Multiple Record Albums nor Joint Recordings may be recorded as part of your Recording Commitment hereunder without Company's written consent. Without limiting the foregoing, Company has the right to reject any Master that Company reasonably believes is either offensive to reasonable standards of public taste or in violation of the rights of others.

3.02.    (a)    During each Contract Period, you will cause the Artist to perform for the recording of Masters and you will Deliver to Company those Masters (the "Recording Commitment") necessary to satisfy the following schedule:

| Contract Period | Recording Commitment |
|---|---|
| initial Contract Period | one (1) Album |
| first Option Period | one (1) Album |
| second Option Period | one (1) Album |
| third Option Period | one (1) Album |
| fourth Option Period | one (1) Album |

(b)    Notwithstanding anything to the contrary contained herein, in connection with each Album recorded hereunder, Company will have the option ("Overcall Option") to require you to cause the Artist to perform for the recording of not more than four (4) Masters (each, an "Overcall Master") and to Deliver such Overcall Masters to Company concurrently with your Delivery to Company of the applicable Album. Any such Overcall Masters will be recorded in addition to the Masters to be recorded and Delivered in connection with the applicable Album. Each Overcall Master will be recorded in accordance with, and pursuant to, the terms and conditions contained in this agreement, subject to the next sentence. The Recording Costs in connection with each Overcall Master will be deemed additional Recording Costs in connection with the Album concerned and will be paid by Company pursuant to the Authorized Budget for such Overcall Master(s); provided, however, that no additional Advances will be payable to you or Artist in connection with such Overcall Masters. Notwithstanding anything to the contrary contained herein, Company will not deduct the Recording Costs in connection with any Overcall Master from the Recording Fund for the Album concerned. Company may exercise its Overcall Option in connection with each Album hereunder at any time before your Delivery to Company of the Album concerned.

3.03.    During each Contract Period, you will Deliver the Album in fulfillment of your Recording Commitment for such Period within the first four (4) months of the commencement of such Period.

3.04.    You will not deviate from the Delivery schedule specified in paragraph 3.03 without Company's written consent; timely Delivery as provided therein is a material obligation

hereunder. You agree not to commence the recording of any Record hereunder until ten (10) months after the date of Delivery to Company of the immediately preceding Record in fulfillment of your Recording Commitment hereunder. Each Record will consist entirely of Masters made in the course of that recording project.

3.05.    (a)    You agree to Deliver to Company each Master hereunder in the form of a Digital Master. You will concurrently deliver: (i) all multitrack tapes recorded in connection with the recording project, including, without limitation, all twenty-four (24) track master tapes and (ii) a detailed list in the form of Schedule "2" attached hereto and incorporated herein by this reference setting forth the location, format and number of all such multitrack tapes and the facilities used in connection with the particular recording project, and you and Artist hereby warrant and represent that all such information supplied by you or the Artist in connection therewith is and shall be complete and accurate. Upon Company's request, you agree to Deliver a 96Khz/24 bit 2 channel stereo version and a 5.1 channel surround sound version of each recording embodied on a Master hereunder for use on DVD Audio discs, and all costs incurred in connection with creating such versions will constitute Recording Costs hereunder. Without limiting any of Company's rights or remedies hereunder, not less than two (2) weeks prior to Company's authorization of pre-mastering (e.g., equalization and the making of reference dubs or the equivalent thereof in the applicable configurations) for a particular set of Master Recordings hereunder (including remixes of Master Recordings, regardless of whether such remixes will be commercially released), you shall deliver to Company for the applicable set of Master Recordings the lyrics to the Compositions embodied on such Masters, which lyrics shall be typed and in an easily readable form.

(b)    You shall comply with Company's policies with respect to samples, and you and Artist hereby warrant and represent that all information supplied by you or the Artist to Company in that regard is and shall be complete and correct. As of the date hereof, Company's policies with respect to all samples embodied in any Master Recording (including remixes of Master Recordings, regardless of whether such remixes will be commercially released) are as follows:

(1)    Prior to Company's authorization of pre-mastering (e.g., equalization and the making of reference dubs or the equivalent thereof in the applicable configurations) for a particular set of Master Recordings hereunder, you shall deliver the following to Company for the applicable set of Master Recordings:

(A)    A detailed list of any and all samples embodied in each Master Recording;

(B)    A written clearance or license for the perpetual, non-restrictive use of each such sample interpolated in each Master Recording in any and all media from the copyright holder(s) of the Master Recording and the Composition sampled.

(C)    Any and all necessary information pertaining to credit copy required by the copyright holder(s) of each sample interpolated in each Master Recording.

(2)    No Master Recording will be scheduled for release and no Master Recording shall be deemed to be Delivered to Company hereunder (and no Advances due on Delivery, if any, will be paid) until such written sample clearances (including credit copy, if any) have been obtained and approved by Company.

(3)    If any such sample clearance provides for an advance, a flat-fee "roll-over" payment and/or a royalty payment for Net Sales of the applicable Master Recording, such payment(s) will constitute Recording Costs hereunder.

3.06.    Company's election to make a payment to you which was to have been made upon Delivery of Masters or to release a Record derived from such Masters will not be deemed to be its acknowledgment that such "Delivery" was properly made, and Company will not be deemed to have waived either its right to require such complete and proper performance thereafter or its remedies for your failure to perform in accordance therewith.

4.    **RECORDING PROCEDURE**

4.01.    You will conduct recording sessions only after you and Company mutually approve in writing the individual producer, the places of recording, the Compositions to be recorded and after you obtain Company's written approval of the Authorized Budget, provided that in the event of a disagreement in respect of times or places of recording or selection of producers, Company's decision shall be final. If Company disapproves any of the foregoing, you will promptly submit alternative proposals, but in all instances you will allow Company a reasonable period of review prior to the proposed first date of recording. Company will approve any first-class recording studio provided (i) its use would not be inconsistent with any of Company's union agreements, (ii) its use would not cause labor difficulties for other reasons, (iii) the studio takes appropriate measures (as determined by Company in its sole discretion) to secure any material recorded on its premises, and (iv) Company does not anticipate that its use will require expenditures inconsistent with the Authorized Budget. You and Artist acknowledge the importance of securing all Recordings made hereunder and of preventing "leaks" of Recordings, and you and Artist will cooperate with Company in taking measures to insure that Artist's Recordings are not made available to any Person other than Company without prior written authorization from Company. The scheduling and booking of all studio time will be done by Company in consultation with you.

4.02.    Company will engage and pay all artists, producers, musicians, and other personnel for the recording sessions hereunder on your behalf after Company prepares a written budget listing all Recording Costs to be incurred in connection therewith (the "Authorized Budget"). The Authorized Budget may provide for payment to you and Artist of no more than union scale for your and Artist's services (subject to paragraph 5.01) and will not contain a charge for arrangements or orchestrations supplied by you or Artist. The Authorized Budget will constitute the maximum amount that may be expended for the applicable session or sessions. The granting of authorizations and the approval of Authorized Budgets are entirely within Company's discretion. Company has the right to have a representative attend all recording sessions conducted pursuant to this agreement. Without limiting Company's other rights or remedies, if it reasonably appears to Company that the Recording Costs for any Masters will exceed the Authorized Budget therefor, Company has the right to immediately cease paying Recording Costs. Nothing contained in this agreement will be deemed to make you or Artist Company's agent or authorize you or Artist to incur any costs on Company's behalf under this agreement.

4.03.    Company agrees to advance Recording Costs for the production of each particular Record of the Recording Commitment in an amount not in excess of the Authorized Budget therefor. Notwithstanding anything to the contrary contained herein, Recording Costs which are payable pursuant to the Authorized Budget in connection with the Recording Commitment for the initial Contract Period shall not reduce the applicable Advance payable to you hereunder. If applicable, you will deliver copies of substantiating invoices, receipts, Form Bs, vouchers and similar satisfactory documentary evidence of such costs. To the extent applicable, you agree to

deliver (or cause the individual producer of the Masters to deliver) the Immigration and Naturalization Service certificates described in paragraph 4.05 below, Form Bs and W-4s to Company within forty-eight (48) hours after each session hereunder so that Company may timely make all required union payments, and you agree to deliver all other invoices, receipts, vouchers and documents within three (3) days after your or the producer's receipt thereof. If Company incurs late-payment penalties by reason of your acts or omissions, Company may deduct an amount equal to all such penalties from monies otherwise payable to you under this agreement. Company will be responsible for late-payment penalties only if caused solely by Company's acts or omissions. You agree, represent and warrant that all Masters delivered by you to Company hereunder will be free and clear of any claims by any Person.

4.04.    (a)    Without limiting the foregoing, your obligations include furnishing the services of the individual producers of Masters hereunder, and Company shall engage and pay them on your behalf.

(b)    Once the producer of any Master is engaged, the following will apply:

(1)    The budget for the recording project concerned will be charged with a Recording Cost item in the amount that Company is obligated to pay such producer in connection with that project. Such a producer may be employed on Company's staff or render services under contract with Company (a "Staff Producer"). The amount charged as a Recording Cost in connection with the services of a Staff Producer will be the greater of (A) the amount actually paid to the Staff Producer per Side, or (B) Twenty Five Thousand Dollars ($25,000.00) per Side.

(2)    The royalties payable to the producers in connection with this project shall be deemed Deductions. With respect to a Staff Producer, the royalty rate payable to such producer will be deemed to be no less than three percent (3%) with respect to USNRC Net Sales of Albums, with proportionate reductions for other exploitations of Masters.

(c)    At your written request pursuant to Company's standard letter of direction, Company will pay a royalty to any mutually approved independent third party producer or mixer engaged by you and to whom you are obligated to pay a royalty (the "Producing Royalty") in respect of Net Sales of Records released hereunder. The Producing Royalty will be computed, adjusted and paid in the same manner, at the same time and subject to the same conditions as the royalty payable to you, but at a basic rate of no more than four percent (4%) (and increasing to no more than 5% as a result of sales-based royalty escalations), with proportionate reductions on all sales for which reduced royalties are payable under this agreement. The Producing Royalty will not be payable to the producer concerned until you have recouped (pursuant to the terms hereof) all Recording Costs attributable to the Recordings concerned other than Advances paid to individual producers or remixers for services rendered in connection with Masters hereunder. Such recoupment will be computed at your net royalty rate (as reduced to reflect the deduction of the Producing Royalty). After such recoupment, the Producing Royalty will be computed retroactively and paid (as provided above) on the Net Sales of the Record concerned from the first such Record sold. The amount of the Producing Royalty will be deducted from all monies payable or becoming payable to you hereunder other than Mechanical Royalties. Company's compliance with your request to pay any such Producing Royalty will not constitute the producer, or any payee on behalf of the producer, a beneficiary of or a party to this agreement. All Producing Royalty payments hereunder will constitute Deductions.

4.05.   In connection with each recording session conducted hereunder, you will use your best efforts to comply with the following procedures required by United States immigration law to the extent applicable:

(a)   Before any individual renders services in connection with the recording of any Master hereunder (including, without limitation, each background instrumentalist, background vocalist, producer and engineer):

(1)   You will require each such individual to complete and sign the EMPLOYEE INFORMATION AND VERIFICATION ("employee section") of a U.S. Immigration and Naturalization Service ("INS") Employment Eligibility Certificate ("Form I-9"), unless you have already obtained (and retained) such certificate from that individual within the past three years;

(2)   You will complete and sign the EMPLOYER REVIEW AND VERIFICATION ("employer section") of each such certificate; and

(3)   You will attach copies of the documents establishing identity and employment eligibility that you examine in accordance with the instructions in the employer section.

(b)   You will not permit any such Person who fails to complete the employee section (or to furnish you with the required documentation) to render any services in connection with Recordings made under this agreement.

(c)   You will deliver the employee and employer certificates (with copies of the necessary documents attached) to Company within forty-eight (48) hours after the conclusion of the session concerned.

(d)   You will comply with any revised or additional verification and documentation procedures required by the INS in the future.

## 5.   RECOUPABLE COSTS

5.01.   Company will pay all union scale payments required to be paid to Artist in connection with Masters made hereunder, all costs of instrumental, vocal and other personnel specifically approved by Company for the recording of such Masters, and all other amounts required to be paid by Company pursuant to any applicable law or any collective bargaining agreement between Company and any union representing persons who render services in connection with such Masters. Notwithstanding the foregoing, you and Artist agree that the Advances hereunder include the prepayment of session union scale for Artist as provided in the applicable union codes, and you and Artist agree to complete any documentation required by the applicable union to implement this sentence. Union contracts will be filed and supplied to Company and pension benefits will be paid on Artist's behalf by Company or its licensees, which payments on Artist's behalf will be an Advance.

5.02.   All packaging costs in excess of Company's then standard design, engraving or manufacturing costs which are incurred at your request or direction with respect to a standard Record package are recoupable from all monies payable to you hereunder. Promptly after your written request therefore (which request may be sent to Company, if at all, within five (5) days after

Company makes the artwork for the Album available to you or your representatives), Company will notify you if Company anticipates incurring any such excess design, engraving or manufacturing costs in connection with any Album package hereunder. Provided that changing the Album package would not unreasonably delay the scheduled release of the Record concerned, if you object to such excess design, engraving or manufacturing costs in connection with an Album package not prepared by you or not prepared at your request, and such written objection is received by Company within five (5) business days after Company's notice, and Company nevertheless uses such package, Company will not charge you for the excess. No failure to so notify you will be deemed a breach hereof provided that if Company fails to so notify you, Company will not charge you for any such excess. Notwithstanding the foregoing, in the event that you approve of a proposed Album cover layout and the picture or art to be used on the cover of such Album, or in the event that you create such Album cover layout and picture or artwork, you will be deemed to have approved any such excess packaging costs incurred in connection therewith in accordance with this paragraph 5.02.

5.03.    The portion of the Recording Costs incurred in the making of a Joint Recording will be computed by multiplying the aggregate amount of total Recording Costs incurred in making that joint recording by the same fraction used in determining the royalties payable to you in respect of that Joint Recording.

6.    **ADDITIONAL ADVANCES**

6.01.    All monies paid to you during the term of this agreement, as well as all monies paid on behalf of you or Artist with your consent, at your request or pursuant hereto, other than royalties paid pursuant to this agreement, constitute Advances unless otherwise expressly stated otherwise in this Agreement or agreed to in writing by Company.

6.02.    (a)    Subject to your full and timely performance of your material obligations hereunder, Company shall pay you an Advance of _____ Dollars ($_____ ) in connection with the Album delivered in fulfillment of your Recording Commitment for the initial Contract Period.    In addition, Company shall pay you the following additional Advances in connection with your Delivery to Company of the Masters constituting an Album in fulfillment of your Recording Commitment (other than with respect to the initial Contract Period) in an amount by which the applicable recording fund set forth below (the "Recording Fund") exceeds Recording Costs for such Album:

        (1)    Album    recorded    during    the    first    Option    Period: _____ Dollar ($_____).

        (3)    Album    recorded    during    the    second    Option    Period: _____ Dollars ($_____).

        (4)    Album    recorded    during    the    third    Option    Period: _____ Dollars ($_____).

        (5)    Album    recorded    during    the    fourth    Option    Period: _____ Dollars ($175,000).

(b)    This subparagraph 6.02(b) will apply to each Album timely Delivered in fulfillment of your Recording Commitment hereunder other than the Album Delivered during the initial Contract Period, the Second Contract Period and the Third Contract Period. Subject to subparagraph 6.02(c) below, the Recording Fund for each Album

specified in the preceding sentence will be the greater of the sum as determined pursuant to clause 6.02(b)(1) below or the applicable sum as set forth in subparagraph 6.02(a) above:

(1)     The amount equal to sixty-six percent (66%) of the lesser of (i) the average royalties earned by you (including any "pipeline" royalties and after provision for reasonable reserves) on USNRC Net Sales of the last two (2) Albums of your Recording Commitment, or (ii) the royalties earned by you (including any "pipeline" royalties and after provision for reasonable reserves) on USNRC Net Sales of the immediately preceding Album of the Recording Commitment. The foregoing calculations will be computed as of the date twelve (12) months after the initial United States release date of the applicable Album.

(c)     Notwithstanding anything to the contrary contained in subparagraph 6.02(b) above, the Recording Fund for Albums recorded in fulfillment of your Recording Commitment other than the Recording Commitment for the initial Contract Period will not exceed the amount equal to two (2) multiplied by the applicable amount set forth in paragraph 6.02(a) above for the Album concerned.

(d)     Each Advance referred to in this paragraph 6.02 will be paid according to the following schedule:

(i)     _____.

(i)     With respect to each subsequent Album:

(A)     Promptly after Company has approved all relevant preconditions to recording (e.g. budget, Compositions, producer, etc.) and the recording of such Album has commenced, Company will pay fifteen percent (15%) of the applicable Advance set forth in paragraph 6.02(a) above (as applicable) less any amounts previously paid to you in connection with the Album concerned (hereinafter the "Commencement Advance"). Company may reduce the amount of the Commencement Advance, to the extent necessary, so that the balance of the applicable Advance after paying the Commencement Advance is not less than one hundred fifteen percent (115%) of the greater of (i) the actual Recording Costs incurred in connection with the immediately prior Album Delivered in fulfillment of your Recording Commitment hereof; or (ii) the Authorized Budget for the Album concerned.

(B)     The balance, less any Recording Costs incurred in connection with the Album concerned, promptly after Delivery of the Album concerned.

6.03.     If the Recording Costs and other Advances paid or reimbursed by Company for any Recording in fulfillment of your Recording Commitment exceed the Authorized Budget payable with respect to such Recording, solely as a result of Artist's acts and/or omissions, you will be solely responsible for such excess, it being agreed that if Company elects to pay such excess, such payment will be a direct debt from you to Company which, in addition to any other available remedies, Company may recover from any sums payable to you and/or Artist or your designees hereunder.

7.     **ARTIST NET PROFITS**

(a)     In consideration of your full and complete performance of the material terms hereof, and for other good and valuable consideration, the receipt and sufficiency of which

is hereby acknowledged, Company shall pay you (i) forty percent (40%) of the "Net Profits" (as hereinafter defined) derived from and in connection with Company's exploitation of the Master Recordings hereunder, any Net Profits derived from Company's entering into and furnishing your services under a Distribution Agreement or other similar license or agreement with respect to your Master Recordings; and (ii) seventy-five percent (75%) of the "Net Profits" derived from and in connection with Company's exploitation of Merchandise, Endorsement Rights, Touring Rights, and including, in each case,. As used herein, "Net Profits" shall mean "Gross Revenue" less "Deductions" (as such terms are hereinafter defined).

(b)    As used herein, "Gross Revenue" shall mean one hundred percent (100%) of any and all monies earned and actually received by Company from any and all sources which are allocable to the exploitation of the Master Recordings, Merchandise, Endorsement Rights, Touring Rights or other rights hereunder in any form or manner, including without limitation royalties, advances and any other sums paid to Company under any Distribution Agreement or other similar license or agreement with respect to your Master Recordings. As to Records manufactured and distributed by Company or Distributor and not consisting entirely of the Masters recorded hereunder, the Gross Revenue with respect to each such Record shall be pro-rated on the basis of the number of Masters which are on such Record compared to the total number of master recordings (including the Masters) on such Record.

(c)    As used herein, "Deductions" shall mean any and all payments, costs and expenses incurred by or charged to Company in connection with any Masters, Merchandise, Endorsement Rights, Touring Rights or otherwise pursuant to this Agreement or under any Distribution Agreement, other than the payment of your share of Net Profits hereunder (and any Advances against such share of Net Profits pursuant to paragraph 6 above), but including without limitation any and all Recording Costs (including without limitation third party producer and mixer payments) for the Masters and records derived therefrom which are paid by or charged to Company, other expenses incurred by or charged to Company with respect to the manufacture, distribution and/or exploitation of the Masters and records derived therefrom, Merchandise and mechanical and other royalties payable in respect of the musical compositions embodied on the Masters. Without limiting the generality of the foregoing, Deductions shall include but not be limited to costs incurred and paid by or charged to Company in respect of the following: any and all travel and related expenses incurred by Company in connection your services, advertising, marketing, promotion, publicity, artwork and legal and other professional fees (including without limitation any costs, expenses and legal and professional fees incurred in connection with obtaining a Distribution Agreement). The parties hereby acknowledge that Company-incurred Deductions prior to the date hereof shall be treated as Deductions hereunder.

8.    <u>ROYALTY ACCOUNTINGS</u>

8.01.    Company will cause its distributor to compute your share of Net Profits (hereinafter sometimes referred to as "royalties") payable pursuant to Article 7 above as of each June 30 and December 31 for the prior six (6) months, in respect of each such six (6) month period in which there are sales or returns of Records, other exploitations of Masters on which royalties are payable to you or Reserves liquidated. On or before the next September 30 with respect to the period ending June 30, and on or before March 31 with respect to the period ending December 31, Company's distributor will send a statement covering those royalties and will remit to the net amount of such royalties, if any, after deducting any and all unrecouped Royalty Advances and chargeable costs under this agreement and such amount, if any, that Company may be required to withhold pursuant to the applicable state tax laws, the U.S. Tax Regulations, or any other applicable statute, regulation, treaty, or law. No royalty statements will be required for periods during which

no additional royalties accrue. In computing the number of Records sold, only Records for which Company has been paid will be deemed sold, and Company will have the right to deduct returns and credits of any nature and to withhold reasonable reserves therefor from payments otherwise due. Returns will be treated as units sold or Free Goods in the same manner as in Company's customer account. Company will liquidate any such reserves within four (4) full accounting periods after the period in which such reserves were initially established. In establishing reserves, Company will take into consideration the sale and returns history of previous Records shipped hereunder as well as that of the Record concerned, Soundscan reports (or similar retail sales reports) and reports from Company's distributor regarding to what extent the Record concerned is "selling through" at retail outlets. If Company (or Company pursuant to a letter of direction) makes any overpayment to you (e.g., by reason of an accounting error or by paying royalties on Records returned later), you will reimburse Company (or Company, as applicable) to the extent Company or distributor does not deduct such sums from monies due you hereunder. Company may at any time elect to utilize a different method of computing royalties provided such method does not decrease the net monies received by or credited to you hereunder.

8.02.    Royalties for Records sold for distribution outside the United States ("foreign sales") will be computed in the same national currency and at the same rate of exchange as Company is accounted to by its licensees with respect to the sale concerned and will be subject to costs of conversion and any taxes applicable to royalties remitted by or received from foreign sources. Royalties on Records sold outside the United States are not due and payable by Company until payment therefor has been received by Company in the United States in United States dollars. For purposes of accounting to you, Company will treat any foreign sale as a sale made during the same six (6) month period in which Company receives its licensee's accounting and payment for that sale. If Company does not receive payment in the United States in United States Dollars and is required to accept payment in foreign currency or in a foreign country, Company will deposit to your credit (at your request and expense) in such currency in a depository selected by you in the country in which Company accepts payment your share of royalties due and payable with respect to such sales. Such deposit will fulfill Company's obligations to you in connection therewith.

8.03.    All royalty statements rendered by Company will be conclusively binding upon you and not subject to any objection by you for any reason unless specific objection in writing, stating the basis thereof, is given to Company within two (2) years from the date such statement is rendered and an audit pursuant to paragraph 8.04 for that statement is completed within said two (2) year period. Failure to make such written objection or conduct the audit within said time periods will be deemed to be your approval of such statement, your waiver of such audit rights, and your waiver of the right to sue Company for additional royalties in connection with the applicable accounting period. Each statement will be deemed rendered when due unless you notify Company that the applicable statement was not received by you and such notice is given within sixty (60) days after the applicable due date specified in paragraph 8.01 above, in which event the statement will be deemed rendered on the date actually sent by Company. You will not have the right to sue Company in connection with any royalty accounting, or to sue Company for monies due on account of the exploitation of Masters hereunder during the period a royalty accounting covers, whether from the sale of Records or otherwise, unless you commence the suit within six (6) months after commencement of your audit for the applicable period.

8.04.    You may, at your own expense, audit Company's books and records directly relating to this agreement that report the sales or other exploitation of Records or Masters for which royalties or other monies are payable hereunder. You may make such audit only for the purpose of verifying the accuracy of statements sent to you hereunder and only as provided herein. You may initiate such audit only by giving notice to Company at least thirty (30) days prior to the date you

intend to commence your audit. Your audit will be conducted by a reputable independent certified public accountant experienced in recording industry audits in such a manner so as not to disrupt Company's other functions and will be completed promptly. You may audit a particular statement only once and only within two (2) years after the date such statement is rendered as provided in paragraph 8.03 above. Your audit may be conducted only during Company's usual business hours and at the place where it keeps the books and records to be examined. You will not be entitled to examine any manufacturing records or any other records that do not specifically report sales or other exploitation of Records or Masters or free distribution of Records on which royalties are payable hereunder. Your auditor will review his tentative written findings with Company before rendering a report to you so as to remedy any factual errors and clarify any issues that may have resulted from misunderstanding.

9.    **COMPANY'S ADDITIONAL RIGHTS**

9.01.    You warrant, represent and agree that throughout the Territory Company (and/or its designees) is the sole, exclusive and perpetual owner of all Masters Delivered hereunder or otherwise recorded by Artist during the term of this agreement, all Videos embodying those Masters or otherwise produced hereunder, and all artwork created for use in connection with the Masters and/or Website Material and/or ECD Material (individually and collectively referred to herein as ("Artwork"), which ownership entitles Company, among other things, to all right, title and interest in the copyright in and to the Masters, Videos (but excluding the copyrights in the Compositions contained in such Masters and Videos) and Artwork. Each Master, Video and Artwork made under this agreement or during its term, from the inception of its recording, will be considered a "work made for hire" for Company (and/or its designees); if any such Master, Video or Artwork is determined not to be such a "work," it will be deemed transferred to Company by this agreement, together with all rights and title in and to it. You warrant, represent and agree that all Masters and Videos made under this agreement or during its term (including duplicates, work tapes, etc.), the performances contained thereon and the Recordings derived therefrom and the related Artwork, from the inception of their creation, are the sole property of Company, in perpetuity, free from any claims by you, Artist or any other Person, and Company has the right to use and control same subject to the terms herein. Company (or Company's designees) has the exclusive right to copyright all such Masters, Videos and Artwork in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the Territory. You will execute and deliver to Company such instruments of transfer and other documents regarding the rights of Company or its designees in the Masters, Videos and Artwork subject to this agreement as Company may reasonably request to carry out the purposes of this agreement, and if you fail to sign such documents within five (5) days (or less, if needed and stated in the request) after your receipt of Company's written request therefor, Company may sign such documents in your name or the name of Artist (and you hereby appoint Company your agent and attorney-in-fact for such purposes) and make appropriate disposition of them consistent with this agreement. All Artwork shall contain all such, trademarks, trade names, information, logos and other items, as Company (or Company's designees) customarily includes on such Artwork, as applicable, including, without limitation, Internet Addresses, so-called "watermarks", "meta-data", and "hyperlinks" to Internet Addresses.

9.02.    Without limiting the generality of the foregoing, but subject to the other terms and conditions contained herein, Company and any Person authorized by Company has the unlimited and exclusive rights throughout the Territory: (a) to manufacture and/or distribute Records by any and all methods now or hereafter known embodying any portion or all of the performances embodied on Masters hereunder; (b) to publicly perform such Records and to permit the public performance thereof in any medium; (c) to import, export, sell, transfer, transmit, lease, rent, deal in or otherwise dispose of such Masters and Records derived therefrom throughout the Territory under

any trademarks, trade names or labels designated by Company; (d) to remix, edit or adapt the Masters to conform to technological or commercial requirements in various formats now or hereafter known or developed, or to eliminate material which might subject Company to any legal action; (e) to use and authorize the use of the Masters for background music, synchronization in motion pictures and television soundtracks and other similar purposes, including, without limitation, use on transportation and in commercials for any product in any and all media, without any payment other than as provided herein; and (f) to reproduce, adapt, and otherwise use and authorize the use of Subject Materials in any manner, including, without limitation, in Mobiletones. Without limiting the foregoing, Company and its subsidiaries, affiliates and licensees may, at their election, delay or refrain from doing any one or more of the foregoing.

9.03.    In accordance with paragraph 10.03 below, Company and any licensee of Company each has the perpetual right, without liability to any Person, and may grant to others the right, to reproduce, print, publish or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Artist and individual producer and all other Persons solely performing services in connection with Masters made under this agreement (including, without limitation, all professional, group and other assumed or fictitious names used by them), and biographical material concerning them for purposes of advertising, promotion and trade in connection with you or Artist, the making and exploitation of Records hereunder, on Websites, including Artist Websites, and in Mobile Materials, Merchandise and general goodwill advertising for Company (individually and collectively referred to as Artist "ID Materials"). The uses authorized by the preceding sentence include, without limitation, the use of those names, portraits, pictures, and likenesses of Artist in the marketing of Records. During the term hereof, Company and their licensees may, in the Territory, bill, advertise and describe Artist as their exclusive Artist or by a similar designation. Company's rights as described in this paragraph will be exclusive during the term of this agreement and nonexclusive thereafter. You will make Artist available from time to time to appear for photography, poster and cover art and the like, under the reasonable direction of Company or its nominees, to appear for on-line "chats" hosted on Websites, including, without limitation, Company Artist Websites, and for interviews with representatives of the media and Company's publicity personnel, and to appear and perform at promotional events such as so-called "in-stores" performances. You and Artist will not be entitled to any compensation for such services, except as may be required by applicable union agreements.

9.04    Without limiting the generality of the rights granted to Company pursuant to this agreement, Company has the perpetual right and may grant to others the right, subject to the terms and conditions hereof, without any liability to any Person, to create, maintain and host Company Artist Websites. You hereby license to Company throughout the Territory the exclusive right, coupled with a security interest and without any liability to any Person, during the term of this agreement, to register, secure any registration renewals thereof, administer such registrations, control and use the Artist Domain Names as Internet Addresses including, without limitation, the right to use such Artist Domain Names in connection with Company Artist Websites. Without limiting the generality of the foregoing, during the term of this agreement, Company will have the right to designate one (1) Company Artist Website as the "official" Artist Website (the "Official Artist Website"), and neither you, Artist, nor any Person deriving any rights from you or Artist shall designate any other Artist Website as an "official" Artist Website except as otherwise provided herein. Company's rights as described in the first sentence of this subparagraph 9.04(a) shall be exclusive during the term of this agreement and non-exclusive thereafter, except that, for the avoidance of doubt, such rights shall be exclusive in perpetuity with respect to utilizing and/or otherwise exploiting Masters, Videos and/or Artwork hereunder in connection with Websites.

9.05.   You and Artist hereby agree to license to Company all of your and Artist's right, title and interest throughout the Territory during the term of this agreement in and to all Internet Addresses (including, without limitation, all Artist Domain Names) relating to Artist that you and/or Artist own and/or control rights to (each, an "Existing Domain Name"), including, without limitation, the right to administer any registrations of the Existing Domain Names, secure any registration renewals of the Existing Domain Names, and control and use the Existing Domain Names in connection with Company Artist Websites, free of encumbrances. You shall so license all such Existing Domain Names to Company within ten (10) days after the date hereof (the "License Date"), and you agree to cease and desist using all of the Existing Domain Names as of the License Date. In connection therewith, you and Artist agree to execute any instruments of transfer or other documents necessary or desirable to effectuate such license and you and Artist will otherwise cooperate with Company for the purpose of establishing or evidencing the rights granted to Company pursuant to this paragraph. In the event you fail to either (i) so license to Company all such Existing Domain Names as of the License Date, or (ii) sign such documents within ten (10) days after your receipt of Company's written request therefor, then Company shall have the right to sign such documents in your name or the name of Artist (and you hereby appoint Company your agent and attorney-in-fact for such purposes) and make appropriate disposition of them consistent with this agreement. You and Artist warrant and represent that (aa) you and Artist are the sole and exclusive owner of all rights, title and interest in and to the Existing Domain Names; (bb) neither you nor Artist has sold, licensed, encumbered, transferred or otherwise disposed of any rights with respect to the Existing Domain Names; (cc) no other Persons have rights in or to the Existing Domain Names; and (dd) there are no outstanding obligations to any Person in connection with the Existing Domain Names. Each Existing Domain Name shall be deemed an item of "Materials" hereunder, covered by your warranties, representations and indemnification obligations hereunder.

9.06.   You hereby grant to Company, and Company shall have the exclusive right (but not the obligation) throughout the Territory during the Merchandising Period, and Company may grant to others the right, to use and/or exploit, reproduce, publish and/or display the Artist ID Materials, any Artwork, either alone or in conjunction with other elements, pertaining to you for the manufacture, sale and distribution for commercial and/or promotional merchandising purposes including without limitation, the exclusive right to sell, distribute, market and/or promote physical merchandise items (e.g., hats, t-shirts, sweatshirts, posters, stickers, games, comics and novelties, etc.) as well as virtual items (e.g., avatars, screen savers, etc.) including tie-ins, fan clubs, and "bounceback" merchandising (collectively "Merchandise Rights"), and to distribute, sell, license, advertise, promote and otherwise exploit any merchandising items ("Merchandise") resulting from the exercise of Merchandise Rights, including without limitation, the distribution and sale of commercial merchandise sold at the site(s) of any and all live concert engagements performed by you anywhere throughout the Territory ("Tour Merchandise"). Notwithstanding the foregoing, Company's Merchandise Rights shall be exclusive in perpetuity with respect to Merchandise embodying Artwork, either alone or in conjunction with other elements.

9.07    You hereby grant to Company, and Company shall have the exclusive right (but not the obligation) throughout the Territory during the Merchandising Period, and Company may grant to others the right, to use and/or exploit, reproduce, publish and/or display the Artist ID Materials, including necessary personality rights, for commercial endorsement, strategic partnerships, and sponsorship purposes, including your personal services in connection therewith ("Endorsements") such as, but not limited to, a commercial advertising campaign for a third party product or service endorsed by You or commercial sponsorship of an event at which you are to appear (collectively, Endorsement Rights"). The Endorsement Rights granted hereunder will not

include professional acting engagements of a non-musical nature secured by individual members of Group but will include appearances made by You or any member of the Group where such appearance is in Your professional capacity as a performing artist (regardless of whether such appearance includes a musical performance) including without limitation, appearances in commercials, films and/or television programs.

9.08    You hereby grant to Company, and Company shall have the exclusive right (but not the obligation) throughout the Territory during the Merchandising Period, and Company may grant to others the right to the performance of Your services as a musician, vocalist and/or performer in connection with one or more live performances or concerts ("Concert(s)"), including without limitation, Concerts by means of public stage performances of all kinds, webcasts, sponsorships, television broadcast or cablecasts (including pay-per-view telecasts), motion pictures, one-nighters, concert tours and the like ("Touring Services"). In respect of all Touring Services performed by you during the Term of this agreement and for a period of nine (9) months thereafter, Company shall have the exclusive right to receive all revenues generated in connection with Touring Services through all manner and means ("Touring Rights"). Touring Services may either be alone or with one or more other individuals and may be in connection with a single Concert or a series of Concerts.  Any and all matters relating to the production, staging and routing of any Concerts will be designated by Company in consultation with you (including without limitation, the musical compositions and other material to be performed), production budgets and all other creative and business elements relating to any Concert.  You will not have the right to, and will not incur any obligations or expenses with respect to any Concert without Company's prior written consent (which may be withheld it its sole discretion).

9.09    As used hereunder, the "Merchandising Period" means that period commencing as of the date of this Agreement and continuing until nine (9) months after expiration of the term of this agreement.  Notwithstanding the foregoing, with respect to any third party agreements concerning Merchandise (excluding Album Artwork Merchandise) entered into by Company or its licensees during the Merchandising Period, Company's Merchandising Rights will continue on an exclusive bases until no later than two (2) years after the expiration of the Merchandising Period, plus a reasonable non-exclusive sell-off period (not to exceed six (6) months) for previously manufactured items.

9.10    Company shall have the exclusive right in the Territory during the Merchandising Period to exploit the Merchandise Rights, the Endorsement Rights and Touring Rights (collectively referred to as "Non-Record Rights") through all manner and means, whether now known or hereafter devised pursuant to the terms of this Agreement.

## 10.    MARKETING AND MISCELLANEOUS RESTRICTIONS

10.01.  (a)    With respect to Videos made in connection with the initial release of an Album of the Recording Commitment, the selection(s) to be embodied in each Video will be mutually designated by you and Company, provided that you will be deemed to have approved any selection that has been or will be embodied on the A-side a Single, and provided further that in the event of a dispute, Company's decision shall control.

(b)    Each Video will be shot on a date or dates and at a location or locations to be designated by Company, subject to Artist's reasonable availability.

(c)    (1)    The producer, director, and concept or script for each Video will be approved by both you and Company. Notwithstanding the foregoing, (A) in the event of a

dispute, Company's decision shall control; and (B) Company will have the right to disapprove and reject any concept or script proposed by you if in the opinion of Company such concept or script does not conform with the then-current on-air practices and standards of any of the primary major music Video outlets (e.g., MTV, VH-1, BET, Fuse) and their affiliated stations (each, a "Major Video Outlet").

(2)    You will not without Company's prior written approval (which approval may be withheld by Company in its sole discretion) film, photograph, or otherwise include in any Video hereunder any third party trademarks, logos or other product identifiers or any third party product or any other form of third party "product placement" (each of the foregoing, a "Third Party Logo") in any manner.

(3)    Company will engage the producer, director and other production personnel for each Video and will pay the production costs of each Video in an amount not in excess of a budget to be established in advance by Company (the "Production Budget"). You will pay any and all production costs for each Video in excess of the Production Budget if such excess costs were caused solely by the acts and/or omissions of Artist. In the event that Company pays any production costs that are your responsibility pursuant to the foregoing (which Company is in no way obligated to do), you will promptly reimburse Company for such excess upon demand and, without limiting Company's other rights and remedies, Company may deduct an amount equal to such excess from any monies otherwise payable to you or Artist hereunder. Artist's compensation for performing in each Video (as opposed to your compensation with respect to the exploitation of such Videos, which is provided elsewhere herein) will be limited to any minimum amounts required to be paid for such performances pursuant to any collective bargaining agreements pertaining thereto, provided, however, that Artist hereby waives any right to receive such compensation to the extent such right may be waived.

(4)    Notwithstanding anything to the contrary contained herein, Company has the right to disapprove and reject any Video hereunder if (A) in the opinion of Company such Video does not conform with the then-current on-air practices and standards of any Major Video Outlet; or (B) such Video embodies any Third Party Logo not approved in advance by Company in writing; or (C) such Video does not conform with the script or concept for such Video approved by Company in writing. If Company rejects any Video hereunder for any of the foregoing reasons, then Company will not be obligated to re-edit or re-film or otherwise complete the particular Video so it can be released or promoted to any of the Major Video Outlets.

(d)    Company is and will be the sole owner of all worldwide rights in and to each Video (including the worldwide copyrights therein and thereto).

(e)    You will issue (or use your best efforts to cause the music publishing companies (other than Company) having the right to do so to issue) (1) worldwide, perpetual synchronization licenses, and (2) perpetual licenses for public performance in the United States (to the extent that ASCAP and BMI are unable to issue same), to Company at no cost for the use of all Controlled Compositions in any promotional Video effective as of the commencement of production of the applicable Video (and your execution of this agreement constitutes the issuance of such licenses by any music publishing company that is owned or controlled by you, Artist or any Person owned or controlled by you or Artist).

(f)    Company (and/or distributor) will have the right to use and allow others to use each Video for Advertising and Promotional Purposes and for Commercial Purposes.

(g)    Each Video will be deemed a Material as provided herein. Company will have the rights in and to each Video as are otherwise applicable hereto with respect to Masters made hereunder, including, without limitation, the right to use and publish, and to permit others to use and publish, your and Artist's name and approved likeness in each Video and for advertising and purposes of trade in connection therewith.

10.02.    (a)    Provided you have fulfilled all your material obligations under this agreement, Company will release in the United States each Album recorded in fulfillment of your Recording Commitment within four (4) months after Delivery of the Album concerned. If Company fails to do so you may notify Company at any time after the end of the four (4) month period concerned (but before commencement of recording of the next Album of your Recording Commitment hereunder), that you intend to terminate the term of this agreement unless Company releases the Album within two (2) months after Company' receipt of your notice (the "cure period"). If Company fails to release the Album before the end of the cure period, you may terminate the term of this agreement by giving Company notice (the "Termination Notice") within thirty (30) days after the end of the cure period. On receipt by Company of your Termination Notice, the term of this agreement will end and all parties will be deemed to have fulfilled their obligations hereunder except those obligations that survive the end of the term (e.g., warranties, rerecording restrictions and obligations to pay royalties). Notwithstanding paragraph 2.01, in the event you fail to give Company the Termination Notice within said thirty (30) day period with respect to the last Album to be Delivered in fulfillment of your Recording Commitment in any Contract Period, you may at any time thereafter notify Company that the applicable Contract Period will end on the date four (4) months from the date of the notice (but in no event earlier than one (1) year from the commencement of the Period), and Company will have through the last day of the Contract Period to exercise its Option (if any) for the next Option Period. Your only remedy for failure by Company to release an Album will be as described in this paragraph. If you fail to give Company the Termination Notice within the period specified, your right to terminate as to that Album will lapse.

(b)    The running of each of the four (4) month and two (2) month periods referred to in will be suspended (and the expiration date of each of those periods will be postponed) for the period of any suspension of the running of the term of this agreement. If any such four (4) month or two (2) month period would otherwise expire on a date between November 16 and the next January 16, its running will be suspended for the duration of the period between November 1 and January 16 and its expiration date will be postponed by the same amount of time (i.e., sixty-three (63) days).

10.03.    Within thirty (30) days following the execution hereof, you may supply Company with six (6) approved pictures of Artist to be used by Company (and Distributor) pursuant to paragraph 9.03 above. In the event that Company disapproves of the pictures supplied by you, Company will make available to you for your approval pictures concerning Artist to be so used by Company. Your approval will not be unreasonably withheld and will be deemed given unless your notice of disapproval (including the reason) has been received by Company within five (5) business days after the material has been made available to you. In the event that you timely disapprove of any pictures, you will, within seven (7) days of the date of your disapproval notice, supply to Company approved pictures. In the event that the pictures supplied by you, pursuant to the preceding sentence, are not satisfactory to Company or in the event that you do not supply the pictures to Company pursuant to this paragraph, Company will have the right to select and use such pictures as it determines in its sole discretion, and you will have no approval rights in respect thereof. In connection with each new Album hereunder, you may supply Company with more recently approved pictures. If you do so, the procedures set forth in this paragraph will apply. No

inadvertent failure by Company to comply with this paragraph will constitute a breach of this agreement. Your sole remedy for any failure by Company to comply with this paragraph will be prospective cure with respect to materials prepared after the notice period specified in paragraph 16.06 below.

10.04.    During the term of this agreement, with respect to audio Records manufactured for sale in the United States, Company will not without your consent, which shall not be unreasonably withheld:

(a)    couple more than two (2) Masters made hereunder on any single Album that includes Recordings not embodying Artist's performance, except promotional Records, non-retail jukebox compilations, consumer compilation Records, sampler-type Records, and programs for use on public transportation carriers and facilities. Notwithstanding the foregoing, if any Master hereunder is released as a Single, then such Master shall be deemed automatically approved for inclusion on the compilation Records with the brand names "Now #_____" and "_____ Smash Hits", and such use(s) shall not be applied towards the two (2) Masters uses set forth in the opening clause of this subparagraph 10.04(1);

(b)    release any Joint Recordings subject hereto.

10.05.    (a)    Company is and will be the sole owner of all worldwide rights in and to each Company Artist Website and all Company Website Material, ECD Material, and Mobile Material created hereunder, all individual elements thereof, and the selection and arrangement of such elements, including the worldwide copyrights therein and thereto, throughout the Territory and in perpetuity.

(b)    You will issue (or use your best efforts to cause the music publishing companies (other than Company) having the right to do so to issue) (1) worldwide, perpetual synchronization licenses, and (2) worldwide, perpetual licenses for public performance to Company at no cost for the promotional use of all Compositions in Website Material, ECD Material and Mobile Material effective as of the commencement of production of the applicable Website Material, ECD Material or Mobile Material (and your execution of this agreement constitutes the issuance of such licenses by you, Artist and any music publishing company that is owned or controlled by you, Artist or any Person owned or controlled by you or Artist).

(c)    Company will have the right to use and allow others to use Website Material, ECD Material, and Mobile Material for Advertising and Promotional Purposes and for Commercial Purposes.

(d)    You will supply Company, at Company's request, with Website Material for possible inclusion on Company Artist Websites, including, without limitation, transcripts of all published interviews of Artist, transcripts of all articles relating to Artist, photographs, and other similar materials.

(e)    Each Company Artist Website, and all Company Website Material, ECD Material, and Mobile Material will be deemed a Material as provided herein. Company will have the rights in and to each Company Artist Website, Company Website Material, ECD Material and Mobile Material as are otherwise applicable hereto with respect to Masters made hereunder, including, without limitation, the right to use and publish, and to permit others to use and publish, your and Artist's name and approved likeness in each Company Artist Website, Company Website

Material, ECD Material, and Mobile Material and for advertising and purposes of trade in connection therewith.

10.06.  Notwithstanding anything to the contrary contained herein, Artist has the right, during the term hereof, to perform as a background vocalist or background instrumentalist for the purpose of making audio Records for others subject to the following:

(a)  You have then fulfilled all of your material obligations hereunder, and the engagement does not interfere with the continuing prompt performances of your obligations to Company nor with any professional engagements to which you or Artist are committed that are intended to aid in the promotion of Records hereunder;

(b)  Artist will not render a solo or "step-out performance" and the musical style of the recording will not be substantially similar to the characteristic musical style of Recordings made by Artist for Company;

(c)  Artist will not record any material embodied on a Master theretofore or thereafter delivered by you hereunder, and neither you nor Artist will be restricted from recording the same material for Company (which you will not do without Company's written consent);

(d)  Artist's name may be used in a courtesy credit to Company on the Album liners used for such Records, in the same position as the credits accorded to other side artists and in type identical in size, prominence and all other respects. Except as provided in this subparagraph (d), neither the Artist's name, nor likeness nor biographical material may be used in any manner in connection with such Recordings. Without limiting the foregoing, Artist's name and/or likeness will not be used on the outside packaging of Records, in any way in connection with Singles, or in advertising, publicity or other forms of exploitation, without Company's express written consent, which Company may withhold in its absolute discretion.

(e)  Before Artist accepts the sideartist engagement, you will notify Company of the names of the Person for whom the recordings are being made and the record company that will have the right to release the Record. Your acceptance of the sideartist engagement will be conditioned upon the other record company's permitting Company/distributor to make similar uses of the services of recording artists of comparable stature under contract to that record company upon Company/distributor's request.

11.    **LICENSES FOR MUSICAL COMPOSITIONS**

11.01.    (a)    (1)    You hereby grant to Company (and its designees, including its distributor) an irrevocable license under copyright to reproduce each Controlled Composition on Records and distribute such Records in the United States and Canada.

(2)  For that license, Company will pay you or your designee Mechanical Royalties, on the basis of Net Sales, at the following rate the ("Controlled Rate"):

(A)  On Records distributed in the United States:

(i)  If the copyright law of the United States provides for a minimum compulsory rate: The rate equal to the minimum compulsory license rate applicable to the use of musical compositions on audio Records under the United States copyright law

4614.2
2307

(hereinafter referred to as the "U.S. Minimum Statutory Rate") at the time of the commencement of the recording of the Master concerned but in no event later than the last date for timely Delivery of such Master (the applicable date is hereinafter referred to as the "Copyright Fixing Date"). (The U.S. Minimum Statutory Rate is $.091 per Composition as of January 1, 2006);

(ii)    If the copyright law of the United States does not provide for a minimum compulsory rate: The rate equal to seventy-five percent (75%) of the minimum license rate agreed to by the major record companies and major music publishers in the United States (hereinafter referred to as the "U.S. Agreed Rate") as of the Copyright Fixing Date of the Master concerned.

(B)    On Records distributed in Canada:

(i)    If the copyright law of Canada provides for a minimum compulsory rate: The rate equal to seventy-five percent (75%) of the minimum compulsory license rate applicable to the use of musical works on audio Records under the copyright law of Canada at the Copyright Fixing Date of the Master concerned;

(ii)    If the copyright law of Canada does not provide for a minimum compulsory rate, but the major record companies and major music publishers in Canada (collectively the "Canadian Record Industry") have agreed to a mechanical license rate: The rate equal to seventy-five percent (75%) of the minimum license rate agreed to as of the Copyright Fixing Date of the Master concerned;

(iii)    If the copyright law of Canada does not provide for a minimum compulsory license rate, and the Canadian Record Industry has not agreed to a rate, the rate applicable under this clause (B) will be six cents ($0.06) (Canadian) per Composition;

(iv)    The rate applicable under this clause (B) will not be more than the rate which would be applicable to the Records concerned under clause 11.01(a)(2)(A) above (Canadian) if they were manufactured for distribution in the United States.

(b)    The total Mechanical Royalty for all Compositions (including Controlled Compositions) will be (i) with respect to each Album other than Multiple Record Albums, not more than eleven (11) times the Controlled Rate; (ii) with respect to each single Record released hereunder, not more than two (2) times the Controlled Rate; (iii) with respect to any EP released hereunder, not more than five (5) times the Controlled Rate; and (iv) with respect to Multiple Record Albums (if any), the maximum aggregate Mechanical Royalty will not be more than the maximum Mechanical Royalty applicable to an Album not in the form of a Multiple Record Album multiplied by a fraction, the numerator of which is the Suggested Retail List Price of such Multiple Record Album and the denominator of which is the Suggested Retail List Price of "top-line" Albums. With respect to the exploitation or sale of Records as described in paragraphs 7.02 (other than with respect to EPs and Multiple Record Albums), and 7.03 (other than with respect to club sales through third parties such as the Columbia House Record Club where a separate license is negotiated between such club and the copyright proprietor and paid by such club), the Mechanical Royalty maximums will be three fourths (3/4) of the amounts prescribed in this subparagraph. Any amounts in excess of the applicable maximums pursuant to this subparagraph 11.01(b) will be treated as described in subparagraph 11.01(f) below.

(c)    Mechanical Royalties will not be payable with respect to Records otherwise not royalty bearing hereunder, with respect to nonmusical material, with respect to

Compositions of one minute or less in duration, and with respect to more than one (1) use of any one (1) Composition per Record. No Mechanical Royalties will be payable in respect of Controlled Compositions in the public domain or arrangements of Compositions in the public domain except that if such arrangement is credited by ASCAP or BMI, then the Mechanical Royalty otherwise payable hereunder will be apportioned in the same ratio used by ASCAP or BMI in determining the credits for public performance of the work, provided you furnish Company with satisfactory evidence of that ratio.

(d)    Company will (or will cause its distributor to) compute Mechanical Royalties on Controlled Compositions as of the end of each calendar quarter-annual period in which there are sales or returns of Records on which Mechanical Royalties are payable to you. On or before the next May 15, August 15, November 15, or February 15, Company will (or will cause its distributor to) send a statement covering those royalties and will pay any net royalties then due. Mechanical Royalty reserves maintained by Company against anticipated returns and credits may be held for a reasonable period of time. If Company (and/or its distributor) makes any overpayment of Mechanical Royalties on Controlled Compositions (e.g., but without limitation, by reason of an accounting error or by paying Mechanical Royalties on Records returned) such excess will be treated as described in subparagraph 11.01(f) below. Your right to audit Company's books and records as the same relate to Mechanical Royalties for Controlled Compositions is subject to the terms and conditions set forth in Article 8.

(e)    Any assignment made of the ownership of copyright in, or the rights to license or administer the use of, any Controlled Composition will be made subject to the provisions of this Article 11.

(f)    You agree to indemnify and hold Company (and its distributor) harmless from the payment of Mechanical Royalties in excess of the applicable amounts in the provisions of this Article 11. If Company (and/or its distributor) pays any such excess, such payments will be a direct debt from you to Company, which, in addition to any other remedies available, Company may recover from royalties or any other payments hereunder.

11.02.   Without limiting the foregoing, you hereby further grant to Company and any licensee of Company the irrevocable right in perpetuity throughout the Territory and without liability to any Person to: (a) print and reproduce the title and/or lyrics to each Composition embodied on a Master hereunder (each, a "Subject Composition") on Record Artwork; and (b) print, reproduce and/or otherwise recreate the title and/or lyrics to each Subject Composition in (1) the so-called "enhanced" or multimedia portion of an enhanced CD, CD Plus, CD ROM, DVD, or any other similar configuration (whether now known or hereafter created) embodying Masters hereunder including, without limitation, ECD Material and (2) Website Material. If Company (or its licensees) is required to pay any monies to any Person for the exercise of any of the rights granted to Company pursuant to this paragraph 11.02, Company will treat such amounts as a Deduction hereunder.

12.    **FAILURE OF PERFORMANCE**

12.01.   Company will have the right to suspend the operation of this Agreement and its obligations hereunder in the event Company (and/or Distributor) is materially hampered in its recording, manufacture, distribution or sale of Records, or in the event its (or Distributor's) normal business operations become commercially impracticable, as the result of any cause beyond their control, including but not limited to labor disagreement, fire, earthquake, catastrophe, riot, shortage

of materials, etc. If such contingency does not affect Distributor's ability to account to you and pay royalties then Company/Distributor will account to you and pay royalties during any such suspension of this agreement. Such right may be exercised by written notice to you, and such suspension will last for the duration of the applicable event. A number of days equal to the total of all such days of suspension plus an additional thirty (30) days will be added to the Contract Period in which such contingency occurs and the dates for the exercise by Company of its options as set forth in Article 2, the dates of commencement of subsequent Contract Periods, the date any other action is required hereunder, and the term of this agreement will be deemed extended accordingly. If such suspension of the term of this agreement exceeds six (6) consecutive months and affects no record manufacturer or distributor other than Distributor, you may, by notice to Company, request that Company terminate the suspension by notice given to you within thirty (30) days after its receipt of your notice. If Company does not do so, the term of this agreement will terminate at the end of such thirty (30) day period and all parties will be deemed to have fulfilled all of their obligations except those that survive the end of the term.

12.02. If Company wrongfully refuses to allow you to fulfill your Recording Commitment for any Contract Period, and if, not later than forty-five (45) days after that refusal takes place, you notify Company of your desire to fulfill such Recording Commitment, then Company may permit you to fulfill such Recording Commitment by notice to you to such effect within thirty (30) days of Company's receipt of your notice. Should Company fail to give such notice, you will have the option to terminate the term of this agreement by notice given to Company within thirty-five (35) days after the expiration of the thirty (30) day period referred to above, and on receipt by Company of such notice the term of this agreement will terminate. If you fail to give Company either notice within the period specified in this paragraph 12.02, Company will be under no obligation to you for failing to permit you to fulfill such Recording Commitment. Alternatively, Company may notify you during any Contract Period that it does not intend to allow you to fulfill your Recording Commitment for the Period concerned, in which case the term of this agreement will terminate as of the date of such notice. In the event the term terminates under this paragraph, all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations that survive the end of the term (e.g., warranties, rerecording restrictions and obligation to pay royalties), and Company shall be obligated to promptly pay you, in full settlement of its obligations hereunder, an Advance in the amount equal to:

        (a)    The aggregate of the Recording Fund set forth in paragraph 6.1 or 6.2 above (as applicable) for each Album of the Recording Commitment then remaining unrecorded for the Contract Period in effect when such termination occurs;

less:

        (b)    The average amount of Recording Costs for the last two (2) Albums recorded hereunder in fulfillment of your Recording Commitment (or, if only one Album has been recorded hereunder, the amount of the Recording Costs for that Album or, if no Album has been recorded hereunder, 90% of the applicable Recording Fund for the first Album hereunder) multiplied by the number of such unrecorded Albums referred to in subparagraph 12.02(a);

Less:

        (c)    any portion of the Recording Funds previously paid for the Albums then remaining unrecorded;

less:

4614.2
2307

(d) any other Advances previously paid to you or at your direction.

13.    **COMPANY'S ADDITIONAL REMEDIES**

13.01.   (a)       Without limiting any other rights and remedies of Company hereunder, if you fail to Deliver any Masters hereunder within the time prescribed in Article 3, Company will have the following options, each exercisable by notice to you:

(1)      Company may suspend its obligations to make payments to you under this agreement until you have cured the default.

(2)      Company may terminate the term of this agreement at any time, whether or not you have commenced curing the default before such termination occurs; and

(3)      Company may require you to repay the amount not then recouped of any Advance previously paid by Company and not specifically attributable under paragraph 6.02 to an Album that has been Delivered.

(b)      If Company terminates the term of this agreement under subparagraph 13.01(a)(2) above, all parties will be deemed to have fulfilled all of their obligations under this agreement except those obligations that survive the end of the term of this agreement [e.g., indemnification obligations, Company's obligation to account and pay royalties to you, rerecording restrictions, and your obligations under subparagraph 13.01(a)(3)]. No exercise of an option under this paragraph will limit Company's rights to recover damages by reason of your default, its rights to exercise any other option under this paragraph, or any of its other rights.

13.02.   If Artist's voice should be or become materially and permanently impaired, or if Artist otherwise becomes physically unable to perform recording and/or personal appearances, and/or if Artist ceases to pursue a career as an entertainer, Company will have the right to terminate the term of this agreement by notice to you at any time during the period in which such contingency continues and thereby be relieved of any liability for the executory provisions of this agreement.

13.03.   You acknowledge, recognize and agree that Artist's services hereunder are of a special, unique, unusual, extraordinary and intellectual character, giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages in an action at law. Inasmuch as a breach of such services may cause Company irreparable damages, Company will be entitled to seek injunctive and other equitable relief, in addition to whatever legal remedies are available, to prevent or cure any such breach or threatened breach.

13.04.   The rights and remedies of Company as specified in this agreement are not to the exclusion of each other or of any other rights or remedies of Company. Company may decline to exercise one or more of its rights and remedies as Company may deem appropriate without jeopardizing any other of its rights or remedies. All of Company's rights and remedies will survive the expiration of the term of this agreement. Notwithstanding anything in this agreement, Company may at any time exercise any right it now has or at any time hereafter may be entitled to as a member of the public as though this agreement were not in existence.

4614.2
2307

13.05.  (a)    You agree to and do hereby indemnify, save and hold Company and its licensees harmless from any and all liability, loss, damage, cost and expense (including legal expenses and attorney fees) arising out of or connected with any breach or alleged breach of this agreement or any claim that is inconsistent with any of the warranties or representations made by you in this agreement. You agree to reimburse Company on demand for any payment made or incurred by Company with respect to the foregoing sentence, and, without limiting Company's rights or remedies, Company may deduct any amount not so reimbursed by you from any monies Company (and/or Distributor) or an affiliate of Distributor owes you hereunder.

(b)    Pending the determination of any claim in respect of which Company is entitled to be indemnified, Company may withhold (or cause Distributor to withhold) monies otherwise payable to you hereunder in an amount not to exceed your potential liability to Company pursuant to this paragraph 13.05. If Company pays a claimant more than Ten Thousand Dollars ($10,000.00) (the "Pre-authorized Amount") in settlement of any claim not reduced to judgment, you will not be obligated to reimburse Company for any of the settlement in excess of the Pre-authorized Amount unless you have consented to the settlement in writing. If you do not consent to a settlement proposed by Company for an amount exceeding the Pre-authorized Amount, you will nevertheless be required to reimburse Company for the full amount unless you make bonding arrangements, satisfactory to Company in its sole discretion, to assure Company of reimbursement for all damages, liabilities, costs and expenses (including legal expenses and counsel fees) that Company and its licensees may incur as a result of that claim.

(c)    Company will notify you of any action commenced on any claim subject to your indemnity hereunder. You may participate in the defense of any such claim through counsel of your selection at your own expense, but Company will have the right at all times, in its sole discretion, to retain or resume control of the defense of such claim.

14.    **DEFINITIONS**

14.01.  "Advance" -- a prepayment of your share of Net Profits. Advances are chargeable against and recoupable from any royalties otherwise payable hereunder.

14.02.  "Advertising and Promotion Purposes", when used in connection with Videos or Company Website Material  -- all uses for which Company receives no monetary consideration from licensees in excess of the costs of the Video or Company Website Material, an incidental fee, a reasonable amount as reimbursement for its administrative costs, and the actual costs incurred by Company (and/or Distributor) in connection with such Videos or Company Website Material  (e.g., for tape stock, duplication of the Videos and shipping).

14.03.  "Album" or "LP" -- a sufficient number of Masters embodying Artist's performances to comprise one (1) or more Compact Discs, or the equivalent, of not less than forty-five (45) minutes of playing time and containing at least ten (10) different Compositions.

14.04.  "Ancillary Exploitations" — (a) the leasing of commercial advertising space to Persons other than Company (or Distributor) or their licensees on an Company Artist Website; (b) the placement on a Company Artist Website of hyperlinks to so-called "e-commerce" Websites owned or controlled by Persons other than Company or its licensees; and (c) the inclusion of computer software, or Website links in ECD Material or Mobile Material.

14.05. "Artist Domain Name" -- the name "_____" and all variations thereof which embody the Artist's name or use a name similar to Artist's name as Internet Addresses. As used in the preceding sentence ".XXX" shall mean each and every so-called "second level" domain name now in existence or hereafter implemented including without limitation, ".com", ".net", ".org" together with territorial identifiers, e.g., ".UK".

14.06. (a)    "Artist Website" -- Websites relating to the Artist.

(b)    "Company Artist Website" -- Artist Websites created, maintained and/or hosted by Company or its licensees, but specifically excluding any so-called "frame" that appears as a bordered area of a Company Artist Website and operates as an independent browser window.

14.07. "Commercial Purposes", when used in connection with Videos or Company Website Material -- any use that is not for Advertising and Promotional Purposes (as defined above).

14.08. "Composition" -- a single musical composition, irrespective of length, including all spoken words and bridging passages, including a medley.

14.09. "Contract Period" -- the initial period, or any option period, of the term hereof (as such periods may be suspended or extended as provided herein).

14.10. "Controlled Composition" -- a Composition wholly or partly written, owned or controlled by you, the Artist, an individual producer or any Person in which you, the Artist or an individual producer has a direct or indirect interest.

14.11. "Delivery" -- the receipt by Company of the Masters as provided in paragraphs 3.01 and 3.05 as well as the submission by you in written form of all necessary information, consents, licenses and permissions, including without limitation those relating to all samples, if any, interpolated in the Master Recordings, such that Company (and/or Distributor) may manufacture, distribute and release the Records concerned, including, without limitation, all label copy, publishing and songwriting information (including, without limitation, applicable music performance rights organizations, and the names, addresses and telephone numbers of publishers), Album credits, the timings of and lyrics to each Composition contained on a Record in accordance with Article 3 hereof, ancillary materials prepared by or for you which are required hereunder, first use mechanical licenses, sideartist permissions and any information required to be delivered to unions, guilds or other third parties.

14.12. "Digital Master" -- a fully mixed, edited, equalized and leadered digital stereo tape master ready for the production of parts from which satisfactory Records can be manufactured.

14.13. "Distributor" -- Company's then-current distributor of Master Recordings for the majority of Records released by Company.

14.14. "ECD Material" -- all material acquired or created for inclusion in the "enhanced" or multimedia portion of an enhanced CD, CD Plus, CD ROM, DVD, or any other similar configuration, whether now known or hereafter created, (including, without limitation, Videos, photography, graphics, technology, software, so-called "hyperlinks" to Internet Addresses, etc.).

14614.2
.2307

14.15.  "Electronic Transmission" -- any transmission to the consumer, whether sound alone, sound coupled with an image, or sound coupled with data, in any form, analog or digital, now known or later developed (including, but not limited to, Limited Downloads, Permanent Downloads, Streams, Masters made available through portable subscription services, Mobiletones, "cybercasts", "webcasts", "streaming audio", "streaming audio/video", "digital downloads", direct broadcast satellite, point-to-multipoint satellite, multipoint distribution service, point-to-point distribution service, cable system, telephone system, broadcast station, and any other forms of transmission now known or hereafter devised) whether or not such transmission is made on-demand or near on-demand, whether or not a direct or indirect charge is made to receive the transmission and whether or not such transmission results in a specifically identifiable reproduction by or for any transmission recipient. All references in this Agreement to the "distribution" of Records, unless expressly provided otherwise, shall be understood to include the distribution of Masters by way of Electronic Transmission thereof.

14.16.  "Internet Addresses" – Uniform Resource Locators, addresses and/or domain names.

14.17.  "Joint Recordings" -- Masters embodying the Artist's performance and any performance by another artist with respect to whom Company is obligated to pay royalties.

14.18.  "Limited Download" -- a digital transmission of a time-limited or other use-limited download of a Master to a local storage device (e.g., the hard drive of the user's computer or a portable device), using technology designed to cause the downloaded file to be available for listening only either (1) during a limited time (e.g., a time certain or a time tied to ongoing subscription payments), or (2) for a limited number of times

14.19.  "Long Play Single" -- a Record containing at least three (3) Sides embodying a total of not more than three (3) different Compositions.

14.20.  "Master," "Master Recording" or "Recording" -- any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, that is or is intended to be embodied in or on a Record.

14.21.  "Materials" -- all Compositions embodied on a Master or Video hereunder; each name or sobriquet used by you or Artist, individually or as a group; and all other musical, dramatic, artistic and literary materials, ideas and other intellectual properties furnished or selected by you, the Artist or any individual producer and contained in or used in connection with any Artist Website, Company Website Material, ECD Material, Mobile Material, Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

14.22.  "Mechanical Royalties" -- royalties payable to any Person for the right to reproduce and distribute copyrighted musical compositions on Records.

14.23.  "Mini Album" or "EP" -- any Record, other than an Album, containing more than three (3) different Compositions.

14.24.  "Mobile Material" -- artwork, images, polyphonic (midi) ringtones, voice messages, voice ringers, graphics, "wallpaper" and/or other materials (excluding Masters) transmitted to or reproduced as an accessory for an end user's mobile telephone or personal digital assistant (or other personal communication device).

14.25. "Mobiletone" -- a digital transmission (including without limitation by means of Permanent Download, Limited Download, or Stream) of a Master (or portion[s] thereof) which may or may not be accompanied by Mobile Material to an end user's mobile telephone or personal digital assistant (or other personal communication device).

14.26. "Multiple Record Album" -- an Album containing two or more cassettes, compact discs, or other configuration packaged as a single unit. For purposes of the Recording Commitment hereunder and for computing the applicable Recording Fund or Advance, a Multiple Record Album accepted by Company will be deemed only one (1) Album.

14.27. "Performance" -- singing, speaking, conducting, or playing an instrument, alone or with others.

14.28. "Permanent Download" -- a digital transmission of a download of a Master to a local storage device (e.g., the hard drive of the user's computer or a portable device) which is not subject to the time or use limitations applicable to Limited Downloads and is permanently available for listening an unlimited number of times (unless deleted by the user).

14.29. "Person" -- any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

14.30. "Recording Costs" -- all amounts described in paragraph 5.01 above plus all other amounts representing direct expenses incurred by Company in connection with the recording of Masters hereunder (including, without limitation, travel, rehearsal, vocal coaching, musical instrument lessons, equipment rental and cartage expenses, costs incurred in connection with sampling, remixing and/or "sweetening", advances to individual producers, transportation costs, hotel and living expenses approved by Company, all studio and engineering charges, in connection with Company's facilities and personnel or otherwise, and all costs necessary to prepare Masters for release on all applicable media including those costs necessary to prepare final, equalized tapes therefor).

14.31. "Record" -- all forms of reproduction, now or hereafter known, manufactured and/or distributed primarily for personal use, home use, school use, juke box use or use in means of transportation, including but not limited to sound-alone Recordings, audiovisual Recordings, interactive media (e.g., CD-ROM), and Electronic Transmissions.

14.32. "Sample(s)" or "sample(s)"-- the embodiment of pre-existing Recording(s) and/or Composition(s) on a Master or Masters hereunder; provided, however, if all rights required for the purpose of manufacturing and distributing Records hereunder may be obtained by Company pursuant to a compulsory mechanical license such embodiment is not a Sample.

14.33. "Side" -- a Recording of not less than three (3) minutes of continuous sound.

14.34. "Single" -- a Record containing not more than three (3) different Compositions.

14.35. "Stream" -- a digital transmission of a Master to allow a user to listen to such Master (e.g., Real Audio or Windows Media Audio), that is configured by the provider of such transmission in a manner designed so that such transmission will not result in a substantially complete reproduction of the Master being made on a local storage device (e.g., the hard drive of

4614.2
2307

the user's computer or a portable device) so that such reproduction is available for listening other than at substantially the time of the transmission.

14.36. The words "term of this agreement" or "period of this agreement" or "term hereof" or "so long as this agreement remains in force" or words of similar connotation refer to the initial period of this agreement and the period of all renewals, extensions and substitutions or replacements of this agreement.

14.37. "Territory" -- the Universe.

14.38. "Uniform Resource Locator" -- the address of a computer or a document on the Internet that consists of a communications protocol followed by a colon and two slashes (e.g., http://), the identifier of a computer (e.g., www.umusic.com) and usually a path through a directory to a file.

14.39. "United States" -- the United States of America, its territories, possessions and military exchanges.

14.40. "Videos" -- sight and sound Recordings that reproduce the audio performances of recording artists together with a visual image.

14.41. "Website" -- a series of one (1) or more interconnected documents or files that are formatted using the Hypertext Markup Language, or any similar language, and that are intended to be accessible by Internet users.

14.42. (a) "Website Material" — all material acquired or created for inclusion on an Artist Website (including, without limitation, Videos, photography, graphics, technology, so-called "hyperlinks" to Internet Addresses, on-line chats, and electronic press kits or so-called "EPK"s).

(b) "Company Website Material" — all Website Material for a Company Artist Website.

15.    **NOTICES AND PAYMENTS**

15.01. All notices required to be given to a party hereto must be sent to the address for the party first mentioned herein, or to such new address if changed as described below, in order to be effective. All royalties and royalty statements will be sent to you at your address first mentioned herein. Each party may change its respective address hereunder by notice in writing to the other. All notices sent under this agreement must be in writing and, except for royalty statements, may be sent only by personal delivery, registered or certified mail (return receipt requested), or by overnight air express (or courier shipment if outside the United States) if such service actually provides proof of mailing. The day of mailing of any such notice will be deemed the date of the giving thereof (except notices of change of address, the date of which will be the date of receipt by the receiving party). Facsimile transmissions will not constitute valid notices hereunder, whether or not actually received. A copy of all notices to Company must be sent to Grubman, Indursky & Shire, PC, 152 West 57th Street, 31st Floor, New York, New York 10019, Attn: Kenneth Meiselas, Esq. A copy of all notices to you shall be simultaneously forwarded to Davis Shapiro Lewit & Hayes, LLP, 689 Fifth Ave., Fifth Floor, New York, New York 10022, attention: Steve Shapiro, Esq. ("Shapiro"),

provided that Company's failure to provide such notice to Shapiro shall not be deemed a breach of this Agreement.

16.    **MISCELLANEOUS**

16.01.  Unless otherwise provided herein, as to all matters to be determined by mutual agreement and as to where any approval or consent by a party is required, such agreement, approval or consent may not be unreasonably withheld.

16.02.  Your agreement, approval or consent, whenever required, will be deemed to have been given unless you notify Company otherwise within three (3) business days following the date of Company's written request to you therefor.

16.03.  The invalidity or unenforceability of any provision hereof will not affect the validity or enforceability of any other provision hereof. This agreement contains the entire understanding of the parties relating to its subject matter. No change of this agreement will be binding unless signed by the party to be charged. A waiver by either party of any provision of this agreement in any instance will not be deemed to waive it for the future. All remedies, rights, undertakings and obligations contained in this agreement are cumulative, and none of them are in limitation of any other remedy, right, undertaking or obligation of either party. Nothing contained herein will be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provisions contained herein and any present or future statute, law, ordinance or regulation, the latter will prevail; but the provision of this agreement which is affected will be curtailed and limited only to the extent necessary to bring it within the requirements of the law.

16.04.  Company (and/or Distributor) has the right at any time during the term hereof to obtain insurance on the life of Artist, at Company's (and/or Distributor's) sole expense and cost, with Company (and/or Distributor) being the sole beneficiary thereof. You agree that Artist will fully cooperate with Company (and/or Distributor) in connection with the obtaining of such a policy, including, without limitation, Artist submitting to any required physical examination and completing any documents necessary or desirable in respect thereof. Neither you, Artist, nor your estate(s) shall have any right to claim the benefit of any such policy obtained by Company (and/or Distributor). If any member of Artist fails its physical examination, such will not be a breach of this agreement, but thereafter Company will have the right to terminate the term hereof.

16.05.  Company may assign its rights under this agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any Person owning or acquiring a substantial portion of the stock or assets of Company, or to any partnership or other venture in which Company participates (including, without limitation, Distributor), and such rights may be assigned by any assignee. Company may also assign its rights to any of its licensees, if advisable in Company's sole discretion to implement the license granted. You shall not have the right to assign this agreement or any of your rights or obligations hereunder without Company's prior written consent in each instance, which consent Company may withhold in its sole discretion. Any purported assignment by you in violation of this paragraph shall be deemed void ab initio.

16.06.  You will not be entitled to recover damages or to terminate the term of this agreement by reason of any breach by Company of its material obligations hereunder unless the Company fails to remedy such breach within thirty (30) days following receipt of your notice thereof.

16.07.  You recognize that the sale of Records is speculative and agree that the judgment of Company with respect to matters affecting the sale, distribution and exploitation of such Records is binding upon you. Nothing contained in this agreement obligates Company (and/or Distributor) to make, sell, license or distribute Records manufactured from the Masters recorded hereunder except as specified herein.

16.08.  THIS AGREEMENT HAS BEEN ENTERED INTO IN THE STATE OF NEW YORK. THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT IS GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN SUCH STATE. THE NEW YORK COURTS (STATE AND FEDERAL), ONLY, WILL HAVE JURISDICTION OVER ANY CONTROVERSIES REGARDING THIS AGREEMENT, AND THE PARTIES HERETO CONSENT TO THE EXCLUSIVE JURISDICTION OF SAID COURTS.  ANY PROCESS IN ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY, AMONG OTHER METHODS, BE SERVED UPON YOU BY DELIVERING IT OR MAILING IT IN ACCORDANCE WITH ARTICLE 15 ABOVE.  ANY SUCH PROCESS MAY, AMONG OTHER METHODS, BE SERVED UPON ARTIST OR ANY OTHER PERSON WHO APPROVES, RATIFIES, OR ASSENTS IN WRITING TO THIS AGREEMENT TO INDUCE COMPANY TO ENTER INTO IT, BY DELIVERING THE PROCESS OR MAILING IT TO THE ARTIST OR THE OTHER PERSON CONCERNED IN THE MANNER PRESCRIBED IN ARTICLE 15.  ANY SUCH DELIVERY OR MAIL SERVICE WILL HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE.

16.09.  In entering into this agreement and in providing services pursuant hereto, you and the Artist have and will have the status of independent contractors. Nothing herein contemplates or constitutes you or Artist as Company's agents or employees.

16.10.  The index (if any) attached hereto and the headings of the Articles herein are intended for convenience only and will not be of any effect in construing the contents of this agreement.

16.11.  This agreement will not become effective until executed by all parties hereto.

16.12.  Any and all riders, exhibits or schedules annexed hereto together with this basic document constitute this agreement.

17.  **COMPLIANCE WITH DISTRIBUTION AGREEMENT**

17.01  You hereby acknowledge and expressly agree that Company may enter into an agreement with a Distributor ("Distribution Agreement") in connection with the exploitation of rights granted by you to Company hereunder.  The relevant terms and conditions of the Distribution Agreement, relative to your services, products, ID Materials, and the recordings shall automatically be deemed incorporated herein and you agree to comply with and be bound by such terms and conditions as the same relate to you and the results, products, and proceeds of your services and performances hereunder.

17.02  Upon our entering into a Distribution Agreement, then, notwithstanding anything to the contrary contained in this agreement:

94614.2
52307

      (a)    Company shall have the right, at its election, to extend any Contract Period(s) to be co-extensive with the then-current period of the Distribution Agreement, plus an additional thirty (30) days.

      (b)    Company shall have the unrestricted right, at its election, to conform any one or more provisions (e.g., definitions, reserves, free goods, Term, recording commitment, sample clearance policies, royalty calculations, etc.) of this Agreement to the Distribution Agreement.

      (c)    You shall comply with all of the terms and conditions of this Agreement and the Distribution Agreement to enable us to fulfill all of its obligations under the Distribution Agreement.

17.03   In the event of any inconsistency between the definitions herein and the definitions contained in the Distribution Agreement (if applicable), then the definitions of the Distribution Agreement shall control. Any terms defined in the Distribution Agreement which are used herein but not defined herein shall have the same meaning as in the Distribution Agreement.

17.04   As and when requested by Company, you shall execute and deliver to Company an appropriate Artist's inducement letter or artist's declaration as may be required by Distributor or Company or any third party with whom we contract relative to the Recordings (collectively the Artist's "Inducement Letter"), and you further agree to be bound by all of the terms and conditions in the Artist Inducement Letter and in the Distribution Agreement, including without limitation, re-recording restrictions, product delivery requirements, controlled composition provisions, exclusivity, and the provisions for promotional activities and photograph sessions, etc. In the event that you fail or refuse to execute any such Inducement Letter or other documents within five (5) business days after Company's request that you do so, you hereby appoint Company as your true and lawful attorney-in-fact to execute such Inducement Letters or documents in your name and on your behalf. Such power of attorney shall be irrevocable and coupled with an interest.

KING MUSIC GROUP, INC.

By:_____
             An Authorized Signatory

AGREED TO AND ACCEPTED:


By:_____
   ELGIN BAYLOR LUMPKIN
Social Security No.: _____

**Schedule "1"**
Attached to that certain exclusive recording agreement between King Music Group Inc. and Elgin
Baylor Lumpkin

## UNRELEASED RECORDED PERFORMANCES

**Title**                                    **Producer**

## SCHEDULE "2"

**Tape Storage Report** _____

**ARTIST:**_____

**Producer:**_____

**Song Title:**_____

**Album Title:**_____

|  | TRACKING STUDIO | MIX STUDIO | MASTERING STUDIO |
|---|---|---|---|
| **Studio Name** |  |  |  |
| **Contact** (name and phone number) |  |  |  |
| **Format** |  |  |  |
| **Inventory** (number of tapes) |  |  |  |
| **Destination / Storage Vault (*)** |  |  |  |
| **Date Sent Out (*)** |  |  |  |
| **All Tapes Returned? (*)** |  |  |  |

**Record of Contact:**

# EXHIBIT "B"

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

Index No:

Date Summons Filed:
Plaintiff designates
New York County as
place of trial.
The basis of Venue is:
CPLR § 509

--------------------------------------------------------------X

PA PAH PRODUCTION, INC. and ELGIN BAYLOR
LUMPKIN P/K/A "GINUWINE"

                                                  Plaintiffs,

        -against-

KING MUSIC GROUP, INC., MICHAEL BOURNE                    **SUMMONS**
and DOES 1-10

                                                  Defendants.

--------------------------------------------------------------X

To the above named Defendant.

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve a
notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this
summons, exclusive of the day of service (or within 30 days after the service is complete
if this summons is not personally delivered to you within the State of New York); and in
case of your failure to appear or answer, judgment will be taken against you by default for
the relief demanded in the complaint.

Dated: 10/3/07
New York, New York

                                        Attorneys for Plaintiffs:

                                        Boddie & Associates, P.C.
NEW YORK                                Corey D. Boddie, Esq.
COUNTY CLERK'S OFFICE                   40 Exchange Place, Suite 1800
                                        New York, New York 10005
OCT _ _                                 Office (212) 480-7652
                                        Fax (212) 480-6581
NOT COMPARED
WITH COPY FILE

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-----------------------------------------------------------------X
PA PAH PRODUCTION, INC. and ELGIN BAYLOR
LUMPKIN P/K/A "GINUWINE"

                        Plaintiffs,

      -against-

KING MUSIC GROUP, INC., MICHAEL BOURNE
and DOES 1-10

                        Defendants.
-----------------------------------------------------------------X

Index No:
**COMPLAINT**

Demand for Jury
Trial

1. Plaintiff, PA PAH PRODUCTION INC. (hereinafter "PAH"), is a Delaware corporation.

2. Plaintiff, ELGIN BAYLOR LUMPKIN P/K/A "GINUWINE" (hereinafter "GINUWINE"), is an individual who, at the times alleged herein, resides in the City of Brandywine, State of Maryland.

3. Defendant KING MUSIC GROUP INC. (hereinafter "KING") is purportedly a corporation, state of incorporation unknown and is doing business in the City of New York, County of New York.

4. Defendant, MICHAEL BOURNE (hereinafter "BOURNE") is an individual who, at the times alleged herein, resides in the City of Memphis, State of Tennessee.

5. Plaintiffs are unaware of the true names, capacities and acts giving rise to the liability of defendants DOES 1-10, and therefore sues such defendants by such fictitious names. Plaintiffs will amend to insert the true names of said defendants when their names, capacities and acts giving rise to their liability become known. Plaintiffs are informed and believes and thereon allege that

Does 1-10 are responsible in some manner for the events and injuries herein alleged.

6. Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, each defendant was the agent and/or employee of each of the remaining defendants, and was acting in the scope of his agency and employment in doing the acts herein alleged.

## FACTS COMMON TO ALL CAUSES OF ACTION

7. GINUWINE is the owner of Defendant, PA PAH PRODUCTION INC. He is nationally and internationally known Rhythms and Blues' recording and performing artist. He is an outstanding record producer. GINUWINE has recording and produced embodying his performances that have sold in excess of ten millions albums. He is a three-time nominee of American Music Award for the favorite male R&B artist. He is the recipient of the Soul Train Music Award, Best R&B Soul Male album. He has received five Recording Industry Association of America Certified Platinum and/or Certified Gold Awards.

8. Plaintiffs believe that Defendant BOURNE is the owner of defendant KING.

9. In or about March 2007, Defendant BOURNE approached plaintiff to sign a recording contract with KING.

10. Defendant BOURNE represented to Plaintiff GENUWINE that he had recently created his own record label company, KING. Particularly, he represented that KING would be the record label for Plaintiff GINUWINE and would create individual attention to GINUWINE as a R&B's singer. BOURNE represented that his record company would sell and promote plaintiff GINUWINE as his main artist.

11. On or about May 8, 2007, Plaintiff PAH and defendant KING entered into a written recording agreement (hereinafter "AGREEMENT" and attached as Exhibit "A"). The AGREEMENT provides that KING/BOURNE would pay to GINUWINE $1,750,000.00 in connection with the recording of the first album.

12. The AGREEMENT provides among other things that upon execution of the AGREEMENT, defendant KING was to pay $500,000.00 to plaintiff.

13. Plaintiff GINUWINE agreed to provide his services as a recording artist to defendant, KING.

14. Further, the contract provided that GINUWINE could not render services for the purpose of recording albums for anyone else than KING. GINUWINE was only to record exclusively for KING.

15. KING is advertising on its Myspace's King Music Group website that:
"King Music Group is a new record label soon to be launched by Memphis businessman Michael Bourne and R&B artist Ginuwine. Michael Bourné is a true American entrepreneur and the embodiment of the term "self-made man." Michael worked his way through the University of Tennessee, and has gone on to create successful businesses in multiple industries. He has now decided to enter into the music industry along with one of R&B's most pre-eminent artists, Ginuwine. During the late 90's Ginuwine's sultry, seductive crooning earned him a substantial female following and made him a regular presence on the R&B charts, even after the futuristic production he favored was eclipsed by the more organic, retro-leaning neo-soul movement. Now Ginuwine's back and alongside Michael Bourne have formed KING MUSIC GROUP..."

16. Defendants are publicly advertising that GINUWINE is King Music Group Inc. exclusive recording artist.

17. Plaintiffs on information and belief have formed the opinion that Defendant KING does not exist. Plaintiffs have checked the corporation records for the

State of New York, Florida, California and Tennessee and no such entity named KING MUSIC GROUP INC. is registered.

18. Defendant BOURNE made false representations as to the existence of his record company KING in order to induce plaintiffs to enter into the agreement.

19. Even after the contract was entered, Defendant BOURNE has continuously represented to plaintiffs that he will pay him the amount of $500,000. But he has failed to make such payment.

20. The advance of $500,000.00 is due Plaintiffs for living expences and to compensate Plaintiffs for not entering into a recording agreement with another record company.

21. Defendant KING failed to pay the amount of $500,000.00 to plaintiff. As result of the false representations made by BOURNE, plaintiffs were damaged in the amount of no less than $500,000.00.

22. Plaintiff GINUWINE is unable to record for anyone but KING because of the AGREEMENT.

23. Additionally, Plaintiff lost the ability to seek other records deals.

24. Defendant KING has failed to perform pursuant to such AGREEMENT and that said AGREEMENT was entered as a result of fraud.

25. The AGREEMENT between plaintiffs and defendants at paragraph 16.08 provided that any dispute arising out of the contract must be submitted exclusively to the jurisdiction of the New York Courts (State and Federal). This Court is the appropriate jurisdiction and venue for these claims.

FIRST CLAIM FOR RELIEF

(BREACH OF CONTRACT)

**(BY PLAINTIFFS AGAINST ALL DEFENDANTS)**

26. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 25.

27. On or about May 8, 2007, Plaintiffs and Defendant KING entered into a recording agreement which provided that KING/BOURNE would pay to GINUWINE $1,750,000.00 in connection with the recording of the first album.

28. The AGREEMENT also provides among other things that upon execution of the AGREEMENT, defendant KING was to pay $500,000.00 to plaintiff.

29. Defendant BOURNE is the owner of KING.  Plaintiffs are informed and believe, and thereon allege, that KING is merely the alter ego of defendant BOURNE.

30. Plaintiffs were to be the recording artist under AGREEMENT.

31. Defendants have breached said AGREEMENT by failing to pay the sum of $500,000 upon execution of the AGREEMENT.

32. Plaintiffs never entered into any other agreement or made any commitment which would interfere with his commitment to the recording agreement.

33. Plaintiffs performed all their obligations in conformity of the AGREEMENT.

34. Plaintiffs have been damaged in an amount according to proof, but not less than the sum of $500,000.00, plus prejudgment interest.

**SECOND CLAIM FOR RELIEF**

**(FRAUD)**

**(BY PLAINTIFFS AGAINST ALL DEFENDANTS)**

35. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 25.

36. Defendant BOURNE falsely represented to plaintiffs that he was entering into the music business industry and that he had recently created his own record company, KING.

37. Particularly, he represented that KING would be the record label for Plaintiff GINUWINE and would create individual attention to GINUWINE as a R&B's singer. BOURNE represented that his record company would sell and promote plaintiff GINUWINE as his main artist.

38. When Defendants made these representations, they knew them to be false.

39. In fact, Plaintiffs on information and belief have formed the opinion that Defendant KING does not exist. Plaintiffs have checked the corporation records for the State of New York, Florida, California and Tennessee and no such entity named KING MUSIC GROUP INC. is registered.

40. On reliance of these representations, Plaintiffs entered into the AGREEMENT with defendants in or about May 2007.

41. Under the AGREEMENT, KING/BOURNE would pay to GINUWINE $1,750,000.00 in connection with the recording of the first album. The AGREEMENT also provides among other things that upon execution of the AGREEMENT, defendant KING was to pay $500,000.00 to plaintiff. Plaintiff GINUWINE was only to record exclusively for KING.

42. Further, the AGREEMENT provides that GINUWINE could not render services for the purpose of recording albums for anyone else than KING. GINUWINE was only to record exclusively for KING.

43. Even after the contract was entered, Defendant BOURNE has continuously represented to plaintiffs that BOURNE/KING will pay plaintiffs the amount

of $500,000. But defendants have failed to make such payment or any other payment.

44. Defendants are publicly advertising that GINUWINE is King Music Group Inc.'s exclusive recording artist.

45. When Defendants made these representations, they knew them to be false.

46. As a result of defendant's fraudulent misrepresentation, plaintiffs lost the ability to seek other records deals, never started the recording of his work, and had been damaged in the amount of $1,750,000.00.

47. At all time, Defendants made these representations with the intention to defraud Plaintiffs and to induce Plaintiffs to act in reliance on these representations in the manner hereafter alleged, or with the expectation that plaintiffs would so act.

48. Plaintiffs at the time Defendants made these representations were ignorant of the falsity of Defendants' representation and believed them to be true. In reliance of theses misrepresentation, Plaintiffs signed the agreement with defendants and thus was bound to record for defendant KING.

49. Plaintiffs justifiably relied upon these misrepresentations and were harmed due to such reliance.   Plaintiffs were induced to rely on Defendants' representations.

50. As a proximate result of the fraudulent conduct of defendants as herein alleged, Plaintiffs are entitled to an award of damages according to proof but not less than the sum of $1,750,000.00.

## THIRD CLAIM FOR RELIEF

## (BREACH OF NEGLIGENT MISREPRESENTATION)

## (BY PLAINTIFF AGAINST DEFENDANT BOURNE)

51. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 25.

52. Defendant BOURNE falsely represented to plaintiffs that he was entering into the music business industry and that he had recently created his own record company, KING.

53. Particularly, he represented that KING would be the record label for Plaintiff GINUWINE and would create individual attention to GINUWINE as a R&B's singer. BOURNE represented that his record company would sell and promote plaintiff GINUWINE as his main artist.

54. As a result of defendants' misrepresentations, plaintiffs entered with Defendants into a recording contract on or about May 8, 2007.

55. The AGREEMENT provides that KING/BOURNE would pay to GINUWINE $1,750,000.00 in connection with the recording of the first album. The AGREEMENT also provides that upon execution of the AGREEMENT, defendant KING was to pay $500,000.00 to plaintiff.

56. After the signature of the agreement, Defendant BOURNE continuously represented to plaintiffs that BOURNE/KING will pay the $500,000 to plaintiff. But defendants have failed to make such payment or any other payment.

57. Defendants are also publicly advertising that GINUWINE is KING's exclusive recording artist.

58. When Defendants made these representations, they knew them to be false.

59. In fact, Plaintiffs on information and belief have formed the opinion that Defendant KING does not exist. Plaintiffs have checked the corporation

records for the State of New York, Florida, California and Tennessee and no such entity named KING MUSIC GROUP INC. is registered.

60. Defendants induced plaintiffs to sign a recording agreement. Defendant BOURNE continuously represented that he and its company KING would be able to represent plaintiff GINUWINE and pay him for his services as a recording artist.

61. At all time Defendants knew that BOURNE and KING would neither pay plaintiffs nor represent plaintiffs under the AGREEMENT.

62. Under the AGREEMENT, Plaintiff GINUWINE was only to record exclusively for KING. Plaintiffs lost the ability to perform for other record companies. Because Plaintiffs had signed a with KING and that defendants constantly represented that they would pay Plaintiffs and performed under the contract, plaintiff GENUWINE did not and cannot sign with other record companies.

63. When Defendants made these representations, they knew them to be false.

64. As a result of defendants' misrepresentation, plaintiff lost the ability to perform for other record company, and had been damaged in the amount of $1,750,000.00.

65. When Defendants made these representations, Plaintiffs had no reasonable grounds for believing them to be true.

66. Defendants made these representations with the intention to defraud Plaintiffs and to induce Plaintiffs to act in reliance on these representations in the manner hereafter alleged, or with the expectation that plaintiffs would so act.

67. Plaintiffs at the time Defendants made these representations were ignorant of the falsity of Defendants' representation and believed them to be true. In

reliance of theses misrepresentation, Plaintiffs signed the agreement with defendants and thus was bound to record for defendant KING.

68. Plaintiffs justifiably relied upon these misrepresentations and were harmed due to such reliance. Plaintiffs were induced to rely on Defendants' representations.

69. As a proximate result of the false representations of defendants as herein alleged, Plaintiffs are entitled to an award of damages according to proof but not less than the sum of $1,750,000.00.

**WHEREFORE, PLAINTIFF PRAYS JUDGMENT AS FOLLOWS:**
ON THE FIRST CLAIM FOR BREACH OF CONTRACT

70. General damages in an amount according to proof but not less than $500,000.00;

71. Costs of suit herein incurred;

72. Prejudgment interest in an amount according to proof; and;

73. Such other relief as the court may deem proper.


ON THE SECOND CLAIM FOR FRAUD

1. General damages in an amount according to proof but not less than $1,750,000.00;

2. Punitive damage in an amount appropriate to punish defendant;

3. Costs of suit herein incurred;

4. Prejudgment interest in an amount according to proof; and,

5. Such other relief as the court may deem proper.


ON THIRD CLAIM FOR NEGLIGENT MISREPRESENTATION

1. General damages in an amount according to proof but not less than $1,750,000.00;

2. Costs of suit herein incurred;

3. Prejudgment interest in an amount according to proof; and,

4. Such other relief as the court may deem proper.


Date: October 3, 2007

By: _____
BODDIE & ASSOCIATES, P.C.
By: COREY D. BODDIE, Esq.
Attorneys for the Plaintiff
40 Exchange Place, Suite 1800
New York, New York 10005
(212) 480-7652
Fax (212) 480-6581


Co-counsel
JOSEPH E. PORTER III, ESQ.
LAW OFFICES OF JOSEPH PORTER III
206 3rd Street
Seal Beach, CA 90740-6009
(562) 493-3940
Fax (562) 493-3670

## VERIFICATION

STATE OF NEW YORK    )
                           )    ss:

COUNTY OF NEW YORK  )

    ELGIN BAYLOR LUMPKIN, being duly sworn, deposes and says:

    I am a Plaintiff in the above captioned action; I have read the foregoing

Complaint and know the contents thereof; the same is true to my own knowledge except

as to those matters therein stated to be alleged on information and belief and as to those

matters I believe it to be true.

_____
Plaintiff

Sworn before me this
2 /day of September , 2007

Valerie L. Widman-Bush
NOTARY PUBLIC
Charles County, MD
My Commission Expires
October 1, 2008

**VERIFICATION**

STATE OF NEW YORK   )
                            )    ss:

COUNTY OF NEW YORK )

        PA PAH PRODUCTIONS, INC., being duly sworn, deposes and says:

        I am a Plaintiff in the above captioned action; I have read the foregoing

Complaint and know the contents thereof; the same is true to my own knowledge except

as to those matters therein stated to be alleged on information and belief and as to those

matters I believe it to be true.

                                                           Plaintiff

Sworn before me this
___ day of September , 2007

Valerie L. Widman-Bloch
NOTARY PUBLIC
Charles County, MD
My Commission Expires
October 1, 2008

Exhibit A

King Music Group Inc.
c/o Grubman Indursky & Shire, PC
152 West 57th Street, 31st floor
New York, NY 10019
Attention: Kenneth Meiselas, Esq.

Dated as of May 8, 2007

Pa Pah Productions, Inc.
f/s/o Elgin Baylor Lumpkin p/k/a "Ginuwine"
c/o Davis Shapiro Lewit & Hayes, LLP
689 Fifth Ave., Fifth Floor
New York, New York 10022
Attention: Steven G. Shapiro, Esq.

Dear Ginuwine:

This letter confirms the material terms of the agreement ("Basic Terms") between Pa Pah Productions, Inc. f/s/o Elgin Baylor Lumpkin p/k/a "Ginuwine" ("Artist" and/or "you") and King Music Group Inc.("Company") in connection with, among other things, Company's engagement of Artist's exclusive recording services.

The Basic Terms, together with Company's standard form recording agreement which is annexed hereto as Exhibit "A" and made a part hereof (the "Recording Agreement Long Form") shall constitute the entire agreement (the "Agreement") between you and Company. Following complete execution hereof, the parties shall negotiate the Recording Agreement Long Form in good faith, other than the Basic Terms, with the express understanding and agreement that unless and until a superceding Recording Agreement Long Form is fully executed, if at all, the Basic Terms with the annexed Exhibit "A" shall constitute the full and complete understanding and fully binding Agreement between the parties. In the event of any inconsistency between the Basic Terms and the provisions of the Recording Agreement Long Form, the Basic Terms shall control to the extent necessary to rectify the inconsistency. All terms used herein, unless separately defined, shall have the same meaning as in the Recording Agreement Long Form. The parties mutually agree as follows:

## I. RECORDING AGREEMENT

1.    Territory:    The universe

2.    Term/Product Commitment

     Term:    Initial Period plus two (2) Option Periods

     Product:    Initial Period:    One (1) Album
               Each Option Period:    One (1) Album

     If Album 1 achieves sales in excess of 500,000 units in the U.S. (as reported by Soundscan) within 9 months of its initial commercial release in the U.S., the recording commitment for 1st Option Period (i.e., Album 2) shall automatically be deemed exercised as of the last date of the Initial Contract Period. Further, if Album 2 achieves sales in excess of 500,000 units in the U.S. (as reported by Soundscan) within 9 months of its initial commercial release in the U.S., the recording commitment for 2nd Option Period (i.e., Album 3) shall automatically be deemed exercised as of the last date of the 1st Option Period.

3.    Artist Advance/Recording Funds:

(a)    Recording Funds:

Albums 1-3:    $1,000,000 per Album.  Company shall pay you, as a non-returnable Advance (subject to paragraph 9 below), $750,000 (to be deducted equally from each of the Recording Funds for Albums 1-3, i.e., $250,000 from the each such Recording Fund), paid as follows: $500,000 upon full execution of this Agreement ("Execution Advance"); and $250,000 upon Delivery of Album 1.  Company shall also pay you the amount by which the applicable Recording Fund exceeds Recording Costs for each such Album.  The Advance referred to in the preceding sentence shall be paid to you promptly following Delivery of the applicable Album, and such sum shall be deemed an additional Advance.  Notwithstanding the foregoing, you hereby irrevocably direct and authorize us to remit Thirty-Seven Thousand Five Hundred Dollars ($37,500) of such Execution Advance to the order of Davis Shapiro Lewit & Hayes, LLP ("DSLH") at 689 Fifth Ave., Fifth floor, New York, New York 10022, Attn: Stephen G. Shapiro, Esq.  Company's compliance with such authorization shall constitute an accommodation to you, and nothing contained herein shall constitute DSLH a beneficiary or party to this Agreement.

(b)    Recoupability of Artist Advances:  All in-pocket advances payable to you (including without limitation, the Advances) shall be recoupable from your share of Net Profits.

4.    Net Profits Participation:

(a)    Records:    Company will credit to your account forty percent (40%) of Company's Net Profits with respect to Company's sale and exploitation of Artist's master recordings.

(b)    Merchandise:    Company will credit to your account eighty percent (80%) of Company's Net Profits with respect to Company's sale and exploitation of your "Merchandise Rights". Notwithstanding the preceding sentence, Company will credit to your account ninety percent (90%) of Company's Net Profits with respect to Company's sale and exploitation of your Merchandise Rights for those exploitations secured by Artist.  "Merchandising Rights" means Company's exclusive right throughout the Territory to use and/or exploit, reproduce, publish and/or display the approved Artist ID Materials, any approved Artwork, either alone or in conjunction with other elements, pertaining to the manufacture, sale and distribution for commercial and/or promotional merchandising purposes including without limitation, the exclusive right to sell, distribute, market and/or promote physical merchandise items (e.g., hats, t-shirts, sweatshirts, posters, stickers, games, comics and novelties, etc.) as well as virtual items (e.g., avatars, screen savers, etc.) including tie-ins, fan clubs, and "bounceback" merchandising.  Merchandise Rights shall also include the right to sell Merchandise in connection with Artist's live concert engagements.

(c)    Endorsement/Sponsorships:    Company will credit to your account eighty percent (80%) of Company's Net Profits with respect to Company's sale and exploitation of your "Endorsement Rights."  Notwithstanding the preceding sentence, Company will credit to your account ninety percent (90%) of Company's Net Profits with respect to Company's sale and exploitation of your Endorsement Rights for those exploitations secured by Artist.  "Endorsement Rights" means Company's exclusive right throughout the Territory to use and/or exploit, reproduce, publish and/or display the Artist ID Materials, including necessary personality rights, for commercial endorsement, strategic partnerships, and sponsorship purposes, including your personal services in connection therewith ("Endorsements") such as, but not limited to, a commercial advertising campaign for a third party product or service endorsed by you or commercial sponsorship of an event at which you are to appear (collectively, Endorsement Rights").  All exploitations of

2

such Endorsement Rights shall be subject to Artist's prior approval.

      (d)    Touring:    Company will credit to your account seventy-five percent (75%) of Company's Net Profits with respect to Company's sale and exploitation of Artist's "Touring Services". Notwithstanding the preceding sentence, Company shall not be entitled to any of Company's Net Profits: (i) with respect to the first twenty (20) performances in connection with Artist's Touring Services; and (ii) to the extent Artist's account is fully recouped. Touring Services" means Company's exclusive right throughout the Territory to the performance of your services as a musician, vocalist and/or performer in connection with one or more live performances or concerts ("Concert(s)"), including without limitation, Concerts by means of public stage performances of all kinds, webcasts, sponsorships, television broadcast or cablecasts (including pay-per-view telecasts), motion pictures, one-nighters, concert tours and the like. All Touring Services provided by Artist shall be subject to Artist's prior approval.

      (e)    "Net Profits" means gross receipts less Company's direct costs (including without limitation, recordings costs, manufacturing costs, marketing costs, distribution/services fee of 23%, mechanical royalties, and all monies becoming payable to third parties which become or may become payable by reason of the acquisition, creation, recording, manufacturing, distribution, exploitation or other use of the masters). Notwithstanding the preceding sentence, no distribution/services fee shall be deducted from gross receipts received by Company relating to Touring Services, Merchandise Rights and Endorsement Rights. In computing Net Profits, losses from prior accounting periods will be carried forward.

      (f)    To the extent that your account is fully recouped, Company shall not cross-collateralize Net Profits derived from one stream of income with any other stream of income earned hereunder.

    5.    Mechanical Royalties:

    USA and Canada:    100% of the minimum statutory rate as of the date of release ("Controlled Rate").

| Configurational Ceilings: | Albums: | 12 times Controlled Rate |
| | EP's: | 5 times Controlled Rate |
| | Singles: | 2 times Controlled Rate |

Mechanicals would be payable on records sold and not returned. So-called "excess" mechanicals paid by Company would be deemed an Advance against your share of Net Profits.

    6.    Creative Matters:    (a)    Artist and Company shall have mutual approval of (i) the musical compositions to be included on each Album, producers, video directors and storyboards; and (ii) Artist's likenesses and biographical material. Company's and Artist's approval shall not be unreasonably withheld; and in the event of an impasse, you and Company shall use their respective best efforts, reasonably and in good faith, to reach a resolution, provided that Company's reasonable good faith decision will control.

    (b)    During the Term, Company will endeavor to consult with Artist regarding the initial marketing campaign in connection with each Album Delivered in fulfillment of your Recording Commitment hereunder.

    7.    Delivery standard:    Commercially and technically satisfactory.

    8.    Rights: Company shall own all masters (excluding the underlying musical compositions) throughout the universe, in perpetuity, as "works made for hire," including, without limitation, those existing

2985144
052409

3

master recordings embodying the performances of Artist recorded prior to the date hereof which are not subject to a third party exclusive recording agreement ("Existing Masters"), a list of which is set forth on "Schedule A" attached hereto, and you shall make the standard representations and warranties in connection therewith. In addition, Company shall have the exclusive rights to your and Artist's rights with respect to Artist's ID Materials (subject to pre-existing grants of rights made to third parties prior to the Term hereof), Merchandise Rights, Endorsement Rights and Touring Services. Notwithstanding the foregoing, the parties acknowledge that prior to the Term hereof, Artist was party to an exclusive recording agreement with Sony_____("Sony") dated as of _____ (the "Sony Agreement"), whereby Sony may require Artist to deliver no more than two (2) additional master recordings in connection with a so-called "Greatest Hits" album (the "GH Masters"). Artist shall notify Company in the event Artist receives notice from Sony requiring Artist to deliver the GH Masters, and you and Artist will use your best efforts to ensure that the release of the GH Masters will not conflict with any Album or other Record to be released by Company hereunder.

9.     Co-Publishing Agreement:  In order to induce Company to execute this Agreement (it being to Artist's benefit as a recording artist that Company execute same) and to pay good and valuable consideration inuring to Artist's benefit under this Agreement, Artist hereby agrees that Company shall not be obligated or required to allow Artist to commence recording the Album to be delivered in connection with the Recording Commitment for the initial Contract Period of the Agreement, unless the parties hereto negotiate and execute a co-publishing agreement (the "Co-Publishing Agreement"). In the event the parties fail, after good faith negotiations, to execute a Co-Publishing Agreement within the time prescribed in the preceding sentence, Company shall have the right to terminate this Agreement.

MISCELLANEOUS:

This document may be signed in counterparts, and may be executed and delivered by facsimile, which when taken together will have the same effect as if signed in its original form by both parties.  You understand and acknowledge that this Agreement constitute a valid and binding legal document which affects your legal and financial interests.  You acknowledge that you have had ample opportunity to read this Agreement and that you understand the terms and conditions set forth in the Agreement.  You hereby acknowledge that Company has advised you to obtain independent legal counsel in connection with the execution of this Agreement and you further acknowledge that you have either obtained such independent legal counsel or have voluntarily waived your right to do so.

This Agreement shall not be construed against either party as the drafter, it being agreed that this Agreement has been drafted jointly by the parties.

If the foregoing reflects your understanding of the Agreement, please so indicate by signing in the space provided below.

KING MUSIC GROUP INC.

By: _____
   Title: President

ACCEPTED AND AGREED:

Pa Pah Productions, Inc.

194312.4
052407

4

An Authorized Signatory

2445124
052497

S

Elgin Baylor Lumpkin p/k/a "Ginuwine"
c/o Davis Shapiro Lewit & Hayes, LLP
689 Fifth Ave.
Fifth Floor
New York, New York 10022
Attention: Steven G. Shapiro, Esq.

Date: May 8, 2007

King Music Group Inc.
c/o Grubman Indursky & Shire, PC
152 West 57th Street, 31st floor
New York, NY 10019
Attention: Kenneth Meiselas, Esq.

Gentlemen:

Pursuant to an exclusive recording contract (the "Recording Contract") between Pa Pah Productions, Inc. ("Company") and me, Company is entitled to my exclusive services as a recording artist and is the sole owner of the entire worldwide right, title and interest in and to the results and proceeds of my services as a recording artist under the Recording Contract, including, without limitation, master recordings embodying my performances and the phonograph records derived therefrom. I have been advised that Company is entering into a written agreement with you (the "Agreement"), pursuant to which Company is agreeing to furnish my services as a recording artist exclusively to you and pursuant to which you shall be the sole owner of the entire worldwide right, title and interest in and to the results and proceeds of my services as a recording artist.

In consideration of your entering into the Agreement, and as a further inducement for you to do so, it being to my benefit as a recording artist that you enter into the Agreement, I hereby represent and agree as follows:

1.     (a)      I have read the Agreement in its entirety and fully understand the Agreement and all of the terms thereof were explained to me before signing this document.

(b)      Company has the right to enter into the Agreement and to assume all of the obligations, warranties and undertakings to you on the part of Company contained therein, and Company shall continue to have those rights during the term of the Agreement and thereafter until all of those obligations, warranties and undertakings shall have been fully performed and discharged.

(c)      All of the obligations, warranties and undertakings covenants and agreements on the part of Company contained in the Agreement which concern Company or me are true and correct.

(d)      I shall fully and to the best of my abilities perform and discharge all of the obligations, warranties and undertakings contained in the Agreement insofar as the same are required of me and to the extent Company has undertaken to cause the performance and discharge by me of those obligations and undertakings.

2. If during the term of the Agreement or any extensions or renewals thereof, Company shall, for any reason, cease to be entitled to my services as a recording artist or the results and proceeds thereof in accordance with the terms thereof or Company shall, for any reason, fail or refuse to furnish my services as a recording artist or the results and proceeds thereof exclusively to you as and when required under the Agreement or Company shall commit any action or omission proscribed in paragraph 15.04 of the Agreement, I shall, at your written request, for the remaining balance of the term of the Agreement upon the

2945124
u53e07

6

terms contained therein, be deemed substituted for Company as a party to the Agreement as of the date of your notice to me. Without limitation of the foregoing, in the event I am substituted in place of Company as a party to the Agreement, I shall render all services and perform all acts as shall give to you the same rights, privileges and benefits to which you are entitled under the Agreement as if Company had continued to be entitled to my services as a recording artist and had continued to furnish my services as a recording artist and the results and proceeds thereof exclusively to you as and when required under the Agreement, and such rights, privileges and benefits shall be enforceable in your behalf against me.

3. You and any person, firm or corporation designated by you shall have the perpetual, worldwide right to use and to permit others to use my name (both legal and professional, and whether presently or hereafter used by me), likeness, other identification and biographical material concerning me, for purposes of trade and advertising. You shall have the further right to refer to me during the term of the Agreement as your exclusive recording artist, and I shall in all my activities in the entertainment field use reasonable efforts to be billed and advertised during the term of the Agreement as your exclusive recording artist. The rights granted to you pursuant to this paragraph with respect to my name, likeness, other identification and biographical material concerning me shall be exclusive during the term of the Agreement and nonexclusive thereafter. Accordingly, but without limiting the generality of the foregoing, I shall not authorize or permit any person, firm or corporation other than you to use during the term of the Agreement my legal or professional name or my likeness in connection with the advertising or sale of phonograph records (including, without limitation, audiovisual records).

4. During the term of the Agreement, I shall not enter into any agreement or make any commitment which would interfere with my performance of my obligations under the Agreement, and I shall not perform or render services in connection with the recording of master recordings for any person, firm or corporation other than you. After the expiration or termination of the term of the Agreement, I shall not prior to the later of the following dates perform for any person, firm or corporation other than you, for the purpose of making recordings of phonograph records, any selection which had been recorded under the Agreement or under any other agreement between Company or me and you or your affiliates: (a) the date five (5) years subsequent to the date on which that selection shall have been last delivered to you in a master recording recorded under the Agreement; or (b) the date two (2) years subsequent to the expiration or termination of the term of the Agreement.

5. Intentionally Deleted.

6. You may, in your name, institute any action or proceeding against me individually or collectively, at your election, to enforce your rights under the Agreement, under this guarantee or under the Recording Contract.

7. Company expressly acknowledges that Company's and my services hereunder and under the Agreement are of a special, unique, intellectual and extraordinary character which gives them peculiar value, and that if Company or I breach any term hereof or of the Agreement, you will be caused irreparable injury which cannot adequately be compensated by money damages. Accordingly, you shall be entitled to injunctive relief, in addition to any other rights or remedies which you may have, to enforce the terms hereof or of the Agreement.

8. I shall look solely to Company for any and all royalties, recording fees or other monies payable to me in respect of the recording of all recordings under the Recording Contract and under the Agreement and in respect of your manufacture, distribution, sale or other use of recordings recorded under the Agreement and all phonograph records and other reproductions derived therefrom, all throughout the world.

9. I warrant and represent that I am not a resident of the State of California.

10. I, on behalf of myself and on behalf of any publisher or other person or entity which has or may

7

have any interest in or to any Controlled Composition (as defined in the Agreement) hereby license to you mechanical reproduction rights with respect to each Controlled Composition upon the terms and at the mechanical royalty rates applicable to Controlled Compositions licensed to you by Company.

11. If there is more than one (1) individual signatory to this Agreement, our obligations hereunder and under the Agreement are joint and several, and your rights hereunder and under the Agreement apply with respect to each of us individually and collectively.

12. This Agreement has been entered into the State of New York, and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York. All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the state of New York or the Federal District Courts located in New York City; provided, however, if you are sued or joined in any other court or forum (including an arbitration proceeding) in respect of any matter which may give rise to a claim by you hereunder, I consent to the jurisdiction of such court or forum over any such claim which may be asserted by you. Any process in any action or proceeding commenced in the courts of the State of New York arising out of any such claim, dispute or disagreement, may among other methods, be served upon me by delivering or mailing the same, via certified mail.

Very truly yours,

Elgin Baylor Lumpkin p/k/a "Ginuwine"
S.S.#: 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

Agreed to and Accepted:

KING MUSIC GROUP, INC.

By:
An Authorized Representative

**EXHIBIT "C"**

LAW OFFICES
# JOSEPH E. PORTER III
206 3RD STREET, SEAL BEACH, CALIFORNIA 90740
TELEPHONE (562) 493-3940  FAX (562) 493-3670

Via Fax (312) 573-4931
and email: michael@bourne-holdings.com

October 9, 2007

Mr. Michael Bourne
and King Music Group, Inc.
6625 Lenox Pkwy, Suite 110
Memphis TN 38115

Re: **Settlement Agreement**
Pa Pah Production, Inc. and Elgin Baylor Lumpkin p/k/a "Ginuwine"
and M&A Holdings, LLC d.b.a King Music Group, Inc., Michael Bourne and Does

Dear Mr. Bourne,

This will confirm our negotiations with respect to settlement of that certain law suit as between Pa Pah Production, Inc. and Elgin Baylor Lumpkin p/k/a "Ginuwine" and King Music Group, Inc., Michael Bourne and Does and the amendment of that certain Agreement dated as of May 8, 2007 as between the parties heretofore set out.

- **1.** Mr. Bourne will immediately deliver to the Law Offices of Joseph E. Porter III a certified check in the amount of $250,000. or wire transfer the sum to Mr. Porter's account at Bank of America in trust for Mr. Lumpkin. Said check shall be payable as follows: "Joseph E. Porter III, in trust for Elgin Lumpkin";

- **2.** Mr. Bourne will immediately deliver transfer of required registration for the Rolls Royce Mr. Bourne previously gave to Mr. Lumpkin. Title will be held in Mr. Lumpkin's name. Mr. Bourne will make and be totally responsible for all payments. Title may be joint in the names of Michael Bourne and Elgin Baylor Lumpkin. Mr. Bourne hereby acknowledges that he quits claim to his interest in the vehicle to Mr. Lumpkin. Mr. Bourne shall remain responsible for all payments except that Mr. Lumpkin is required to obtain all necessary automobile insurances.

- **3.** Not later than November 17, 2007 Mr. Bourne will deliver to the Law Offices of Joseph E. Porter III a certified check in the amount of $100,000. or wire transfer the sum to Mr. Porter's account at Bank of

America in trust for Mr. Lumpkin. Said check shall be payable as follows: "Joseph E. Porter III, in trust for Elgin Lumpkin";

- **4.** Mr. Bourne will establish a line of credit in the sum of $1,000,000. which will be available to Mr. Lumpkin and/or his business manager, Mr. Louis Bush, for all costs incurred in connection with the recording of the First Album due under the terms of the aforesaid Agreement. Mr. Lumpkin and/or Mr. Bush will have the right to draw against this account to fulfill the delivery obligations pursuant to the terms of the Agreement. Mr. Bourne shall receive a full accounting with regards to amounts drawn down from this line of credit. Mr. Bourne agrees to use his American Express Black Card Account to manage the recording budget. Mr. Bourne will further provide Mr. Louis Bush, Mr. Elgin Lumpkin/Ginuwine and Mr. Terence Williams with individual user American Express Black Cards on his account. Mr. Bourne and Mr. Bush will negotiate deals for certain budget items together including but not limited to studios', producers' fees etc.

- **5.** Not later than 5 days after delivery of the First Album indicated above Mr. Bourne will deliver to the Law Offices of Joseph E. Porter III a certified check in the amount of $250,000. or wire transfer the sum to Mr. Porter's account at Bank of America in trust for Mr. Lumpkin. Said check shall be payable as follows: "Joseph E. Porter III, in trust for Elgin Lumpkin";

- **6.** Mr. Bourne and Mr. Lumpkin have agreed that Mr. Lumpkin shall have and hold a 50% interest in the net profits derived by Mr. Bourne, and/or King Music Group, Inc. It is expressly agreed that Mr. Bourne and Mr. Lumpkin are equal partners in King Music Group, Inc.

- **7.** The Agreement is further amended to provide that Mr. Bourne shall be entitled to only 1 album instead of 2 albums;

- **8.** All sums paid by Mr. Bourne to Mr. Lumpkin other than the $1,000,000. budget to record the album shall not be recoupable under the terms of the Agreement. If Mr. Bourne makes any loans of cash or personal items that are not gifts and are outside of the terms of this Settlement Agreement, said amounts shall be recoupable.

- **9.** Mr. Lumpkin will move the Court for an Order dismissing the Lawsuit without prejudice. Mr. Bourne agrees to remain personally responsible for all the obligations set forth in this Settlement Agreement. The parties further agree to cooperate with respect to the issuance of a Press Release stating in essence that they have settled the differences between themselves and are looking forward to a positive and cooperative

relationship in the future. Mr. Lumpkin will be recording his next album for Mr. Bourne.

- **10.** Should Mr. Bourne fail to meet any of the obligations set forth in this Settlement Agreement, the Amended Agreement or the Agreement, Mr. Lumpkin shall be entitled to his legal fees and/or costs he has or will incur in connection with Mr. Bourne's failure to properly perform Mr. Bourne's obligations.

This Settlement Agreement, when executed by each of the parties in the places indicated below, shall settle the Lawsuit and amend the Recording Agreement. The Settlement Agreement may be executed in counterparts. A facsimile signature shall, for all purposes, be deemed an original.

Very truly yours,

Joseph E. Porter III

Agreed and Acknowledged:

Michael Bourne

_Michael Bourne_ (signature)

M&A Holdings, LLC d.b.a King Music Group, Inc.

_Michael Bourne_ (signature)

Elgin Baylor Lumpkin, p/k/a "Ginuwine"

Pa Pah Production, Inc.

relationship in the future. Mr. Lumpkin will be recording his next album for Mr. Bourne.

- 10. Should Mr. Bourne fail to meet any of the obligations set forth in this Settlement Agreement, the Amended Agreement or the Agreement, Mr. Lumpkin shall be entitled to his legal fees and/or costs he has or will incur in connection with Mr. Bourne's failure to properly perform Mr. Bourne's obligations.

This Settlement Agreement, when executed by each of the parties in the places indicated below, shall settle the Lawsuit and amend the Recording Agreement. The Settlement Agreement may be executed in counterparts. A facsimile signature shall, for all purposes, be deemed an original.

Very truly yours,

Joseph E. Porter III

Agreed and Acknowledged:

Michael Bourne

_____

M&A Holdings, LLC d.b.a King Music Group, Inc.

_____

Elgin Baylor Lumpkin, p/k/a "Ginuwine"

_____

Pa Pah Production, Inc.

_____

**EXHIBIT "D"**

LOCKE LORD BISSELL & LIDDELL LLP    300 SOUTH GRAND AVENUE, SUITE 800 | LOS ANGELES, CALIFORNIA 90071
213.485.1500 | 213.485.1200 FAX | WWW.LOCKELORD.COM

January 4, 2008

BRANDON J. WITKOW
Direct Tel.: 213.687.6781
Direct Fax: 213.341.6781
BWitkow@Lockelord.com

**VIA ELECTRONIC MAIL & FEDERAL EXPRESS**

Mr. Michael Bourne
6625 Lenox Park Drive, Suite 110
Memphis, Tennessee 38115

Re:    *May 8, 2007 Recording Agreement & October 9, 2007 Settlement Agreement with
Elgin Baylor Lumpkin p/k/a Ginuwine*

Dear Mr. Bourne:

We have been retained by Elgin Baylor Lumpkin p/k/a Ginuwine (hereafter "Mr. Lumpkin") to
prepare the attached Complaint against you, King Music Group, Inc., King Music Group, LLC, and
M&A Holdings, LLC based on, among other things, egregious breaches by you individually, and on
behalf of King Music Group of the Recording Agreement, dated May 8, 2007 ("Recording
Agreement"), and Settlement Agreement, dated October 9, 2007 ("Settlement Agreement"), by and
between you and King Music Group, on the one hand, and Mr. Lumpkin, on the other hand.

As you should be well aware, the Settlement Agreement requires you to provide to Mr. Lumpkin,
among other things, (1) monetary payments, (2) full title to, without any liens or encumbrances, and
registration for, the 2005 Rolls Royce Phantom automobile, (3) access to a $1 million dollar line of
credit to be used for recording costs incurred in producing an album, (4) an American Express Black
card tied to your line of credit for recording costs,[1] and (5) a one-half (50%) interest in King Music
Group.  While you have made the initial monetary payments called for under the Settlement
Agreement, despite repeated requests by Mr. Lumpkin and Mr. Bush, you have refused to comply
with the remaining terms of the agreement.  Most importantly, your refusal to provide Mr. Lumpkin
access to the recording line of credit completely frustrates Mr. Lumpkin's ability to comply with his
obligations under the Recording Agreement to produce an album for King Music Group.
Moreover, Mr. Lumpkin, relying upon your representations and the terms of the Recording
Agreement and Settlement Agreement, has refused several recording and professional opportunities
in order to fully perform his obligations under these agreements.  Since you have failed to perform
your obligations, which are central to the production of an album, Mr. Lumpkin has suffered
significant damage to his reputation, marketability and earnings power.

On behalf of Mr. Lumpkin, we hereby demand that you immediately cure your and King Music
Group's material breaches of the Settlement Agreement and provide us, no later than the close of
business on Friday, January 11, 2008: (1) the specific account and access instructions for the $1

---

[1]    The Settlement Agreement also calls for you to provide an American Express Black card to
Louis Bush, Mr. Lumpkin's business manager.

LOCKE LORD BISSELL & LIDDELL LLP

Mr. Michael Bourne
January 4, 2008
Page 2

million dollar recording line of credit,[2] (2) official title and registration to the 2005 Rolls Royce
Phantom automobile, (3) documentation confirming that the 2005 Rolls Royce Phantom is not
encumbered by any liens or debts or subject to financing by any third party, (4) an American
Express Black card in the names of Mr. Lumpkin and Mr. Bush, respectively, tied to your American
Express line of credit to be used for recording costs, (5) documentation confirming Mr. Lumpkin's
one-half (50%) interest in King Music Group, Inc., and (6) a complete financial statement (including
all assets, liabilities, income etc.) of King Music Group, Inc. so that we may assess Mr. Lumpkin's
financial interest in this entity. While Mr. Lumpkin continues to be interested in resolving this
dispute short of litigation, you must understand the seriousness of our position. Mr. Lumpkin will
no longer accept your empty promises, made on an almost weekly basis, concerning your intent to
comply with the terms of the Agreements.

If we do not hear from you by the above-stated date, or if you respond that you are not willing to
negotiate in good faith to reach a settlement of this dispute, our client is prepared to aggressively
litigate his claims and to seek all damages and remedies to which he is entitled. We look forward to
hearing from you.

Sincerely,

LOCKE LORD BISSELL & LIDDELL, LLP



Brandon J. Witkow

cc:    Elgin Baylor Lumpkin
       Louis Bush

Encl.

---

[2]    Please note that we are in receipt of your email of today's date wherein you represent that
you will "put 300k into an account as requested" by January 11, 2008. As stated above, the
Settlement Agreement requires the provision of a $1 million dollar recording line of credit. Mr.
Lumpkin has never agreed to accept such line of credit in installments or at your discretion. Indeed,
given the issues we have encountered in obtaining the line of credit over the past several months, we
will not accept any modification of this term.

LA 591610v.1