## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------------x
PA PAH PRODUCTIONS, INC. and              :
ELGIN BAYLOR LUMPKIN p/k/a GINUWINE,      :        08 CV 0391 (AKH)
                                          :        ECF CASE
                   Plaintiffs,            :
                                          :        ANSWER, DEFENSES
            v.                            :        AND COUNTERCLAIMS
                                          :
KING MUSIC GROUP, INC., KING MUISC        :        JURY DEMAND
GROUP, LLC, M&A HOLDINGS, LLC,            :
MICHAEL BOURNÉ and DOES 1-10 inclusive,   :
                                          :
                   Defendants.            :
                                          :
--------------------------------------------------------------x
```

Defendants King Music Group, LLC, formerly known as M&A Holdings, LLC

(incorrectly sued separately as "M&A Holdings, LLC" and "King Music Group, Inc.")[1],

and Michael Bourné ("Defendants"), by their attorneys, Jonathan D. Davis, P.C., for their

answer and defenses to the Complaint, dated January 15, 2008, state on their own

knowledge as to their acts, and upon information and belief as to the acts of others, as

follows:

1. Deny the allegations in paragraph 1 of the Complaint, except aver that

Plaintiff purports to allege claims for breach of contract, fraud, negligent

---

[1]  Plaintiff has purported to sue non-existent entity "King Music Group, Inc." "M&A
Holdings, LLC," duly formed on April 19, 2007, is a limited liability company organized
under the laws of the State of Tennessee. On or about October 11, 2007, M&A Holdings,
LLC was renamed "King Music Group, LLC" by filing an amendment with the Tennessee
Secretary of State's Office. Prior to the formal name change, M&A Holdings, LLC was
doing business as "King Music Group, LLC," which was sometimes mistakenly referred
to as "King Music Group, Inc." (underlining added). To avoid unnecessary repetition of
this history, the entity that contracted with Plaintiffs is sometimes referred to herein as
"King Music Group."

misrepresentation and for a declaratory judgment. To the extent that paragraph 1 calls for a legal conclusion, no response is required.

2. Deny the allegations in paragraph 2 of the Complaint and expressly deny that Defendants engaged in any fraud and/or other wrongdoing. To the extent that paragraph 2 calls for a legal conclusion, no response is required.

## RESPONSES TO JURISICTION AND VENUE ALLEGATIONS

3. Deny the allegations in paragraph 3 of the Complaint, except aver that, upon information and belief, the parties are citizens of diverse states, but none are citizens of the State of New York. To the extent that paragraph 3 calls for a legal conclusion, no response is required.

4. Deny the allegations in paragraph 4 of the Complaint.

5. Deny the allegations in paragraph 5 of the Complaint, except aver that M&A Holdings, LLC (which was sometimes mistakenly referred to as "King Music Group, Inc." (underlining added), instead of King Music Group, LLC, which was formerly known as M&A Holdings, LLC) and Pa Pah Productions, Inc. ("Pa Pah") entered into a recording agreement as of May 8, 2007 (the "Recording Agreement"), a copy of which is attached as Exhibit A to the Complaint, together with an inducement letter with Elgin Baylor Lumpkin p/k/a "Ginuwine" ("Lumpkin"), dated May 8, 2007 (the "Inducement Letter"), a copy of which is also attached as Exhibit A to the Complaint, agreed, *inter alia*, that all "claims, disputes or disagreements" among the parties arising out of the interpretation, performance or breach of the Recording Agreement and Inducement Letter would be submitted exclusively to the jurisdiction of the state or federal courts in the City and State of New York.

6. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 6 of the Complaint.

7. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 7 of the Complaint, except aver that Lumpkin is professionally known as "Ginuwine," a performer and recording artist.

8. Deny the allegations in paragraph 8 of the Complaint, except aver that "M&A Holdings, LLC," duly formed on April 19, 2007, is a limited liability company organized under the laws of the State of Tennessee. On or about October 11, 2007, M&A Holdings, LLC was renamed "King Music Group, LLC." Prior to the formal name change, M&A Holdings, LLC was doing business as "King Music Group, LLC," which was sometimes mistakenly referred to as "King Music Group, Inc." (underlining added).

9. Admit the allegations in paragraph 9 of the Complaint.

10. Deny the allegations in paragraph 10 of the Complaint, except aver that M&A Holdings, LLC, duly formed on April 19, 2007, is a limited liability company organized under the laws of the State of Tennessee. On or about October 11, 2007, M&A Holdings, LLC was renamed "King Music Group, LLC." Prior to the formal name change, M&A Holdings, LLC was doing business as "King Music Group, LLC," which was sometimes mistakenly referred to as "King Music Group, Inc." (underlining added). King Music Group, LLC is the asset holder of the Recording Agreement. King Music Group, LLC maintains its principal office at 6625 Lenox Parkway, Suite 110, Memphis, Tennessee 38115, and its registered agent is Teresa M. Bernhardt at 6363 Poplar Avenue, Suite 405, Memphis, Tennessee 38119.

3

11. Deny the allegations in paragraph 11 of the Complaint, except aver that Michael Bourné resides in Tennessee, is the sole member of King Music Group and Bourné Holdings, LLC, and otherwise refer to the Settlement Agreement, dated October 9, 2007, a copy of which is attached as Exhibit C to the Complaint.

12. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 12 of the Complaint.

13. Deny the allegations in paragraph 13 of the Complaint.

## RESPONSES TO BACKGROUND ALLEGATIONS

14. Deny the allegations in paragraph 14 of the Complaint, except aver that Michael Bourné was introduced to Lumpkin for the purpose of discussing a potential union to commercially exploit musical recordings featuring Lumpkin's performances. It is further averred that M&A Holdings, LLC, duly formed on April 19, 2007, is a limited liability company under the laws of the State of Tennessee. On or about October 11, 2007, M&A Holdings, LLC was renamed "King Music Group, LLC." Prior to the formal name change, M&A Holdings, LLC was doing business as "King Music Group, LLC," which was sometimes mistakenly referred to as "King Music Group, Inc." (underlining added).

15. Deny the allegations in paragraph 15 of the Complaint, except aver that Michael Bourné had limited prior experience in the music business.

16. Deny the allegations in paragraph 16 of the Complaint, except aver that Michael Bourné and Lumpkin discussed various business and financial matters in connection with their potential union to commercially exploit musical recordings featuring the performances of Lumpkin.

4

17. Deny the allegations in paragraph 17 of the Complaint, except aver that M&A Holdings, LLC (which was sometimes mistakenly referred to as "King Music Group, Inc." (underlining added), instead of King Music Group, LLC, formerly known as M&A Holdings, LLC) and Pa Pah entered into the Recording Agreement. The Court is respectively referred to the Recording Agreement for its true terms, meaning and import. To the extent that paragraph 17 calls for a legal conclusion, no response is required.

18. In response to paragraph 18 of the Complaint, which purports to summarize specific provisions of the Recording Agreement, Defendants respectfully refer the Court to those provisions for their true terms, meaning and import. To the extent that paragraph 18 calls for a legal conclusion, no response is required.

19. In response to paragraph 19 of the Complaint, which purports to summarize specific provisions of the Recording Agreement, Defendants respectfully refer the Court to those provisions for their true terms, meaning and import. To the extent that paragraph 19 calls for a legal conclusion, no response is required.

20. Deny the allegations in paragraph 20 of the Complaint, except aver that M&A Holdings, LLC (which was sometimes mistakenly referred to as "King Music Group, Inc." (underlining added), instead of King Music Group, LLC, formerly known as M&A Holdings, LLC) and Pa Pah executed the Recording Agreement and undertook to promote the subject of that contract, including, *inter alia*, on www.myspace.com, which the Court is respectfully referred to for the true content.

21. Deny the allegations in paragraph 21 of the Complaint and respectfully refer the Court to the Recording Agreement and Inducement Letter for their true terms,

meaning and import. To the extent that paragraph 21 calls for a legal conclusion, no response is required.

22. Deny the allegations in paragraph 22 of the Complaint, except aver that M&A Holdings, LLC (which was sometimes mistakenly referred to as "King Music Group, Inc." (underlining added), instead of King Music Group, LLC, formerly known as M&A Holdings, LLC) and Pa Pah entered into the Recording Agreement. The Court is respectfully referred to the Recording Agreement for its true terms, meaning and import. To the extent that paragraph 22 calls for a legal conclusion, no response is required.

23. Deny the allegations in paragraph 23 of the Complaint, except aver that Michael Bourné and Lumpkin corresponded by e-mail concerning various topics, including, but not limited to, the bilateral performance of the respective obligations of King Music Group and Pa Pah under the Recording Agreement, and King Music Group and Lumpkin under the Inducement Letter. To the extent that paragraph 23 calls for a legal conclusion, no response is required.

24. Deny the allegations in paragraph 24 of the Complaint.

25. Deny the allegations in paragraph 25 of the Complaint with respect to any fraud and/or other wrongdoing by Defendants, and deny knowledge or information with respect to other "recording and performance opportunities" allegedly offered to Lumpkin. The Court is respectfully referred to the Recording Agreement and any written correspondence referred to in paragraph 25 for their true terms, meaning and import. To the extent that paragraph 25 calls for a legal conclusion, no response is required.

26. Deny the allegations in paragraph 26 of the Complaint, except aver that Michael Bourné and Lumpkin corresponded by e-mail concerning various topics,

including, but not limited to, the bilateral performance of the respective obligations of King Music Group, LLC and Pa Pah under the Recording Agreement, and King Music Group and Lumpkin under the Inducement Letter. The Court is respectfully referred to the Recording Agreement, the Inducement Letter and any written correspondence referred to in paragraph 26 for their true terms, meaning and import. To the extent that paragraph 26 calls for a legal conclusion, no response is required.

27. Deny the allegations in paragraph 27 of the Complaint, except aver that: (i) the alleged obligation to make the initial $500,000 payment was subject at all times to Plaintiffs' obligation, as a condition precedent, to enter into a Co-Publishing Agreement, which never occurred; (ii) Pa Pah failed to furnish the exclusive recording services of Lumpkin, and Lumpkin engaged in recording music and performing for third parties, in contravention of the Recording Agreement and Inducement Letter, thereby suspending King Music Group's further performance; and (iii) King Music Group did in fact pay Pa Pah and/or Lumpkin the sum of $350,000.

28. Admit the allegation in paragraph 28 of the Complaint that Plaintiffs filed an action against Defendants in the Supreme Court of the State of New York, County of New York (the "New York State Action"), and respectfully refer the Court to Exhibit B to the Complaint as to the allegations and claims asserted therein.

29. Deny the allegations in paragraph 29 of the Complaint, except aver that the action was withdrawn promptly after it was filed by Plaintiffs and that Michael Bourné was not represented by counsel. To the extent that paragraph 29 calls for a legal conclusion, no response is required.

30. Deny the allegations in paragraph 30 of the Complaint, except aver that Defendant M&A Holdings, LLC (which was mistakenly referred to as d/b/a "King Music Group, Inc.") and Michael Bourné signed the Settlement Agreement, dated October 9, 2007, which is attached as Exhibit C to the Complaint. On October 11, 2007, M&A Holdings, LLC was formally renamed "King Music Group, LLC" by the filing of an amendment with the Tennessee Secretary of State's Office. The Court is respectfully referred to the Settlement Agreement for its true terms, meaning and import. To the extent that paragraph 30 calls for a legal conclusion, no response is required.

31. In response to paragraph 31 of the Complaint, the Court is respectfully referred to the Settlement Agreement, which recites that "Lumpkin will move the Court for an Order dismissing the Lawsuit without prejudice." To the extent that paragraph 31 calls for a legal conclusion, no response is required.

32. Deny the allegations in paragraph 32 of the Complaint, except aver that: (i) Pa Pah failed, among other things, to enter into a Co-Publishing Agreement and to furnish the exclusive recording services of Lumpkin; (ii) Pa Pah and Lumpkin engaged in recording music and performing for third parties in contravention of the Recording Agreement and Inducement Letter, thereby suspending King Music Group's further performance; and (iii) King Music Group did in fact pay Pa Pah and/or Lumpkin the sum of \$350,000. The Court is respectfully referred to the Settlement Agreement and any written correspondence referred to in paragraph 32 for their true terms, meaning and import. To the extent that paragraph 32 calls for a legal conclusion, no response is required.

33. Deny the allegations in paragraph 33 of the Complaint, except aver that: (i) Pa Pah failed, among other things, to enter into a Co-Publishing Agreement and to furnish the exclusive recording services of Lumpkin; (ii) Pa Pah and Lumpkin engaged in recording music and performing for third parties in contravention of the Recording Agreement and Inducement Letter, thereby suspending King Music Group's further performance; and (iii) King Music Group did in fact pay Pa Pah and/or Lumpkin the sum of \$350,000. The Court is respectfully referred to the Settlement Agreement and any written correspondence referred to in paragraph 33 for their true terms, meaning and import. To the extent that paragraph 33 calls for a legal conclusion, no response is required.

34. Deny the allegations in paragraph 34 of the Complaint, except aver that: (i) Pa Pah failed, among other things, to enter into a Co-Publishing Agreement and to furnish the exclusive recording services of Lumpkin; (ii) Pa Pah and Lumpkin engaged in recording music and performing for third parties in contravention of the Recording Agreement and Inducement Letter, thereby suspending King Music Group's further performance; and (iii) King Music Group did in fact pay Pa Pah and/or Lumpkin the sum of \$350,000. The Court is respectfully referred to the Settlement Agreement and any written correspondence referred to in paragraph 34 for their true terms, meaning and import. To the extent that paragraph 34 calls for a legal conclusion, no response is required.

35. Deny the allegations in paragraph 35 of the Complaint, except aver that: (i) Pa Pah failed, among other things, to enter into a Co-Publishing Agreement and to furnish the exclusive recording services of Lumpkin; (ii) Pa Pah and Lumpkin engaged in

recording music and performing for third parties in contravention of the Recording Agreement and Inducement Letter, thereby suspending King Music Group's further performance; and (iii) King Music Group did in fact pay Pa Pah and/or Lumpkin the sum of $350,000. The Court is respectfully referred to the Settlement Agreement for its true terms, meaning and import. To the extent that paragraph 35 calls for a legal conclusion, no response is required.

## RESPONSE TO COUNT I

36. In response to paragraph 36 of the Complaint, Defendants repeat and reallege each of their responses to the allegations in paragraphs 1 through 35 of the Complaint, as if fully set forth at length herein.

37. Deny the allegations in paragraph 37 of the Complaint. The Court is respectfully referred to the Settlement Agreement for its true terms, meaning and import. To the extent that paragraph 37 calls for a legal conclusion, no response is required.

38. Deny the allegations in paragraph 38 of the Complaint. "M&A Holdings, LLC," duly formed on April 19, 2007, is a limited liability company organized under the laws of the State of Tennessee. On or about October 11, 2007, M&A Holdings, LLC was renamed "King Music Group, LLC" by the filing of an amendment with the Tennessee Secretary of State's Office. Prior to the formal name change, M&A Holdings, LLC was doing business as "King Music Group, LLC," which was sometimes mistakenly referred to as "King Music Group, Inc." (underlining added). To the extent that paragraph 38 calls for a legal conclusion, no response is required.

39. Deny the allegations in paragraph 39 of the Complaint. To the extent that paragraph 39 calls for a legal conclusion, no response is required.

10

40. Deny the allegations in paragraph 40 of the Complaint. To the extent that paragraph 40 calls for a legal conclusion, no response is required.

41. Deny the allegations in paragraph 41 of the Complaint, except aver that: (i) Pa Pah failed, among other things, to enter into a Co-Publishing Agreement and to furnish the exclusive recording services of Lumpkin; (ii) Pa Pah and Lumpkin engaged in recording music and performing for third parties in contravention of the Recording Agreement and Inducement Letter, thereby suspending King Music Group's further performance; and (iii) King Music Group did in fact pay Pa Pah and/or Lumpkin the sum of $350,000. The Court is respectfully referred to the Settlement Agreement and any written correspondence implicitly referred to in paragraph 41 for their true terms, meaning and import. To the extent that paragraph 41 calls for a legal conclusion, no response is required.

42. Deny the allegations in paragraph 42 of the Complaint.

43. Deny the allegations in paragraph 43 of the Complaint, except respectfully refer the Court to the Settlement Agreement for its true terms, meaning and import. To the extent that paragraph 43 calls for a legal conclusion, no response is required.

## RESPONSE TO COUNT II

44. In response to paragraph 44 of the Complaint, Defendants repeat and reallege each of their responses to the allegations in paragraphs 1 through 43 of the Complaint, as if fully set forth at length herein.

45. Deny the allegations in paragraph 45 of the Complaint.

46. Deny the allegations in paragraph 46 of the Complaint.

47. Deny the allegations in paragraph 47 of the Complaint, except aver that Michael Bourné is a member and authorized representative of M&A Holdings, LLC, duly formed on April 19, 2007, which is a limited liability company organized under the laws of the State of Tennessee. On or about October 11, 2007, M&A Holdings, LLC was renamed "King Music Group, LLC" by the filing of an amendment with the Tennessee Secretary of State's Office. Prior to the formal name change, M&A Holdings, LLC was doing business as "King Music Group, LLC," which was sometimes mistakenly referred to as "King Music Group, Inc." (underlining added). To the extent that paragraph 47 calls for a legal conclusion, no response is required.

48. Deny the allegations in paragraph 48 of the Complaint and expressly deny making any false representations and/or omissions.

49. Deny the allegations in paragraph 49 of the Complaint and expressly deny making any false representations and/or omissions.

50. Deny the allegations in paragraph 50 of the Complaint and expressly deny any fraud and/or other wrongdoing.

51. Deny the allegations in paragraph 51 of the Complaint and expressly deny any fraud and/or other wrongdoing.

## RESPONSE TO COUNT III

52. In response to paragraph 52 of the Complaint, Defendants repeat and reallege each of their responses to the allegations in paragraphs 1 through 51 of the Complaint, as if fully set forth at length herein.

53. Deny the allegations in paragraph 53 of the Complaint and expressly deny making any false representations of material facts or concealing any material facts. The

Court is respectfully referred to the Recording Agreement, Inducement Letter and Settlement Agreement for their true terms, meaning and import. To the extent that paragraph 53 calls for a legal conclusion, no response is required.

54. Deny the allegations in paragraph 54 of the Complaint and expressly deny making any false representations and/or omissions.

55. Deny the allegations in paragraph 55 of the Complaint, except aver that Michael Bourné is a member and authorized representative of M&A Holdings, LLC, duly formed on April 19, 2007, which is a limited liability company under the laws of the State of Tennessee. On or about October 11, 2007, M&A Holdings, LLC was renamed "King Music Group, LLC" by the filing of an amendment with the Tennessee Secretary of State's Office. Prior to the formal name change, M&A Holdings, LLC was doing business as "King Music Group, LLC," which was sometimes mistakenly referred to as "King Music Group, Inc." (underlining added). To the extent that paragraph 55 calls for a legal conclusion, no response is required.

56. Deny the allegations in paragraph 56 of the Complaint and expressly deny making any false representations and/or omissions.

57. Deny the allegations in paragraph 57 of the Complaint and expressly deny making any false representations and/or omissions.

58. Deny the allegations in paragraph 58 of the Complaint and expressly deny any fraud and/or other wrongdoing.

59. Deny the allegations in paragraph 59 of the Complaint and expressly deny any fraud and/or other wrongdoing.

60. Deny the allegations in paragraph 60 of the Complaint and expressly deny any fraud and/or other wrongdoing.

## RESPONSE TO COUNT IV

61. In response to paragraph 61 of the Complaint, Defendants repeat and reallege each of their responses to the allegations in paragraphs 1 through 60 of the Complaint, as if fully set forth at length herein.

62. Deny the allegations in paragraph 62 of the Complaint, except respectfully refer the Court to the Recording Agreement and Inducement Letter for their true terms, meaning and import. To the extent that paragraph 62 calls for a legal conclusion, no response is required.

63. In response to paragraph 63 of the Complaint, the Court is respectfully referred to the Recording Agreement and Inducement Letter for their true terms, meaning and import. To the extent that paragraph 63 calls for a legal conclusion, no response is required.

64. Admit the allegation in paragraph 64 of the Complaint that Plaintiffs filed the New York State Action against the named Defendants and respectfully refer the Court to Exhibit B to the Complaint for the allegations and claims asserted therein.

65. Deny the allegations in paragraph 65 of the Complaint, except aver that Defendant M&A Holdings, LLC and Michael Bourné signed the Settlement Agreement, dated October 9, 2007, which is attached as Exhibit C to the Complaint.

66. Deny the allegations in paragraph 66 of the Complaint, except aver that Defendant M&A Holdings, LLC (which was mistakenly referred to as d/b/a "King Music Group, Inc.") and Michael Bourné signed the Settlement Agreement, dated October 9,

14

2007, which is attached as Exhibit C to the Complaint. The Court is respectfully referred to the Settlement Agreement for its true terms, meaning and import. To the extent that paragraph 66 calls for a legal conclusion, no response is required.

67. Deny the allegations in paragraph 67 of the Complaint, except aver that: (i) Pa Pah failed, among other things, to enter into a Co-Publishing Agreement and to furnish the exclusive recording services of Lumpkin; (ii) Pa Pah and Lumpkin engaged in recording music and performing for third parties in contravention of the Recording Agreement and Inducement Letter, thereby suspending King Music Group's further performance; and (iii) King Music Group did in fact pay Pa Pah and/or Lumpkin the sum of $350,000. The Court is respectfully referred to the Settlement Agreement for its true terms, meaning and import. To the extent that paragraph 67 calls for a legal conclusion, no response is required.

68. Deny the allegations in paragraph 68 of the Complaint, except aver that: (i) Pa Pah failed, among other things, to enter into a Co-Publishing Agreement and to furnish the exclusive recording services of Lumpkin; (ii) Pa Pah and Lumpkin engaged in recording music and performing for third parties in contravention of the Recording Agreement and Inducement Letter, thereby suspending King Music Group's further performance; and (iii) King Music Group did in fact pay Pa Pah and/or Lumpkin the sum of $350,000. The Court is respectfully referred to the Settlement Agreement for its true terms, meaning and import. To the extent that paragraph 68 calls for a legal conclusion, no response is required.

69. Admit the allegations in paragraph 69 of the Complaint that Defendant King Music Group, LLC (which entity was previously sometimes mistakenly referred to

as King Music Group, Inc. (underlining added)), and Michael Bourné have complied with any and all of their obligations under the Recording Agreement, Inducement Letter and Settlement Agreement.

70. Deny the allegations in paragraph 70 of the Complaint, except aver that Plaintiffs should be adjudicated and declared bound by their agreements under the Recording Agreement, Inducement Letter and Settlement Agreement, or those agreements should be rescinded, as demanded in the Counterclaims, with any and all consideration paid to and received by Pa Pah and/or Lumpkin disgorged to King Music Group.

71. Deny the allegations in paragraph 71 of the Complaint, except aver that Plaintiffs should be adjudicated and declared bound by their agreements under the Recording Agreement, Inducement Letter and Settlement Agreement, or those agreements should be rescinded, as demanded in the Counterclaims, with any and all consideration paid to and received by Pa Pah and/or Lumpkin disgorged to King Music Group.

72. Deny the allegations in paragraph 72 of the Complaint.

73. Deny the allegations in paragraph 73 of the Complaint.

## FIRST DEFENSE

74. The Complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

75. The Complaint is barred because Plaintiffs have failed to comply with a condition precedent in the Recording Agreement.

## THIRD DEFENSE

76. Plaintiffs lack standing to pursue the Complaint.

16

**FOURTH DEFENSE**

77. Plaintiffs have improperly named King Music Group, Inc. (underlining added) as a party to this action.

**FIFTH DEFENSE**

78. The Complaint is barred by the doctrine of payment and/or set-off.

**SIXTH DEFENSE**

79. The Complaint is barred by the doctrine of accord and satisfaction.

**SEVENTH DEFENSE**

80. Plaintiffs are barred from asserting or otherwise pursuing the Complaint based on their consent, approval, and/or ratification.

**EIGHTH DEFENSE**

81. Plaintiffs are equitably and/or promissorily estopped from asserting and otherwise pursuing the Complaint.

**NINTH DEFENSE**

82. To the extents Plaintiffs seek equitable relief in the Complaint, they are barred from asserting and otherwise pursuing equitable claims based on the doctrine of unclean hands.

**TENTH DEFENSE**

83. Plaintiffs failed to provide proper notice of breach, and the opportunity to cure any such breach, in accordance with the terms of their agreements with King Music Group and are barred from pursuing the Complaint.

**ELEVENTH DEFENSE**

84. Defendants have not engaged in any willful or improper conduct.

## TWELFTH DEFENSE

85.  Plaintiff's conduct is unreasonable, vexatious and contrary to well settled-

law.

## THIRTEENTH DEFENSE

86.  The Complaint fails to allege a justiciable controversy.

## COUNTERCLAIMS

### Introductory Statement

87.  As set forth in these Counterclaims, the only thing "genuine" about Elgin Baylor Lumpkin p/k/a "Ginuwine" was his unbridled desire to loot King Music Group and Michael Bourné of as much of their money as possible, while performing no services under the Recording Agreement.  Instead, Counterclaim-Defendants Pa Pah and Lumpkin willfully intended to destroy, and succeeded in destroying, the very purpose of that agreement by recording for others with King Music Group's money, despite Lumpkin's contractual obligation to record exclusively for King Music Group.

88.  Counterclaim-Defendants achieved their predatory ends by coercing Mr. Bourné to advance money and property to which they were not contractually entitled under the applicable agreements, and by threatening to cause and causing collateral damage to Mr. Bourné if he did not quickly settle, on terms they dictated, a baseless action they filed in New York State court.

89.  Indeed, by Counterclaim-Defendants' failure to enter into a Co-Publishing Agreement – a necessary precondition to the very existence of the Recording Agreement – King Music Group had the right to terminate the Recording Agreement, without any

18

payment to Pa Pah or Lumpkin, who have, nevertheless, reaped undeserved financial benefits that they must now disgorge.

90.  By the Counterclaims set forth below, King Music Group seeks to rescind the Recording Agreement, as amended, because of Counterclaim-Defendants' utter failure to satisfy a condition precedent to its formation, *i.e.*, entering into the Co-Publishing Agreement.

91.  In the event that the Court determines that a contract was formed between the parties, then King Music Group seeks a negative injunction barring Pa Pah from furnishing Lumpkin's recording services, and Pa Pah and Lumpkin from, among other things, recording music embodying Lumpkin's vocal and/or musical performances for anyone other than King Music Group until the expiration of the full term of the Recording Agreement, as amended.

92.  Further, King Music Group is entitled to, among other things, damages arising from Counterclaim-Defendants' breach of the Recording Agreement, as amended.

## PARTIES AND JURISDICTION

93.  Counterclaimant Michael Bourné is a citizen and resident of the State of Tennessee.

94.  Counterclaimant King Music Group is a citizen of the State of Tennessee. It is a limited liability corporation organized under the laws of the State of Tennessee, maintaining its principal place of business at 6625 Lenox Park Drive, Memphis, Tennessee.  King Music Group was formerly named M&A Holdings, LLC ("M&A Holdings").  Prior to its formal name change, M&A Holdings was doing business as "King Music Group, LLC," which was sometimes mistakenly referred to as "King Music

Group, Inc." (underlining added).  King Music Group, LLC is the asset holder of the Recording Agreement.

95.  Upon information and belief, Counterclaim Defendant Pa Pah is a citizen of the State of Maryland, maintaining its principal place of business at 12408 Plantation Drive, Brandywine, Maryland.

96.  Upon information and belief, Counterclaim Defendant Lumpkin is a citizen and resident of the State of Maryland.

## FACTS COMMON TO ALL COUNTERCLAIMS

97.  Following a business trip to Miami in March 2007, Mr. Bourné was contacted by Darrin Sherry, whom Mr. Bourné met while in Florida.  Mr. Sherry was acquainted with Elgin Baylor Lumpkin, the recording artist and performer professionally known as "Ginuwine."  Mr. Sherry informed Mr. Bourné that Lumpkin was looking for an investor to launch a record label.

98.  Mr. Sherry told Mr. Bourné that this was a great opportunity and urged him to act promptly.  Although Mr. Bourné had limited experience in the music business, he was aware of Lumpkin's prior success as a singer and recording artist.

99.  Lumpkin, Mr. Sherry, and Mark Morales, a Miami deejay, traveled to Memphis in late March or early April 2007, where they met with Mr. Bourné at his home to persuade Mr. Bourné to establish a record label.  Mr. Bourné was interested in the concept, having previously created several successful business ventures.

100.  On or about April 19, 2007, M&A Holdings was duly formed as the intended vehicle for the newly-created label, King Music Group.  Prior to M&A Holdings'

formal name change to "King Music Group, LLC," King Music Group was sometimes mistakenly referred to as King Music Group, Inc. (underlining added).

101. On or about May 8, 2007, Pa Pah, on behalf of Lumpkin, and King Music Group entered into the Recording Agreement, whereby King Music Group secured, among other things, the exclusive rights to Lumpkin's recording services.

**The Recording Agreement**

102. The Recording Agreement at ¶1.01(a) provides that Plaintiffs "hereby represent, warrant and agree that during the term of this agreement, you will render your exclusive recording services to Company in the Territory as provided herein."

103. Paragraph 1.06 further provides, *inter alia*, that: "You warrant and represent that Artist will not perform for any Person other than Company (and neither you nor Artist will license or consent to or permit the use by any Person other than Company of Artist's name or likeness) for or in connection with the recording or exploitation of any Record embodying a Composition recorded by Artist under this agreement prior to the later of (i) the date five (5) years after the date of Delivery hereunder to Company of the last Master embodying that Composition, or (ii) the date two (2) years after the expiration or termination of the term of this agreement or any subsequent agreement between Company and you or Artist or any other Person furnishing Artist's recording services."

104. In the Inducement Letter, Lumpkin confirmed the exclusive rights to his recording services that were granted to King Music Group under the Recording Agreement, as follows: "Pursuant to an exclusive recording contract (the "Recording Contract") between Pa Pah Productions, Inc. ("Company") and me, Company is entitled to my exclusive services as a recording artist and is the sole owner of the entire worldwide

right, title and interest in and to the results and proceeds of my services as a recording artist under the Recording Contract, including, without limitation, master recordings embodying my performances and the phonograph records derived therefrom. I have been advised that Company is entering into a written agreement with you [King Music Group] (the "Agreement"), pursuant to which Company is agreeing to furnish my services as a recording artist exclusively to you and pursuant to which you shall be the sole owner of the entire worldwide right, title and interest in and to the results and proceeds of my services as a recording artist."

105. Paragraph 13.03 of the Recording Agreement acknowledges the "special, unique, unusual, extraordinary and intellectual character" of Lumpkin's services, "the loss of which cannot be reasonably or adequately compensated for by damages in an action at law." Accordingly, because a breach of such services would cause King Music Group irreparable damages, King Music Group is "entitled to seek injunctive and other equitable relief, in addition to whatever legal remedies are available, to prevent or cure any such breach or threatened breach." The Inducement Letter, at ¶7, has similar extraordinary protections in favor of King Music Group in connection with Lumpkin's unique and special services as a recording artist.

106. Pursuant to ¶6 of the Inducement Letter, Lumpkin agreed that King Music Group "may, in your name, institute any action or proceeding against me individually or collectively, at your election, to enforce your rights under the Agreement, under this guarantee or under the Recording Contract."

22

**The Basic Terms Agreement**

107. As provided in the document entitled "Basic Terms Agreement," which is dated as of May 8, 2007, and made a part of the Recording Agreement (and which is attached as Exhibit A to the Complaint), the Recording Agreement was for an initial period plus two option periods, thereby potentially obligating Pa Pah, by its obligation to furnish the exclusive recording services of Lumpkin, to deliver up to three (3) albums.

108. Paragraph 3(a) of the Basic Terms Agreement further provides for the payment of Artist Advances as follows: "Albums 1-3: $1,000,000 per Album. Company shall pay you, as a non-returnable Advance **(subject to paragraph 9 below)**, $750,000 (to be deducted equally from each of the Recording Funds for Albums 1-3, *i.e.*, $250,000 from the each such Recording Fund), paid as follows: $500,000 upon full execution of this Agreement ("Execution Advance"); and $250,000 upon Delivery of Album 1." (emphasis added). Pursuant to ¶3(b), all of the advances were recoupable from Lumpkin's share of Net Profits.

109. Pursuant to ¶9 of the Basic Terms Agreement, as referenced in the preceding paragraph, King Music Group possessed the absolute right to terminate the Recording Agreement if the parties failed to negotiate a Co-Publishing Agreement. Paragraph 9 of the Basic Terms Agreement thus provides: "In order to induce Company to execute this Agreement (it being to Artist's benefit as a recording artist that Company execute same) and to pay good and valuable consideration inuring to Artist's benefit under this Agreement, Artist hereby agrees that Company shall not be obligated or required to allow Artist to commence recording the Album to be delivered in connection with the Recording Commitment for the initial Contract Period of the Agreement, **unless the**

23

**parties hereto negotiate and execute a co-publishing agreement** (the "Co-Publishing Agreement"). [emphasis added]. In the event the parties fail, after good faith negotiations, to execute a Co-Publishing Agreement within the time prescribed in the preceding sentence, **Company shall have the right to terminate this Agreement.**" (emphasis added).

110. The parties never negotiated or executed a Co-Publishing Agreement, thus authorizing King Music Group to terminate the Recording Agreement for failure of the condition precedent.

111. Paragraph 4.01 of the Recording Agreement granted King Music Group prior approval and control over the budget for recording sessions: "You will conduct recording sessions only after you and Company mutually approve in writing the individual producer, the places of recording, the Compositions to be recorded and after you obtain Company's written approval of the Authorized Budget, provided that in the event of a disagreement in respect of times or places of recording or selection of producers, Company's decision shall be final."

## The Failure to Satisfy the Condition Precedent

112. Mr. Bourné purchased a 2007 Rolls Royce for the King Music Group to add glamour and enhance its image. Once Lumpkin was signed to the label, it was intended that Lumpkin would have use of the car, while ownership remained in the company's name.

113. Mr. Bourné soon recognized that Counterclaim-Defendants would receive excessive advances and compensation on what was potentially only a one-album deal for King Music Group.

24

114. Moreover, Counterclaim-Defendants failed to enter into any negotiations for the Co-Publishing Agreement, which was a condition precedent for King Music Group's obligation under the Recording Agreement.

115. Mr. Bourné attempted to contact Lumpkin with respect to these crucial issues before paying the $500,000 Execution Advance under the Recording Agreement, but his calls were unreturned and Lumpkin's e-mail communications were unresponsive.

116. Indeed, Lumpkin was out of the country on a tour during the summer months and at inaccessible retreats at various times.

**The New York State Action**

117. On or about October 3, 2007, even though Counterclaim-Defendants had not entered into the required Co-Publishing Agreement, and thus no advances were then due, they precipitously filed a baseless action in New York State Supreme Court against Counterclaimants alleging (i) breach of contract for the purported non-payment of the $500,000 Execution Advance and (ii) fraud on the basis that there was no entity named King Music Group, Inc. (underlining added). Copies of the Summons and Complaint are attached as Exhibit B to the Complaint in this action.

118. The lawsuit and, in particular, the spurious fraud allegations, were calculated to cause collateral damage to Mr. Bourné's investments. Indeed, as a result of the tabloid nature of the allegations against Mr. Bourné for fraud, several of his bank relationships were endangered and loans that were in good standing were suddenly called solely as a result of the negative global media attention that was given to the meritless claims peddled by Lumpkin, an internationally-recognized celebrity.

119. Although Counterclaim-Defendants had not negotiated the requisite Co-Publishing Agreement or performed any service under the Recording Agreement, Counterclaim-Defendants, keenly aware of the acute financial pressure that the lawsuit placed on Mr. Bourné, used those circumstances to force Mr. Bourné to rashly and unnecessarily settle the New York State Action. Mr. Bourné was not represented by independent counsel.

120. The ensuing Settlement Agreement of the New York State Action, Exhibit C to the Complaint, amended the Recording Agreement in certain respects, but did not otherwise affect its terms, which dispose of Counterclaim-Defendants' illusory and baseless claims.

## The Settlement Agreement

121. The Settlement Agreement provides, among other things, that Mr. Bourné deliver a certified check in the amount of $250,000 for Lumpkin's benefit and a certified check in the amount of $100,000 payable to Lumpkin's lawyer to be held in trust for Lumpkin. Mr. Bourné timely, but unnecessarily, paid these sums.

122. The Settlement Agreement also provides that Lumpkin share title in the company's Rolls Royce.

123. In addition, the Settlement Agreement provides that Mr. Bourné establish a line of credit for $1,000,000 "for all costs incurred in connection with the recording of the First Album **under the terms of the aforesaid Agreement**." (emphasis added). The Settlement Agreement further provides that Lumpkin, his representatives, Louis Bush (Lumpkin's manager) and Terence Williams would receive individual American Express Black Cards with respect to this line of credit. The Settlement Agreement provides that

26

Messrs. Bourné and Bush would negotiate deals for certain budget items together, but did not abrogate King Music Group's absolute authority to approve the budget for the album.

124. The Settlement Agreement provides for Mr. Bourné to pay $250,000 within five days of delivery of the First Album, an event that has never occurred.

125. Finally, although Counterclaim-Defendants base their spurious fraud claim in both this action and the New York State Action, on the grounds that there was no entity entitled King Music Group, Inc., the Settlement Agreement provides that Lumpkin be granted a 50% interest in the net profits derived by Mr. Bourné and/or King Music Group, Inc.

126. Lumpkin and his counsel, Joseph E. Porter, Esq., who drafted the Settlement Agreement, were obviously untroubled about obtaining a 50% interest in King Music Group, Inc., an entity which they claimed in a lawsuit did not exist. Moreover, the Settlement Agreement was entered into between Pa Pah and Lumpkin, on the one hand, and "M&A Holdings LLC d.b.a. King Music Group, Inc." (underlining added), on the other.

127. Following the execution of the Settlement Agreement, Lumpkin's current attorneys were provided with documentation of the name change of M&A Holdings to King Music Group, LLC (underlining added). Thus, they were or should have been aware that the use of the word "Inc." in connection with King Music Group was completely inadvertent, and had been corrected on October 11, 2007, when M&A Holdings formally changed its name with the Tennessee Secretary of State.

128. In or about November 2007, Lumpkin's representatives submitted a budget for $389,850, and repeatedly demanded that the $1,000,000 line of credit be

established and they immediately be issued American Express Black cards to draw on the credit line. However, no monies for recording sessions were due until and unless: (i) the parties negotiated a Co-Publishing Agreement, an event which never occurred, and (ii) King Music Group "approved" the budget by the requisite writing, which event also never occurred. Moreover, the proposed budget included a preposterous $87,500 item to build a home recording studio in Lumpkin's Maryland residence for his personal convenience.

129. Under the foregoing circumstances, Counterclaim-Defendants' demands for the establishment of the line of credit and the American Express Black cards were premature and unreasonable, and Mr. Bourné and King Music Group properly delayed and later refused to make such funds available for unapproved recording sessions.

130. In addition to (i) making spurious fraud allegations regarding the inadvertent and inconsequential use of the word "Inc.," instead of "LLC," (ii) failing to negotiate a Co-Publishing Agreement as a precondition to the Recording Agreement, and (iii) prematurely and unreasonably demanding access to a $1,000,000 line of credit before approving the budget or considering or resolving any production matters, Counterclaim-Defendants willfully breached the Recording Agreement and Inducement Letter by violating the exclusivity provisions that prohibited Lumpkin from rendering his recording services to any third parties.

131. In particular, the media reported that Lumpkin has recorded a collaborative track, *Sex*, with a new recording group, professionally known as "TGT." Such recording activities by Lumpkin constitute a willful violation of the exclusivity provisions of the Recording Agreement, which require that Lumpkin record only for King

28

Music Group.   Counterclaim-Defendants' actions destroy the very purpose of the Recording Agreement, Inducement Letter and the Settlement Agreement.

### FIRST COUNTERCLAIM
### (Preliminary and Permanent Injunction)

132. Counterclaimant King Music Group repeats and realleges the allegations in paragraphs 1 through 131 as if fully set forth at length herein.

133. From inception, Counterclaimant-Defendants have failed to comply with and otherwise perform under the Recording Agreement, as amended, by, among other things, the following: (i) failing to negotiate and enter into a Co-Publishing Agreement; (ii) failing to agree upon a recording budget; and (iii) failing to record and perform exclusively for King Music Group.

134. Counterclaim-Defendants' acts and omissions have deprived and continue to deprive King Music Group of its rights and entitlements under the Recording Agreement, as amended, and have injured and continue to injure Counterclaimant's business.

135. Counterclaim-Defendant Pa Pah is obligated to furnish, and Counterclaim-Defendant Lumpkin is obligated to perform, his exclusive recording services to King Music Group under the Recording Agreement, as amended, which Lumpkin expressly recognized to be of a special, unique, unusual, extraordinary and intellectual character. King Music Group is entitled, in the event of a breach or threatened breach of this exclusivity provision, to injunctive and other equitable relief.

136. Upon information and belief, Lumpkin has performed his recording services for third parties, including a collaborative track, *Sex*, with a new recording group professionally known as "TGT." Lumpkin's activities willfully violate the exclusivity

provisions of the Recording Agreement, as amended, which requires that he record only for King Music Group.

137. Unless Counterclaim-Defendants, their directors, officers, employees, representatives, agents, servants, subsidiaries, affiliates, divisions, attorneys and all persons acting in concert or privity or participation with them, are preliminarily and permanently enjoined and restrained from violating the Recording Agreement, including but not limited to, creating, manufacturing, distributing, releasing, marketing, advertising, promoting, displaying, offering to sell, and selling any sound recordings, videos and videograms embodying Lumpkin's vocal and/or musical performances until the expiration the full term of the Recording Agreement, as amended, King Music Group will continue to suffer irreparable injury.

138. King Music Group has no adequate remedy at law.

## SECOND COUNTERCLAIM
### (Impoundment And Destruction)

139. Counterclaimant King Music Group repeats and realleges the allegations in paragraphs 1 through 131 as if fully set forth at length herein.

140. Counterclaimant-Defendants' acts and omissions have deprived and continue to deprive King Music Group of its rights and entitlements under the Recording Agreement, as amended, and have injured and are continuing to injure Counterclaimant's business.

141. King Music Group is entitled to an order requiring Counterclaim-Defendants to deliver up on oath and to impound all copies of all sound recordings, videos and videograms embodying the vocal and/or musical performances of Lumpkin that have been created or are now being created in violation of the Recording Agreement, as

30

amended, and to further deliver up for destruction, at Counterclaimant's discretion, all such copies, together with any and all materials and matter used in making such unauthorized product, including, without limitation, the original and all copies of the multi-track master tapes, two-track stereo masters in analog and DAT format, films, video, digital files and computer tape.

142.  Counterclaimant has no adequate remedy at law.

### THIRD COUNTERCLAIM
### (Accounting)

143.  Counterclaimant King Music Group repeats and realleges the allegations in paragraphs 1 through 131 as if fully set forth at length herein.

144.  Counterclaim-Defendants have a duty and obligation to account to King Music Group with respect to their unauthorized exploitation of the collaborative track, *Sex*, with "TGT" as well as the creation and exploitation of any other sound recordings embodying the vocal and/or musical performances of Lumpkin.

145.  Counterclaimant has no adequate remedy at law.

146.  Counterclaimant is entitled to an accounting.

### FOURTH COUNTERCLAIM
### (Constructive Trust)

147.  Counterclaimant King Music Group repeats and realleges the allegations in paragraphs 1 through 131 as if fully set forth at length herein.

148.  Counterclaim-Defendants have exploited the collaborative track, *Sex*, with "TGT" as well as created and exploited, upon information and belief, other sound recordings embodying the vocal and/or musical performances of Lumpkin.

31

149.  Counterclaim-Defendants have acquired property and collected funds that belong to, and should be enjoyed by, King Music Group, which cannot in good conscience be retained by them.

150.  Counterclaim-Defendants acquired and obtained said property and funds under the misrepresentation that they were entitled to the proceeds from the exploitation of Lumpkin's recorded vocal and/or musical performances.

151.  Counterclaimant has no adequate remedy at law.

152.  Counterclaimant is entitled to a constructive trust.

## FIFTH COUNTERCLAIM
### (Breach of Contract)

153.  Counterclaimant King Music Group repeats and realleges the allegations in paragraphs 1 through 131 as if set forth at length herein.

154.  Counterclaim-Defendants have materially breached the Recording Agreement, as amended.

155.  King Music Group has faithfully performed, and continues to be ready, willing and able to perform, its duties and obligations under the Recording Agreement, as amended.

156.  Counterclaim-Defendants have deprived and continue to deprive Counterclaimants of its rights and benefits under the Recording Contract, as amended, causing compensatory damages and injury to its business, reputation and goodwill.

157.  By reason of the foregoing, Counterclaimant King Music Group has sustained damages in an amount to be determined at trial, but not less than $500,000.

## SIXTH COUNTERCLAIM
### (Breach of Duty of Good Faith and Fair Dealing)

158. Counterclaimant King Music Group repeats and realleges the allegations in paragraphs 1 through 131 as if fully set forth at length herein.

159. Counterclaim-Defendants have materially breached the duty of good faith and fair dealing under the Recording Agreement, as amended.

160. By reason of the foregoing, King Music Group has sustained damages in an amount to be determined at trial, but not less than $500,000.

## SEVENTH COUNTERCLAIM
### (Unjust Enrichment)

161. Counterclaimants King Music Group and Michael Bourné repeat and reallege the allegations in paragraphs 1 through 131 as if fully set forth at length herein.

162. The monies paid to and property received by Counterclaim-Defendants constitute to a benefit conferred upon and accepted by them.

163. Counterclaim-Defendants obtained said benefits without providing Counterclaimants any reciprocal benefits.

164. By reason of the foregoing, Counterclaim-Defendants have been unjustly enriched in an amount not less than $500,000.

## EIGHTH COUNTERCLAIM
### (Rescission)

165. Counterclaimant King Music Group and Michael Bourné repeat and reallege the allegations in paragraphs 1 through 131 as if set forth at length herein.

166. Counterclaim-Defendants have willfully breached the Recording Agreement, as amended, and/or have destroyed the very purpose of that agreement.

33

167. Based on Counterclaim-Defendants' acts and omissions, King Music Group and Michael Bourné are entitled to rescind the Recording Agreement, as amended, and Counterclaim-Defendants must disgorge all monies paid and property received by them.

168. Counterclaimants have no adequate remedy at law.

## NINTH COUNTERCLAIM
### (Declaratory Judgment)

169. Counterclaimants King Music Group and Michael Bourné repeat and reallege the allegations in paragraphs 1 through 131 as if set forth at length herein.

170. An actual and justiciable controversy presently exists between Counterclaimants, on the one hand, and Counterclaim-Defendants, on the other hand, such that Counterclaimants request this Court to declare that: (i) the Recording Agreement and Settlement Agreement are invalid and of no force or effect and (ii) Counterclaim-Defendants must disgorge all monies paid and property received by them under those agreements.

171. A declaration by this Court is necessary to determine the rights of the parties' under the Recording Agreement and Settlement Agreement.

172. Counterclaimants have no adequate remedy at law.

WHEREFORE, Defendants-Counterclaimants respectfully request that the Court grant the following relief:

(a) Dismissal of the Complaint in its entirety against Defendants;

(b) On the First Counterclaim, awarding King Music Group a preliminary and permanent injunction enjoining and restraining Counterclaim-Defendants, their directors, officers, employees, representatives, agents, servants, subsidiaries, affiliates, divisions,

34

attorneys and all persons acting in concert or privity or participation with them, from violating the Recording Agreement by creating, manufacturing, distributing, releasing, marketing, advertising, promoting, displaying, offering to sell, and selling any sound recordings, videos and videograms embodying Lumpkin's vocal and/or musical performances until the expiration the full term of the Recording Agreement;

(c) On the Second Counterclaim, awarding King Music Group an order requiring Counterclaim-Defendants to deliver up on oath and to impound all copies of all sound recordings, videos and videograms embodying the vocal and/or musical performances of Lumpkin that have been created or are now being created in violation of the Recording Agreement, and to further deliver up for destruction, at Counterclaimant's discretion, all such copies, together with any and all materials and matter used in making such unauthorized product, including, without limitation, the original and all copies of the multi-track master tapes, two-track stereo masters in analog and DAT format, films, video, digital files and computer tape;

(d) On the Third Counterclaim, awarding King Music Group an accounting;

(e) On the Fourth Counterclaim, awarding King Music Group a constructive trust;

(f) On the Fifth Counterclaim, awarding King Music Group damages in an amount to be determined at trial, but not less than $500,000;

(g) On the Sixth Counterclaim, awarding King Music Group damages in an amount to be determined at trial, but not less than $500,000;

(h) On the Seventh Counterclaim, awarding King Music Group and Michael Bourné an amount for unjust enrichment to be determined at trial, but not less than $500,000;

(i) On the Eighth Counterclaim, awarding King Music Group and Michael Bourné a judgment rescinding the Recording Agreement and Settlement Agreement;

(j) On the Ninth Counterclaim, awarding a judgment declaring the Recording Agreement and Settlement Agreement are invalid and of no force or effect and declaring that Counterclaim-Defendants must disgorge all monies paid and property received by Counterclaimants under those agreements;

(k) Awarding costs and attorney's fees in favor of Defendants-Counterclaimants, as provided by applicable statute and/or the inherent powers of this Court; and

(l) Awarding such other and further relief as this Court deems just and proper.

Dated:    March 10, 2008
          New York, New York

JONATHAN D. DAVIS, P.C.

By: _____

Jonathan D. Davis (JD 5712)
99 Park Avenue
Suite 1600
New York, New York 10016
(212) 687-5464
Attorneys for Defendants-
Counterclaimants King Music Group,
LLC (incorrectly sued herein as M&A
Holdings, LLC and King Music
Group, Inc.) and Michael Bourné

## JURY DEMAND

Defendants-Counterclaimants hereby demand trial by jury as to all triable

claims, including the Counterclaims

Dated:  March 10, 2008
        New York, New York

JONATHAN D. DAVIS, P.C.

By:

Jonathan D. Davis (JD 5712)
99 Park Avenue
Suite 1600
New York, New York 10016
(212) 687-5464
Attorneys for Defendants-
Counterclaimants King Music Group,
LLC (incorrectly sued herein as M&A
Holdings, LLC and King Music
Group, Inc.) and Michael Bourné

37